1   JORGE I. HERNANDEZ, ESQ. (SBN 263617)
    Law Offices of Jorge I. Hernandez
2   823 Anchorage Place
    Chula Vista, CA 91914
3   Ph: (619) 475-6677; Fax: (619) 475-6296

4   ~~Attorney~~Email; jorge@jihlaw.com

5   JORGE I. HERNANDEZ Daniel M. Smith, Esq. (SBN 149334)
    SAN DIEGO DEFENDERS APC
6   585 Third Avenue
    Chula Vista CA 91910
7   Ph: (619) 233-6900; Fax: (619) 374-8477
    Email: dsmith@sandiegodefenders.com

8
    Attorneys for ~~Plaintiff~~ Plaintiffs
9

10

11

12                SUPERIOR UNITED STATES DISTRICT COURT OF THE STATE

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15
    ELIZABETH JIMINEZ, individually,          CASE NO. 3:18-cv-1269-BTM-AGS
16  and as successor in interest of           (CONSOLIDATED 3:17-cv-1205)
    FERNANDO GEOVANNI LLANEZ,
17  deceased; FERNANDO LLANEZ,                **PLAINTIFFS' SECOND**
    individually, and as successor in interest **AMENDED COMPLAINT FOR**
18  of FERNANDO GEOVANNI LLANEZ,              **DAMAGES**
    deceased                                  **1. Violation of Federal Civil Rights**
19                                               **[42 USC §§ 1983]**
                        Plaintiffs,           **2. Bivens Claim Pursuant to Bivens**
20                                               **v. Six Unknown Named Fed.**
          vs.                                    **Narcotics Agents**
21                                            **3. Wrongful Death [C.C.P § 377.60]**
    THE UNITED STATES OF AMERICA;                **A. Assault and Battery;**
22  CITY OF CHULA VISTA, a public                **B. Negligence;**
    entity; RONALDO RICARDO             **4. Wrongful Death/Survival (Federal**
23  GONZALEZ, an individual;                     **Tort Claims Act/GC§815.2(a)) –**
    MARCUS OSORIO, an individual;                **Battery**
24  CHRIS BARONI, an individual;         **5. Wrongful Death/Survival (Federal**
    ANGELA SANCHEZ, an individual;               **Tort Claims Act) – Negligence**
25  MICHAEL BURBANK, an individual;      **6. Violation of Federal Civil Rights**
    JEREMY DORN, an individual;                  **(Claim for Conspiracy)**
26  ANTHONY CASTELLANOS, an                      **[42 USC §§ 1983 & 1985]**
    individual;
27  MEREDITH, an individual; and DOES    *JURY TRIAL DEMANDED*
    1-100, inclusive,
28
                        Defendants.

~~COUNTY OF SAN DIEGO~~

COME NOW, PLAINTIFFS ELIZABETH JIMINEZ AND FERNANDO LLANEZ, DO HEREBY ALLEGE AND COMPLAIN AS FOLLOWS:

1.      Jurisdiction is vested in this court under 28 U.S.C. section 1343, subdivisions 27 (a)(3) and (a)(4), for violations of the Civil Rights Enforcement Act, as amended, including 42 U.S.C. sections 1983 and 1985, and sections 1331 and 1367, subdivision (a). Jurisdiction is also vested in this Court under the ancillary jurisdiction of the Court.

2.      Venue is proper in the Southern District of California and the County of San Diego because the incidents alleged here occurred in this District.

## PARTIES

3.      Plaintiff, ELIZABETH JIMINEZ is a surviving parent of Decedent FERNANDO GEOVANNI LLANEZ, and a Successor in Interest to the Estate of FERNANDO GEOVANNI LLANEZ and at all times mentioned herein was an individual residing in Los Angeles County, State of California. ELIZABETH JIMINEZ, individually, is an 'heir at law' of Decedent FERNANDO GEOVANNI LLANEZ, as that term is defined by the California Code of Civil Procedure Section 377.60(a) and elsewhere and has legal standing to maintain an action for wrongful death based upon the death of her son, FERNANDO GEOVANNI LLANEZ, under California Code of Civil Procedure section 377.60. Plaintiff ELIZABETH JIMINEZ may maintain causes of action under 42 U.S.C. §1983 and as a Federal Wrongful Death Action (28 U.S.C. §2680, et seq.) and recover damages for loss of financial support and the value of the decedent's life under cases interpreting 42 U.S.C. section 1983.

4.     Plaintiff, FERNANDO LLANEZ is a surviving parent of Decedent FERNANDO GEOVANNI LLANEZ, and a Successor in Interest to the Estate of FERNANDO GEOVANNI LLANEZ and at all times mentioned herein was an individual residing in Los Angeles County, State of California. FERNANDO LLANEZ, individually, is an 'heir at law' of Decedent FERNANDO GEOVANNI LLANEZ, as that term is defined by the California Code of Civil Procedure Section 377.60(a) and elsewhere and has legal standing to maintain an action for wrongful death based upon the death of his son, FERNANDO GEOVANNI LLANEZ, under California Code of Civil Procedure section 377.60. Plaintiff FERNANDO LLANEZ may maintain causes of action under 42 U.S.C. §1983, as a Federal Wrongful Death Action (28 U.S.C. §2680, et seq.) and recover damages for loss of financial support and the value of the decedent's life under cases interpreting 42 U.S.C. §1983.

5.     Defendant AGENT RONALDO RICARDO GONZALEZ (AGENT GONZALEZ) is and at all times mentioned herein was, an Agent employed by the Defendant UNITED STATES OF AMERICA (Hereinafter, "USA"), who was acting within the course and scope of his employment as an Agent acting as a member of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

6.     Defendant AGENT MARCUS OSORIO is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was

acting within the course and scope of his employment as an Agent acting as a member of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

7.    Defendant AGENT CHRIS BARONI is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was acting within the course and scope of his employment as an Agent acting as a member of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

8.    Defendant AGENT ANGELA SANCHEZ is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was acting within the course and scope of his employment as an Agent acting as a member of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of hisher employment with the JOINT TASKFORCE

OPERATION at the time heshe undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

9. Defendant TECHINCAL ENFORCEMENT OFFICER MICHAEL BURBANK is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was acting within the course and scope of his employment as an Agent acting as a member of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

10. Defendant AGENT JEREMY DORN is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was acting within the course and scope of his employment as an Agent acting as the supervisor of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the

State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

11.     Defendant AGENT ANTHONY CASTELLANOS is and at all times mentioned herein was, an Agent employed by the Defendant USA, who was acting within the course and scope of his employment as an Agent acting as the supervisor of the "ROAD KILL TEAM" and employed by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who was acting within the course and scope of his employment with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a federal agent under color of federal law, and working with state agents acting under color of state law, and representative of every other defendant, and willfully participated in joint activity with the State or its agents to include OFFICER MARK MEREDITH of the CHULA VISTA POLICE DEPARTMENT.

12.     Defendant OFFICER MARK MEREDITH is and at all times mentioned herein was, an Agent employed by the Defendant CITY OF CHULA VISTA, who was acting within the course and scope of his employment as an Officer, authorized under Cal. Penal Code § 830 et seq. Part of his duties involved acting as a supervisory member of the "ROAD KILL TEAM" and employed and paid solely by the CITY OF CHULA VISTA POLICE DEPARTMENT, who was acting within the course and scope of his employment under color of state law in the State of California, with the JOINT TASKFORCE OPERATION at the time he undertook the activities alleged herein and was, at all times herein mentioned, acting as a California law enforcement officerwith federal agents that were acting under color of state and federal law, and working with state agents acting under color of state law, and representative of every other defendant. OFFICER MARK MEREDITH was an integral part of planning and executing ROADKILL TEAM investigations and

1   operations that were intended to financially benefit the CITY by splitting funds

2   acquired through his involvement in the supervision of any UNITED STATES

3   DEPARTMENT OF HOMELAND SECURITY operation where he was

4   involved.

5       a. OFFICER MARK MEREDITH is and at all times mentioned herein

6   was, employed by the Defendant CHULA VISTA POLICE DEPARTMENT as

7   a detective. As part of his duties, he was assigned by the CHULA VISTA

8   POLICE DEPARTMENT to assist and provide supervisory leadership and

9   guidance for the ROADKILL TEAM on or about June 2016.

10      b. OFFICER MARK MEREDITH was listed as the "Team Leader" in the

11   June 2, 2016 Enforcement Operation Plan (Exhibit A) wherein the Team of

12   agents "intend on conducting an International Controlled Delivery (ICD)

13   containing approximately 2,000 pounds of marijuana" in San Diego, California.

14   On or about May 17, 2016, U.S. Homeland Security Investigations (HSI) agents

15   received information from a Source of Information (SOI) that he/she had

16   information about a specific, but unnamed, drug trafficking organization (DTO)

17   that approached the SOI about providing assistance in the smuggling and

18   transportation of narcotics through the San Diego Ports of Entry to San Diego

19   California. Per the Enforcement Operation Plan, agents were only allowed to

20   conduct the ICD if ~~Agents~~they have determined it will be successful and will

21   ensure that all coordination required is completed and the operation is conducted

22   in a safe manner.

23      c. OFFICER MARK MEREDITH began the subject operation on June 2,

24   2016. The original DTO refused to continue with the purchase. Instead of

25   cancelling the operation~~,~~ that was ostensibly created to dismantle the DTO that

26   was transferring the marijuana, the true intent of the scheme became apparent,

27   the JOINT TASKFORCE OPERATION was intended to provide operating

28   funds for the participating entities. Namely Agents and Officers wanted to

PLAINTIFFS' ~~THIRD~~SECOND AMENDED COMPLAINT FOR DAMAGES                    (CONSOLIDATED 3:17
-cv-1205)

1   collect approximately $200,000 in cash, regardless of whether or not they had

2   proper authority. ROADKILL team members scurried to find another purchaser.

3   A second purchaser was located but also eventually refused to continue. After a

4   second failed purchase, ROADKILL team members became aware of a "broker"

5   that was facilitating a potential purchase of the product to an unknown buyer,

6   thus there was no longer the original DTO, the new buyer was not even a DTO

7   involved inat all. No new authorization was sought to complete the ICD. On

8   June 14, 2016 OFFICER MARK MEREDITH and the Road KillROADKILL

9   team were briefed at 8:30 AM to pick up a van dropped ofoff by a different

10   suspect, recently identified by the Confidential Informant (CI), and to load said

11   van with 2,000 lbspounds of marijuana the team had been storing in a Federal

12   facility.

13        d. OFFICER MARK MEREDITH was the supervisor of the cover team

14   that was tasked on the morning of June 14, 2016 to make sure that HSI

15   undercover agent Castellanos got away safe with the empty van and to load it

16   with the 2,000 lbspounds of  marijuana which was accomplished by OFFICER

17   MARK MEREDITH and others.

18        e. Chula Vista Police Department personnel were in constant radio contact

19   with law enforcement on the ground and in the air to advise that ICE will be

20   conducting an undercover operation in a unmarked vehicles, that agents were in

21   area for a drug exchange and specifically "Mark Meredith will be onthe

22   supervisor for the operation".

23        df. OFFICER MARK MEREDITH was operating underthe supervisor of

24   an Operation Plan which required that:

25        i. Once the existence of narcotics has been confirmed, the HSI

26        Undercover Agent (UCA) will contact a representative of the DTO and

27        arrange for the delivery of the narcotics and pickup of the transportation

28        fees.

ii. HSI agents will utilize a tracking device to assist in maintaining control of the narcotic laden vehicle, once it is in the possession of the DTO.

iii. Air support will also be requested and utilized if available.

iv. The SOI communicating with the DTO is to agree on a general area of delivery in San Diego, California (CA).

/ / /

/ / /

v. Upon arrival to the yet to be determined location in San Diego, HSI agents will wait for the UCA to park and exit the vehicle, leaving the keys inside.

vi. The UCA will coordinate with a DTO representative for payment and delivery.

vii. Once the UCA is clear of the scene, local authorities will take over surveillance of the load vehicle and will coordinate independent enforcement action in an attempt to arrest, seize, and prosecute any suspects involved with the load vehicle.

viii. This ICD will fall under one of the established exceptions to the Jones Ruling. All other requirements in the DEA-HSI Memorandum of Understanding for de-confliction and coordination have been met and an ICD number should be issued.

ix. **If at any time during the surveillance it appears that agents are in jeopardy of losing the contraband, the conveyance will be stopped and the narcotics will be seized and secured.**

x. Any individual attempting to make contact with the target vehicle with the intent to assist delivery of the vehicle will be arrested or detained pending further investigation.

xi. Agents will also query all known locations, vehicles, and

1   persons for de-confliction. NO CONFIDENTIAL

2   SOURCES/INFORMANTS OR UNDERCOVER OPERATIONS WILL

3   BE CONDUCTED IN THE REPUBLIC OF MEXICO IN

4   FURTHERANCE OF THIS OPERATION.

5        xii. This operation is part of a certified undercover operation

6   entitled, Operation Road Kill, will use assets from this operation as

7   deemed necessary.

8   e/ / /

9        xiii. For officer safety, the Distress Code oral signal was "Don't

10   hurt me", and the visual signal was to put hands in the air.

11   Exhibit A.

12        g. Initially the transfer of the drug-laden vehicle was planned by

13   OFFICER MARK MEREDITH as the "TEAM LEADER/COVER TEAM" to

14   have been in a location in San Diego and all participants and emergency services

15   were briefed for that location in the City of San Diego. A last-minute change of

16   the location was implemented to a location in Chula Vista that was not briefed

17   properly, and emergency services were not coordinated for the new location.

18   Nevertheless, OFFICER MARK MEREDITH set up surveillance at 2310

19   Proctor Valley Road and along with other Agents and Officers of the Operation

20   Road Kill Team for the exchange of the marijuana with the current potential

21   buyers that were not known to OFFICER MARK MEREDITH, thus there was

22   no way to verify they were part of a known DTO as required by the directives of

23   the ICD. (Exhibit A.) On or about 12:00PM on June 14, 2016 outside of the

24   Subway restaurant in the courtyard outside of the Starbucks located in the same

25   shopping center in Chula Vista, CA. OFFICER MARK MEREDITH was

26   present with Defendant JACQLEEN RILEY, Defendant ANTHONY

27   CASTELLANOS, Defendant AGENT RONALDO RICARDO GONZALEZ

28   and several other ROADKILL and JOINT TASKFORCE OPERATION

CASE NO. 3:18-cv-1269-BTM-AGS

PLAINTIFFS' THIRDSECOND AMENDED COMPLAINT FOR DAMAGES    (CONSOLIDATED 3:17

-cv-1205)

1   personnel to meet with the unknown potential buyers of the drugs and seize

2   approximately $200,000 in exchange for nearly $1,000,000 worth of marijuana.

3          ~~f~~h. While at the shopping center where the exchange was taking place,

4   OFFICER MARK MEREDITH received a group text message that the

5   unidentified potential buyer was leaving for 15 minutes after conducting

6   surveillance with another ROADKILL team member on AGENT GONZALEZ

7   ACTING AS AN Under Cover Agent (UCA) and the unidentified potential

8   buyer for approximately 30 minutes before they moved to a position in front of

9   the Starbucks for better view of UCA AGENT ANTHONY CASTELLANOS,

10  and AGENT GONZALEZ ~~ACTING AS AN UCA~~.

11         ~~g. OFFICER MARK MEREDITH~~      i. JOINT TASKFORCE

12  OPERATION personnel were not in proper communications or view of each

13  other during the operation. Three individuals were present to purchase the

14  marijuana and another two individuals appeared, bringing the total of suspects

15  for a marijuana purchase to five. A reasonable law enforcement professional

16  would know that only one or two individuals appear for a normal undercover

17  drug purchase. When five appear, the likelihood that the drugs will be stolen is

18  virtually certain. Although several Agents were aware of the number of

19  purchasers, none signaled to end the operation and immediately arrest all

20  suspects. AGENT GONZALEZ ACTING AS AN UCA was either not properly

21  briefed, trained or supervised, and failed to give the Distress Code of either

22  saying "Don't hurt me" and did not put his hands in the air. Instead AGENT

23  GONZALEZ ACTING AS AN UCA had wilfully locked the vehicle and took

24  the only set of keys to the van and ran for approximately 9 seconds and yelled

25  "help" before stopping and firing four shots. OFFICER MARK MEREDITH

26  had lost visual contact with AGENT GONZALEZ ACTING AS AN UCA and

27  another ROADKILL Team member was relaying that additional suspects were

28  walking around and one suspect might have gotten in the narcotic laden van

when OFFICER MARK MEREDITH heard one "pop" and then four more, at which time he ran toward AGENT GONZALEZ ACTING AS AN UCA and observed ~~Decedant~~Decedent LLANEZ shot and falling to the ground before OFFICER MARK MEREDITH withdrew his firearm and yelled "police, stop, stop, stop" when a vehicle was heading in his direction.

~~h~~j. OFFICER MARK MEREDITH observed LLANEZ lying on the ground on his stomach and face and being handcuffed by an individual who he believed to be fellow team member. OFFICER MARK MEREDITH then observed AGENT GONZALEZ ACTING AS AN UCA by the old Albertson's grocery store who told him he was "okay." OFFICER MARK MEREDITH saw half of a plastic taser and a taser cartridge near where LLANEZ was shot and had fallen. No first aid was rendered to LLANEZ while he was handcuffed and on the ground on his stomach and bleeding to death from gunshot wounds. OFFICER MARK MEREDITH did not summon medical assistance for Plaintiff LLANEZ.

~~i~~k. OFFICER MARK MEREDITH, immediately called AGENT GONZALEZ acting as an UCA to ask him to return to the scene to give a "safety statement". UC Gonzalez indicated he did not feel safe to return to the scene.

~~j~~l. OFFICER MARK MEREDITH explained what a "safety statement" was to AGENT GONZALEZ acting as an UCA. He then gave a safety statement to OFFICER MARK MEREDITH and told him he had fired 3 to 5 shots in the general direction of the area between the "old Albertson's building and the bank." UC Gonzalez also told OFFICER MARK MEREDITH that he knew he got shot by a taser and he felt the darts.

~~k~~m. OFFICER MARK MEREDITH was able to contact Chula Vista Police at all times during the operation and was in communication with dispatchers yet did not have emergency personnel in position to respond to an

1  injury during the operation.

2      n. Other CITY OF CHULA VISTA personnel were involved in the

3  incident, but were not part of the planning and execution of the JOINT

4  TASKFORCE OPERATION and were thus acting at the behest of OFFICER

5  MARK MEREDITH and Federal Agents in the JOINT TASKFORCE

6  OPERATION between THE CITY OF CHULA VISTA and multiple

7  FEDERAL AGENCIES of the UNITED STATES OF AMERICA. The CHULA

8  VISTA POLICE OFFICERS acting at the behest of others are identified as:

9  Sargent (Sgt) F. Giaime ID 701, Sgt Harris ID 429, Sgt T. Kahl ID 707, Sgt G.

10  Grippo lD 1505, Captain (Cpt) L. Turner ID 465, Lieutenant (Lt) Thunberg ID

11  499, Lt J. Autolino ID 973, Officer (Off) C. Bayless ID 1000, Off C. Zimmer ID

12  1083 Off T. Gonzalez lD 975, Off F. Dominguez lD 923, Off C. Fisher ID 815,

13  Off T. McAtee ID 1101, Sgt M. Varga lD 772, Off L. Ruiz ID 1057, D. Tapper/

14  CVPD Crime Lab, L Ney/CVPD Crime Lab, J. Pulverenti/CVPD Crime Lab,

15  Off X. Rosario lD 856, Sgt M. Smith ID 591, Off. M. Schneider ID 805, Off S.

16  Hall ID 1022, V. Marino CSO ID 1076, Off C. Walters ID 1105, Sgt C. Kelley

17  ID 623, Off D. Bruzee ID 1116, Off M. Byers ID 1087, W. Anderson CVPD

18  Chaplain, Off J. Zualet ID 777, Sgt E. Tarr ID 409, T. Venn CVPD Crime Lab,

19  Off M. Padilla ID 1018, Off L. Hernandez ID 925, J. Zuffoletto ID 8584, Off A.

20  Dela Pena ID 984, Off N. Oluvic ID 1156.

21      o. COUNTY OF SAN DIEGO personnel were involved in the incident,

22  but were not part of the planning and execution and were thus acting at the

23  behest of OFFICER MARK MEREDITH and Federal Agents in the JOINT

24  TASKFORCE OPERATION between THE CITY OF CHULA VISTA and

25  multiple FEDERAL AGENCIES of the UNITED STATES OF AMERICA. The

26  SAN DIEGO COUNTY SHERIFF personnel acting at the behest of others are

27  identified as: Deputy (Dep) B. Chassen/San Diego Sheriff's

28  Office(SDSO)/Border Crime Suppression Team(BCST), Dep R.

1   Forbes/SDSO/BCST, Dep W. Kerr/SDSO/BCST, Dep C.

2   Manookian/SDSO/BCST, Dep M. Myers/SDSO/BCST, Dep K.

3   Olin/SDSO/BCST, Dep R. Siegfried/SDSO/BCST, Dep M. Bravo/SDSO, Lt M.

4   Ryan/SDSO, Dep W. Manning/SDSO, R. Enns/SDSO,

5        13.    Plaintiffs are informed and believe that Defendant CITY OF

6   CHULA VISTA (Hereinafter, "CITY"), is an incorporated municipality doing

7   business in the State of California with its principal place of business in San

8   Diego County, and the employer of one or more of the individual officers named

9   as Defendants in this action.

10  / / /

11       14.    Plaintiffs are informed and believe and thereon allege that the CITY

12  has an agreement with one or more of the Federal Agencies named in this suit to

13  receive assets seized in connection with the ~~participation~~JOINT TASKFORCE

14  OPERATION of CITY police officers, including, but not limited to OFFICER

15  MARK MEREDITH. Additionally, OFFICER MARK MEREDITH's

16  participation in the ROADKILL operation is a part of his employment by the

17  CITY, his sole employer ~~from which he receives pay in connection with law~~

18  ~~enforcement duties~~, from which he receives his only pay in connection with law

19  enforcement duties. OFFICER MARK MEREDITH was part of the planning

20  and supervision of the ROADKILL operation and specifically detailed as "Team

21  Leader/Cover Team" at all relevant times associated with this complaint. Thus

22  the involvement of OFFICER MARK MEREDITH with ROADKILL in a

23  supervisory capacity and the agreement to share in assets seized from

24  ROADKILL constituted a JOINT TASKFORCE OPERATION with the CITY

25  OF CHULA VISTA and THE UNITED STATES OF AMERICA.

26       15.    Plaintiffs are informed and believe and thereon allege that the

27  HOMELAND SECURITY INVESTIGATIONS UNIT in the DEPARTMENT

28  OF IMMIGRATIONS AND CUSTOMS ENFORCEMENT is an investigative

agency within the UNITED STATES DEPARTMENT OF HOMELAND
SECURITY of the Defendant USA. Plaintiffs are informed and believe that the
HOMELAND SECURITY INVESTIGATIONS UNIT (HSI) is and was an
official law enforcement agency for the USA working with the CITY operating
under color of state law of California as part of a JOINT TASK FORCE, at all
times mentioned herein, and the USA is/was the employer of one or more
individual Agents named in this action, including, but not limited to, AGENTS
GONZALEZ, OSORIO, BARONI, SANCHEZ, BURBANK, DORN,
CASTELLANOS, MUNOZ, GRIMMING, MARTINEZ, RILEY,
GIANNANTONIO and DOES 1̶5-100.

/ / /

16.    Plaintiffs are informed and believe and thereon allege that the
DRUG ENFORCEMENT AGENCY (DEA)is an investigative agency of the
Defendant USA. Plaintiffs are informed and believe that the DEA is and was an
official law enforcement agency for the USA, at all times mentioned herein, and
the USA is/was the employer of one or more individual Agents named in this
action.

17.    Plaintiffs are informed and believe and thereon allege that the
UNITED STATES CUSTOMS AND BORDER PROTECTION (CBP) is an
investigative agency of the Defendant USA. Plaintiffs are informed and believe
that the CBP is and was an official law enforcement agency for the USA, at all
times mentioned herein, and the USA is/was the employer of one or more
individual Agents named in this action.

18.    Plaintiffs are informed and believe that Defendant DOES 1̶5-100
are supervisors, officers and/or staff of the CITY and/or USA and are fictitiously
named individuals whose true names are unknown at this time to Plaintiffs. The
true names and capacities of DOES 1̶5-100 are unknown to plaintiffs, who
therefore sue said defendants by such fictitious names and will amend this

1   complaint to allege their true names and capacities when ascertained. Plaintiffs

2   are informed and believe and based thereon alleges that each of the fictitious

3   named defendants are responsible for the acts complained of herein.

4       a Defendant AGENT JUAN MUNOZ (Previously identified as Doe 1) is

5   and at all times mentioned herein was, an Agent employed by the Defendant

6   USA, who was acting within the course and scope of his employment as an

7   Agent acting as the supervisor of the "ROAD KILL TEAM" and employed by

8   the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who

9   was acting within the course and scope of his employment with the JOINT

10  TASKFORCE OPERATION at the time he undertook the activities alleged

11  herein and was, at all times herein mentioned, acting as a federal agent under

12  color of federal law, and working with state agents acting under color of state

13  law, and representative of every other defendant, and willfully participated in

14  joint activity with the State or its agents to include OFFICER MARK

15  MEREDITH of the CHULA VISTA POLICE DEPARTMENT. Assistant

16  Special Agent in Charge (ASAC) Title 21 Coordinator delivering Operational

17  Plan.

18      b. Defendant AGENT JEFFREY GRIMMING (Previously identified as

19  Doe 2) is and at all times mentioned herein was, an Agent employed by the

20  Defendant USA, who was acting within the course and scope of his employment

21  as an Agent acting as the supervisor of the "ROAD KILL TEAM" and employed

22  by the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, who

23  was acting within the course and scope of his employment with the JOINT

24  TASKFORCE OPERATION at the time he undertook the activities alleged

25  herein and was, at all times herein mentioned, acting as a federal agent under

26  color of federal law, and working with state agents acting under color of state

27  law, and representative of every other defendant, and willfully participated in

28  joint activity with the State or its agents to include OFFICER MARK

CASE NO. 3:18-cv-1269-BTM-AGS

PLAINTIFFS' ~~THIRD~~SECOND AMENDED COMPLAINT FOR DAMAGES               (CONSOLIDATED 3:17
-cv-1205)

1   MEREDITH of the CHULA VISTA POLICE DEPARTMENT. HSI Supervisor.

2        c. Defendant AGENT JACQLEEN RILEY (Previously identified as Doe

3   3) is and at all times mentioned herein was, an Agent employed by the

4   Defendant USA, who was acting within the course and scope of her employment

5   as an Agent of the "ROAD KILL TEAM" and employed by the UNITED

6   STATES DEPARTMENT OF HOMELAND SECURITY, who was acting

7   within the course and scope of her employment with the JOINT TASKFORCE

8   OPERATION at the time she undertook the activities alleged herein and was, at

9   all times herein mentioned, acting as a federal agent under color of federal law,

10  and working with state agents acting under color of state law, and representative

11  of every other defendant, and willfully participated in joint activity with the

12  State or its agents to include OFFICER MARK MEREDITH of the CHULA

13  VISTA POLICE DEPARTMENT.

14       d. Defendant LORI GIANNANTONIO (Previously identified as Doe 4) is

15  and at all times mentioned herein was, an Agent employed by the Defendant

16  USA, who was acting within the course and scope of her employment as ASAC,

17  the supervisor of the "ROAD KILL TEAM" and employed by the UNITED

18  STATES DEPARTMENT OF HOMELAND SECURITY, who was acting

19  within the course and scope of his employment with the JOINT TASKFORCE

20  OPERATION at the time he undertook the activities alleged herein and was, at

21  all times herein mentioned, acting as a federal agent under color of federal law,

22  and working with state agents acting under color of state law, and representative

23  of every other defendant, and willfully participated in joint activity with the

24  State or its agents to include OFFICER MARK MEREDITH of the CHULA

25  VISTA POLICE DEPARTMENT.

26       19.   At all relevant times herein, each of the Defendants was an agent,

27  servant, or employee of each of the remaining Defendants acting under color of

28  state and/or federal law, and was at all times acting within the time, purpose or

scope of said agency or employment, and was acting with the express or implied

knowledge, permission or consent of the remaining Defendants, and each of

them. Each of the Defendants held out the other as its authorized representative

and each of the Defendants ratified the conduct of its agents. At all times herein

mentioned, DOES ~~1~~5-100 were and are Defendants whose identity is unknown

at this time who supervised, controlled, or were in some manner responsible for

the activities alleged herein and proximately caused Plaintiffs' damages.

## **INTRODUCTION**

20.    Federal and California law enforcement personnel physically

transported 2,000 pounds of marijuana across the U.S. Border crossing at

Tijuana, Baja California on June 2, 2016, and stored the marijuana for 12 days

with the intent to sell the marijuana for approximately $200,000.00 to fund the

operations of their respective agencies. The marijuana was believed to have been

worth over $1,000,000.00. ~~Nevertheless, the Defendants tried repeatedly to sell~~

~~it for only $200,000.00.~~Defendants' operations were limited to the terms

contained in Enforcement Operation Plan Case Number SY13MR16SY0835 that

stated in relevant part:

> "Agents intend to conduct an International Controlled Delivery
> (ICD), Agents **_will only_** conduct the ICD if Agents have determined
> it will be successful and will ensure that all coordination required is
> completed and **_the operation is conducted in a safe manner._**
>
> A HSI UC Agent will take control of the unknown conveyance
> containing the marijuana in the pre-primary area of the Otay Mesa
> Port of Entry (U.S. territory) and drive to San Diego. This
> investigation will attempt to identify members of **_the DTO [drug_**
> **_trafficking organization] in the United States thereby disrupting_**
> **_and dismantling a portion of this DTO._**
> Exhibit A at p. 2.

The initial buyer and a subsequent potential buyer both backed out of the

purchase, thus rendering the aforementioned plan moot since "the" DTO

referred to in the plan was no longer viable. Additionally "this DTO" was

1  specifically referred to in the Enforcement Operation Plan which again, was no

2  longer viable, making the delivery of 2000 pounds of marijuana without

3  authorization since the Enforcement Operation Plan did not state "any DTO" or

4  other verbiage that would lead a reasonable person to believe that any possible

5  DTO was the target of the operation. Nevertheless, the Defendants tried

6  repeatedly to sell it for only $200,000.00, with no authority. Supervisors from

7  both the UNITED STATES and the CITY that had previously authorized the

8  Enforcement Operation Plan failed to intervene to stop the operation once the

9  planned DTO was no longer viable. After two failed attempts to sell the

10  marijuana, a third buyer was convinced to purchase the marijuana. and

11  Defendants did not know the identities of the third group of purchasers thus

12  / / /

13  defendants had no idea if any DTO was purchasing the cannabis. The original

14  Enforcement Operation Plan was in compliance with Sec. 542:

15      None of the funds made available in this Act to the Department of
        Justice may be used, with respect to any of the States of Alabama* *
16      *California * * * to prevent any of them from implementing their
        own laws that authorize the use, distribution, possession, or
17      cultivation of medical marijuana"

18  (Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat.

19  2242, 2332–33 (2015). (Sec. 542.)

20  Since the particular DTO that was identified in the Enforcement Operation Plan

21  as an organization identified back on May 17, 2016 by HSI agents that "received

22  information from a Source of Information (SOI) that he/she had information

23  about a drug trafficking organization (DTO) that approached the SOI about

24  providing assistance in the smuggling and transportation of narcotics through the

25  San Diego Ports of Entry to San Diego, California." (Exhibit A at p.2.) The

26  identified DTO in May 2016 was clearly not authorized to engage in legal

27  marijuana exchanges in California, thus there was no preclusion on the use of

28  federal funds under Sec. 542.

- 19 –

1       Defendants did not know the identities of the third group of purchasers
2   thus they had no way of verifying that the purchasers were not authorized by the
3   State of California to possess or distribute medical marijuana. Defendants failed
4   to investigate the potential purchasers' authority to possess or distribute
5   marijuana thus under Sec. 542, no federal funds could be expended to proceed
6   with an operation against these unknown purchasers that Defendants
7   consistently referred to as "the crooks".

8       Plaintiff LLANEZ was hired to drop off and pick up a rental van in
9   exchange for $500.00 and believed the van would contain money to satisfy a
10  debt to the person that hired him, with no knowledge that any illegal items were
11  in the vehicle. When plaintiff arrived to pick up the van, AGENT GONZALEZ
12  went to open the door of the van and instantly ran away from the van with the
13  only set of keys. While AGENT GONZALEZ was running away from the van
14  he only yelled "aaaaa..Help!" approximately 6 seconds after he began running
15  he did not give the proper distress signal of raising his hands or stating "Don't
16  hurt me" as required in the Enforcement Operation Plan. (Exhibit A at p. 3.)
17  Plaintiff LLANEZ gave chase to recover the keys and drew a taser to stop the
18  fleeing individual despite being out of effective range for the taser. AGENT
19  GONZALEZ was surrounded by concealed law enforcement personnel and was
20  running towards cover when he stopped. AGENT GONZALEZ never told
21  Plaintiff LLANEZ "Federal Agent, Stop or I will shoot" or words to that effect
22  at any point during the approximately 10 seconds while he was running before
23  he opened fire on LLANEZ. AGENT GONZALEZ had time to warn Plaintiff
24  LLANEZ by saying "Federal Agent, Stop or I will shoot" 8 times during the
25  time he was running and before he actually opened fire, but no warning was ever
26  given. AGENT GONZALEZ was surrounded by Defendants OSORIO,
27  BARONI, MARTINEZ, BARONI, BURBANK, CASTELLANO, DORN, with
28  two additional Agents overhead in a helicopter and Deputies CHASSEN,

1  FORBES, KERR, MANOOKIAN, MYERS, OLIN, SIEGFRIED of the San

2  Diego County Sheriff's Office in the area immediately outside of the parking lot

3  where the shooting took place, along with two additional HSI Agents LINDSEY

4  MARTIN and CLAUDIA HERZOG that had provided security for the

5  marijuana laden van driven by JOINT TASKFORCE OPERATION personnel to

6  the PLAN location that remained in the area for the entire exchange.

7  EIGHTEEN concealed law enforcement personnel were in the area of the

8  parking lot, and AGENT GONZALEZ was running towards cover when he said

9  he believed he had been Tased in the back (despite a reasonable law

10  enforcement professional knowing a Taser deployment into a person's back will

11  incapacitate them) so he suddenly stopped, turned around to face Plaintiff and

12  drew his concealed firearm in an ankle holster and shot Plaintiff LLANEZ four

13  times, the final, and only fatal shot was into the mid back of Plaintiff

14  / / /

15  LLANEZ when he was on the ground and presenting no threat whatsoever. The

16  fatal bullet was described in an autopsy as:

17  A gunshot entrance wound is located on the right mid back centered
19 inches from the top of the head and 3-1/2 inches right of midline.

18  It is a 3/16 inch circular defect with an asymmetrical abrasion rim
measuring 1/8 inch from 3 - 6 o'clock and 1/16 inch from 6 - 9

19  o'clock. There is no soot or stippling of the adjacent skin. The bullet
perforates the skin and muscle of the back traveling in an upward and

20  slightly leftward direction. It enters the chest cavity through the
intercostal muscle between the posterior right 9th and 10th ribs. The

21  ribs are not fractured. The bullet perforates the lower lobe of the right
lung traveling upward toward the hilum. It perforates the pericardial

22  sac, the right atrium, root of the aorta, and pulmonary arteries with
extensive anterior mediastinal hemorrhage. It travels upward and

23  slightly leftward through the anterior strap muscles of the neck. There
are no injuries of the hyoid bone, or tracheal and laryngeal cartilages.

24  There is extensive purple-black hemorrhage throughout the facial
planes of the strap muscles, left side greater than right. The bullet

25  lacerates the base of the tongue and is lodged within the muscle from
where it is recovered. There is 650 ml of liquid and clotted blood in

26  the right chest cavity and 20 ml in the left. There are focal
posterolateral right pleural adhesions. The pericardial sac contains

27  250 ml of liquid and clotted blood.

28  Recovered from the muscle of the tongue approximately 8 inches
from the top of the head near the midline is an orange metal

jacketed, gray metal projectile, non-deformed with an intact base measuring 0.9 cm. The projectile is labeled "tongue" and turned over to the forensic specialist. The direction this bullet traveled is back to front, sharply upward, and slightly leftward.

The shooting occurred 33 seconds after AGENT GONZALEZ first encountered Plaintiff LLANEZ and AGENT GONZALEZ never identified himself as a law enforcement officer. Plaintiff LLANEZ died without ever knowing he had been shot by an officer. Despite having the time to identify himself and warn Plaintiff LLANEZ, he died without ever knowing he had been shot by an officer. The other Agents and OFFICER MEREDITH that were in the parking lot during the operation had the ability and were instructed "If at any time during the surveillance it appears that agents are in jeopardy of losing the contraband, the conveyance will be stopped and the narcotics will be seized and secured." Exhibit A at p. 5.) Defendants knew or should have known that the large number of individuals arriving from the potential purchasers was irregular and posed a high risk of losing the "contraband". AGENT BARONI, a 13 year veteran agent at the time of the shooting, told investigators on the day of the shooting

I've done a, a lot of these in my career. * * * I'm like, why is there five guys, like…that's… five guys don't show up to do this kind of stuff. * * * Because that's, five guys. That's, that's exposing them. Why would you want to be? [interviewer -You tell as few people as you can.] That...exactly ... it's dumb. It's usually just one guy. It's one guy. And then there might be another guy hidden in the background who's gonna come in and drive the truck, and he gets the hell out of there. You never bring five people. That's ridiculous. * * *
I mean, and you know I don't want to speculate, but the more I think about it it's like, you know, the number of people, I've never seen that many people show up.

And I've done a lot of these ... there ,was ...[interviewer states - Nor have I.] Five people show up. That's a little ridiculous. That's when I'm like this is, I think at that point, we're all thinking like ,we need to call this, like, get him the hell out of there.

Defendants should have stopped the conveyance before AGENT GONZALEZ panicked and ran away from the van, thus saving the life of

PLAINTIFFS' THIRDSECOND AMENDED COMPLAINT FOR DAMAGES (CONSOLIDATED 3:17 -cv-1205)

1   Plaintiff LLANEZ. Once AGENT GONZALEZ fired four shots at Plaintiff
2   LLANEZ, JOINT TASKFORCE OPERATION personnel were in chaotic
3   disarray. Some agents were communicating with texts on their phones, others
4   were on radios with some, but not all team members, and those with radios and
5   texts were not monitoring their devices properly.

6        AGENT BARONI and TECHNICAL ENFORCEMENT OFFICER
7   BURBANK were in a truck when AGENT BARONI noticed AGENT
8   GONZALEZ was running so he sped to pick him up with the truck. AGENT
9   GONZALEZ entered AGENT BARONI's truck within 35 seconds of firing the
10   final shot, and the truck immediately left the parking lot at a high rate of speed.
11   Many of the remaining Defendants in the parking lot believed AGENT
12   GONZALEZ had been abducted and spent crucial minutes panicking over a
13   situation that did not exist and failed to render medical aid to Plaintiff LLANEZ
14   that was wounded and laying on his side and moving when AGENT RILEY
15   / / /
16   directed another individual to handcuff Plaintiff when she arrived in his vicinity
17   because he was still moving.

18        Once Plaintiff LLANEZ had been shot, Defendants should have rendered
19   immediate first aid. Instead, he was handcuffed with his hands behind his back,
20   which made his chest cavity expand and likely caused increased internal
21   hemorrhaging; and placed facing down on his abdomen which made is breathing
22   more difficult. Defendants accelerated his death by not only failing to render
23   first aid, but also placed him in a position that reduced the amount of time
24   medical professionals would be able to save his life. Since Defendants were so
25   panicked, disorganized and unprepared for this type of situation, emergency
26   personnel were not called until Defendants finally realized AGENT
27   GONZALEZ had not been abducted.

28        The UNITED STATES and CITY failed to properly train and supervise

1  their personnel in their duties which resulted in the death of Plaintiff LLANEZ.

2  Instead the Defendants were solely focused on retrieving money from potential

3  purchasers from an unknown group. The Enforcement Operation Plan (Exhibit

4  A) that was the source of authority for this operation was not valid since it was

5  specifically focused on the DTO identified on May 17, 2016 that no longer

6  wanted to purchase the 2000 pounds of marijuana. Supervisory personnel such

7  as OFFICER MARK MEREDITH, AGENT JEREMY DORN, AGENT JUAN

8  MUNOZ, AGENT JEFFREY GRIMMING, and AGENT LORI

9  GIANNANTONIO knew, or should have known, the Enforcement Operation

10 Plan was no longer valid and should have cancelled the operation, but each and

11 all of them failed to stop the ill-fated operation. Additionally, they all failed to

12 ensure the personnel had proper training and supervision to safely complete the

13 operation as required under the Enforcement Operation Plan.

14      The operation used significant amounts of federal funds, including he use

15 of a helicopter for several hours, that were not allowed per Consolidated

16 Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332–33

17 (2015).

18

19                    **FACTUAL ALLEGATIONS**

20      21.    On or about November 11, 2006, DEFENDANT AGENT

21 RONALDO RICARDO GONZALEZ (AGENT GONZALEZ) was hired by

22 HSI. Prior to the date of hire AGENT GONZALEZ worked as a contractor for

23 the DEA since 2001 in a law enforcement capacity and was a member of the

24 United States Armed Forces prior to entering law enforcement and stated he has

25 "a great deal of experience dealing with crime and narcotics in general. And I

26 know that anytime you're dealing with people who are involved in those circles

27 there's always a potential for danger."

28      22.    On or about June 2, 2016, AGENT GONZALEZ received

1  authorization from his supervisor and thereafter he and other HSI Agents

2  coordinated with the DEA and CBP to transport "jump" 2,000 pounds of

3  Marijuana with a value AGENT GONZALEZ believed to have been

4  approximately $1,000,000.00 across the United States Border through the

5  Tijuana Border Crossing. HSI, CBP and the DEA expected to receive

6  $200,000.00 for transporting the marijuana across the border and stored the

7  marijuana on HSI property in the possession of law enforcement personnel.

8       23.    On or about June 6, 2016 a tactical plan was developed by

9  ~~HSI~~OFFICER MARK MEREDITH and HSI personnel for the transfer of the

10  marijuana for the Home Depot/Walmart parking lot near Palm Avenue in San

11  Diego.

12      24.    On or about June 7, 2016, HSI attempted to deliver the marijuana to

13  a buyer named Juan, but a Confidential Informant known as MIGUEL (CI)

14  informed HSI that Juan did not have the money available. AGENT GONZALEZ

15  told the CI that "we need to make sure they have the money available. Because

16  we're not gonna be playing any games that you guys can take the dope and come

17  back later with the money."

18      25.    After the original buyer Juan no longer wanted the marijuana in the

19  possession of HSI, the CI was told by an individual named Sergio, a broker that

20  there was another interested buyer, but this buyer was completely unknown to

21  AGENT GONZALEZ.

22      26.    HSI directives stated that the OPERATION ROAD KILL was to

23  interact only with "Known Drug Trafficking Organizations" for the transfer of

24  the marijuana in their possession. More importantly, the Enforcement Operation

25  Plan specified "a" DTO and "this" DTO when referring to the May 17, 2016

26  contact that triggered the plan, thus the plan was no longer valid since the

27  particular DTO was no longer part of the operation and there was no

28  authorization to substitute a different purchaser.

27.     On June 13. 2016 AGENT GONZALEZ was feeling pressure from his team because he had them on stand-by all weekend for a new transaction. Again, AGENT GONZALEZ was told by the CI that the second buyers could not secure the money and the transaction was cancelled.

28.     AGENT GONZALEZ informed the CI to tell Sergio the broker that if the transaction was not completed by 1:00 P.M. on Monday, June 13, 2016, then there would be no sale at all. The CI called AGENT GONZALEZ at 1:00 P.M. and stated "we got a new buyer. But they have to go to L.A. to get the money and then they will come back."

29.     AGENT GONZALEZ scheduled the transaction for the next day with the Case Agent, AGENT MARCUS OSORIO (AGENT OSORIO).

30.     AGENT GONZALEZ told the CI to relay to Sergio the broker that they needed to provide AGENT GONZALEZ with a vehicle to transfer the drugs to the provided vehicle so they can take the drugs after the transportation */ / /* fees had been paid. AGENT GONZALEZ had already identified Sergio and stated he could have arrested him at any time.

31.     Unbeknownst to AGENT GONZALEZ, Sergio the Broker was negotiating with Damian Martinez for the sale and neither was part of a KNOWN DRUG TRAFFICKING ORGANIZATION~~.~~, or the original DTO in the approved Enforcement Operation Plan. Damian was in turn coordinating the actions of several other individuals, some of which had no idea they were involved in a drug transaction. Plaintiff LLANEZ was one of the parties that was unaware the transaction involved drugs.

32.     Damian hired Decedent FERNANDO GEOVANNI LLANEZ for $500.00 to drop off a van in the morning, and then later the same day pick up the van after a debtor of Damian had deposited a repayment.

33.     Damian was the third buyer engaged by HSI in an attempt to sell

the marijuana, and LLANEZ dropped off the van and left the keys under the passenger seat at the Terra Nova Shopping Center near the intersection of Interstate 5 and East H Street in Chula Vista, California.

34.     The CI informed AGENT GONZALEZ about the location of the van and AGENT GONZALEZ, along with. OFFICER MARK MEREDITH (OFFICER MEREDITH),) as TEAM LEADER along with, AGENT ANTHONY CASTELLANOS (AGENT CASTELLANOS) and AGENT OSORIO pick up the van at approximately 8:45 A.M., June 14, 2016. Under the supervision of OFFICER MEREDITH, AGENT CASTALLANOS drives the van to a secure location to check for tracking devices and later to load the marijuana on the HSI property where it has been stored since HSI personnel "jumped" (transported) it from Mexico. At the time the van is taken, Sergio the broker is the only person known to AGENT GONZALEZ regarding the purchase of the marijuana that is scheduled to take place.

/ / /

35.     Sergio wanted the van dropped off back at the same location it was picked up, but HSIJOINT TASK FORCE OPERATION personnel from HSI and the CITY would not allow dropping the van where suspects are requesting. The buyers appeared ready to cancel the transaction but, nevertheless, AGENT GONZALEZ stated that he *needed* to get this deal to happen. Despite having no tactical plan for the new location, HSI selectedOFFICER MEREDITH as TEAM LEADER authorized the shopping center near Interstate 125 and East H Street in Chula Vista, California. The time was approximately noon and the shopping center was in the middle of lunch hour with numerous bystanders. AGENT CASTELLANOS parked the drug laden van close to the occupied portion of the shopping center despite having an abandoned Albertson's store with dozens of empty parking spaces 100 feet away from the parking location selected by HSI personnel. After the van was in place, AGENT GONZALEZ arrived in the

1   parking lot in another vehicle and informed the CI to inform Sergio about the

2   location of the van.

3       36.     AGENT GONZALEZ had an Under Cover (UC) team on scene of

4   approximately six people that were strictly responsible for the safety of AGENT

5   GONZALEZ, AGENT CASTELLANOS and the CI. In addition to the UC

6   Cover Team, there were San Diego County Sheriff Deputies from the ~~Border~~

7   ~~Crime Suppression Team (BCST)~~BCST on the scene to follow the vehicle that

8   had been loaded by HSI personnel with 2000 pounds of marijuana. Additionally,

9   there was a helicopter that was observing the transaction, as well as one or more

10  officers from the Chula Vista Police Department (See paragraph 12) and Chula

11  Vista Police Dispatchers. The helicopter pilot asked ~~AGENT JEREMY DORN~~

12  if the event was to be video recorded and ~~DORN~~AGENT OSORIO stated "no~~.~~".

13      37.     AGENT CASTELLANOS had never been involved in an

14  undercover purchase of drugs before June 14, 2016, was new to the HSI team

15  and was a last-minute addition to the undercover team on that date because two

16  other more experienced undercover agents were not available. AGENT

17  GONZALEZ briefed AGENT CASTELLANOS regarding the plan with Sergio

18  the Broker in that AGENT GONZALEZ would be doing the negotiations and

19  AGENT CASTELLANOS would be the driver.

20      38.     AGENT GONZALEZ contacted the CI and confirmed that Sergio

21  the Broker was supposed to arrive with two other individuals that had $200,000

22  order to purchase what AGENT GONZALEZ believed to have been $1,000,000

23  worth of marijuana. Sergio arrived at the Starbucks and met with AGENT

24  GONZALEZ on or about 1:00 P.M. on June 14, 2016. Prior to this meeting,

25  prospective buyers requested to inspect a sample of the products which JOINT

26  TASKFORCE PERSONNEL refused to provide. None of the buyers had

27  inspected the quality of the marijuana placed in the truck by HSI personnel

28  which is contrary to normally and reasonably performed undercover operations

1    to avoid problems when turning over a large shipment of contraband.

2    39.    Sergio and AGENT GONZALEZ spoke for approximately 20

3    minutes before the buyers arrived in the parking lot. Sergio recommended that

4    only AGENT GONZALEZ approach the buyers. AGENT CASTELLANOS

5    remained seated as the two men approached the individuals described as buyers,

6    described by AGENT GONZALES GONZALEZ as two young Hispanic males

7    and. He later refers to them as "kids" and that he was taken aback in the sense of

8    how young they were. At this point there are three suspects that have appeared at

9    the scene. Normal undercover operations have only one suspect and possibly a

10   second suspect that will drive, thus with three suspects present, a reasonable law

11   enforcement officer would be concerned about a high risk that the suspects will

12   try to steal the contraband.

13   40.    The two young males state to AGENT GONZALEZ that they need

14   to see the marijuana first before they buy it. AGENT GONZALEZ tells one of

15   the males to open the passenger door and open a package to inspect the

16   marijuana. Upon return from inspecting the van, they buyer informs AGENT

17   GONZALEZ that the marijuana was too yellow. AGENT ANGELA SANCHEZ

18   (AGENT SANCHEZ) was monitoring the concealed listening device and texted

19   AGENT GONZALEZ and relayed that the large bags had better quality

20   marijuana and for the buyers to inspect the large bags. Since JOINT

21   TASKFORCE OPERATION personnel refused to allow inspection of a sample

22   before the planned exchange, as is typically done in undercover operations by

23   reasonable law enforcement personnel, additional risk is present if there are

24   questions about the quality of the products.

25   41.    The two young males did not approve of the quality of the

26   marijuana, but a deal to reduce the price from $200,000 to $150,000 was agreed

27   upon by AGENT GONZALEZ. The buyers wanted the van moved to the same

28   shopping center where the van was picked up, but AGENT JEREMY DORN

refused to change the location of the van. At this point the purchasers on-scene are Sergio, and two males ostensibly there to inspect the quality of the marijuana. JOINT TASKFORCE OPERATION personnel still have no idea of the identity of any of the individuals or whether or not they are authorized to possess and or distribute cannabis under California Law.

42.    A driver dropped off LLANEZ and another individual that waswere tasked with retrieving a loaned van by Damien Martinez in exchange for $500. LLANEZ was previously given a taser by Damien in the event the delivery driver tried to injure LLANEZ or steal the van. At this point there are five suspects on scene for the exchange of contraband. A reasonable law enforcement professional would have terminated the operation as soon as this many individuals appeared on scene.

43.    Unbeknownst to LLANEZ, the van was full of marijuana and that the delivery driver was an under-cover Federal Agent.

44.    LLANEZ approached the van and met AGENT GONZALEZ at approximately 1:56 P.M. on June 14, 2016.

/ / /

44.    LLANEZ approached the van and met AGENT GONZALEZ at approximately 1:56 P.M. on June 14, 2016. At this time five individuals from the potential purchaser of the contraband were present and constituted an unreasonable number of individuals present for a normal transfer. Reasonable law enforcement officers should have known this many individuals constituted a high likelihood of a potential loss of contraband and per the directives of the Enforcement Operation Plan (Exhibit A), any of the Defendants could have, and should have, immediately ceased the transfer under the Enforcement Operation Plan that stated: "If at any time during the surveillance it appears that agents are in jeopardy of losing the contraband, the conveyance will be stopped and the narcotics will be seized and secured." (Exhibit A at p. 5.) Additionally, AGENT

1    GONZALEZ was instructed to leave the vehicle unlocked, which he did not do.

2        45.    Approximately 23 seconds later, AGENT GONZALEZ can be

3    heard, on his under-cover recording, inserting a key into the driver's side door

4    and immediately withdrawing the key and running.

5        46.    46.    Contrary to the requirements of the Enforcement Operation

6    Plan regarding officer safety, which stated in relevant part "Distress Code:

7    Audio: Don't Hurt[sic] Me[sic][,] Visual: Hands in the Air[sic]" AGENT

8    GONZALEZ went to unlock the driver's door of the van when he suddenly took

9    the only set of keys and ran around the front of the van. and approximately 50

10   feet away from all other individuals standing near the van. LLANEZ was not as

11   quick and agile as AGENT GONZALEZ and drew the taser while running after

12   AGENT GONZALEZ attempting to stop him from stealing the only set of keys

13   to the van. Plaintiff LLANEZ was attempting to stop him from stealing the only

14   set of keys to the van. AGENT GONZALEZ did not use the audio or visual

15   distress code while running for 10 seconds and only stated "aaaaa..Help!" before

16   shooting Plaintiff. AGENT GONZALEZ had ample time to state "Federal

17   Agent, stop or I'll shoot" to warn Plaintiff LLANEZ. AGENT GONZALEZ

18   could have repeated the statement eight or nine times before shooting, but he did

19   not say it even one time. Nor did he give the other Defendants any of the pre-

20   determined distress codes. A reasonable law enforcement officer would have left

21   the keys at the vehicle to avoid a potential chase. A reasonable law enforcement

22   officer would have used the distress codes to elicit assistance. A reasonably

23   trained law enforcement officer would have left the keys at the vehicle to avoid a

24   potential chase. A reasonably trained land or supervised aw enforcement officer

25   would have used the distress codes to elicit assistance.

26   47.    Approximately 10 seconds after withdrawing the key and running,

27   AGENT GONZALEZ can be heard on his under-cover recording shooting

28   LLANEZ four times.

47.     AGENT GONZALEZ states he believed he had been shot in the back by a Taser which is why he said he fired upon Plaintiff LLANEZ. Approximately 10 seconds after withdrawing the key and running away from the van with the keys, AGENT GONZALEZ can be heard on his under-cover recording shooting LLANEZ four times. The only thing AGENT GONZALEZ said during the 10 seconds he was running was "aaaaa..Help!". A reasonably trained law enforcement profession would know that a Taser strike to the back would incapacitate a person thus making it impossible for him to have returned fire had he actually been struck by the prongs of a Taser. A reasonably trained law enforcement profession would know that a Taser is not able to fire multiple times without ejecting the previously fired cartridge and reloading a new cartridge. A reasonably trained law enforcement profession would know that Plaintiff LLANEZ was not in range to fire another Taser charge at him from the distance he was shot. AGENT GONZALEZ was immediately picked up by AGENT BARONI and TECHNICAL ENFORCEMENT OFFICER BURBANK who checked AGENT GONZALEZ' back and fund no penetration marks. He was then taken to a hospital that was not able to find any indication of a Taser prong having struck AGENT GONZALEZ anywhere on his body. Pictures of AGENT GONZALEZ' back while he was in the hospital reveal no discoloration whatsoever.

/ / /

48.     AGENT GONZALEZ never announced he was a federal agent or any other form of law enforcement officer. He was surrounded by his support team of at least nineDefendants OSORIO, BARONI, RILEY, MEREDITH, SANCHEZ, BURBANK, CASTELLANO, DORN, with additional Agents overhead in a helicopter and Deputies CHASSEN, FORBES, KERR, MANOOKIAN, MYERS, OLIN, SIEGFRIED of the San Diego County Sheriff's Office in the area immediately outside of the parking lot where the

shooting took place. Seventeen concealed law enforcement personnel ~~and~~were in the area of the parking lot, and AGENT GONZALEZ was running towards cover when he was running away from the van with the only set of keys. Despite having out-run the individual trying to stop him from stealing the keys to the van, and being out of range of the taser, AGENT GONZALEZ stopped and drew his firearm from his ankle holster and shot LLANEZ four times. ~~The first three shots fired by AGENT GONZALEZ hit LLANEZ in: a finger of his left hand that lodged a bullet in the sinus cavity of his right cheek; his right front tooth and the bullet lodged in his tongue~~AGENT GONZALEZ stated to immediately after the shooting that he thought he had been Tased in the back so he fired upon Plaintiff LLANEZ. A reasonable law enforcement professional should know that if a Taser is used successfully, a person would not be able to have enough motor control of their body to draw a firearm from an ankle holster and place multiple accurate shots at a distance of over twenty feet. A reasonable law enforcement professional would know that a Taser is not capable of firing more than once without ejecting the used cartridge and reloading a new set of prongs.  Of the four bullets fired by AGENT GONZALEZ, three bullets' casings had markings of FC 15 40 S&W. One had a different marking of SPEER 40 S&W. Two bullets were recovered from Plaintiff LLANEZ' body. One was a partially deformed hollow point bullet that was in his right cheek. The other was a full metal jacket projectile with no deformation that was fired into the mid right side of his back that stopped in his tongue. Full metal jacket bullets are not authorized for use by AGENT GONZALEZ' employer. The first three shots fired by AGENT GONZALEZ hit LLANEZ in: a finger of his left hand that eventually lodged the deformed hollow point bullet in the sinus cavity of his right cheek; a bullet grazed the top of the Taser leaving a diagonal gouge in the plastic of the Taser, the projectile was not recovered; and in the web of flesh between his thumb and index finger of his right hand that destroyed the taser he

was holding. All of which were non-fatal injuries.

49.    AGENT GONZALEZ' fourth and only fatal shot was while pointing in a downwards direction and into the middle right side of the back of FERNANDO GEOVANNI LLANEZ while he was on the ground, and no longer a threat. The bullet was an unauthorized full metal jacket projectile with no deformity that lodged in his tongue.

50.    Approximately 35 seconds after the last shot was fired, AGENT GONZALEZ was picked up in a truck driven by AGENT CHRIS BARONI and TECHINCAL ENFORCEMENT OFFICER MICHAEL BURBANK.

51.    Upon entering the vehicle, and within 45the following conversation took place between 36 and 53 seconds of firing his last shot, AGENT GONZALEZ stated to AGENTS BARONI and BURBANK he believed he had been tasered.:

AGENT BARONI: "You all right?"

AGENT GONZALEZ: "I'm all right…I think he…[unintelligible murmur]"

AGENT BARONI: "You're good…There's no blood"

AGENT GONZALEZ: "Like he shot me with something."

AGENT BARONI: "What'd he hit you with?"

AGENT GONZALEZ: "With a Taser."

AGENT BARONI: "A Taser?..You good?...Was it a Taser?"

AGENT BARONI: on the radio "We have the UC. He's good to go. He might have got hit by a Taser.

52.    One minute and fifty seconds after the final shot was fired while still speeding away from the scene:

/ / /

AGENT BARONI: "What'd they hit you with a Taser? These motherfuckers."

1   AGENT GONZALEZ: "They shot me with something dude."

2   AGENT BARONI: "I saw you running and I was like…what the fuck!"

3   Two minutes and ten seconds after firing his last shot at Plaintiff LLANEZ,

4   AGENT GONZALEZ asked ~~AGENT~~ TECHNICAL ENFORCEMENT

5   OFFICER BURBANK ~~to check his~~ "Check my back ~~for any injuries which~~

6   ~~AGENT~~ dude. Do you see anything?" TECHNICAL ENFORCEMENT

7   OFFICER BURBANK ~~could not find~~: 'No you're good." AGENT BARONI,

8   AGENT GONZALEZ and TECHNICAL ENFORCEMENT OFFICER

9   BURBANK never discussed that LLANEZ used a firearm and never discussed

10   whether AGENT GONZALEZ had been shot with a bullet. Nevertheless in later

11   interviews with investigators, all three fraudulently stated gunshots were at issue

12   instead of the Taser prong marks they were actually looking for on AGENT

13   GONZALEZ' back.

14   53.   Two minutes and nineteen seconds after firing his last shot at

15   Plaintiff LLANEZ,

16   AGENT GONZALEZ ~~stated~~: "I think I killed that guy"

17   ~~to which~~ AGENT BARONI ~~responded "~~: "Did you hit somebody?

18   AGENT GONZALEZ: "Yeah, I think I killed him."

19   AGENT BARONI:"Don't worry about it…You're good man…Don't

20   worry about it… Remember, uh, no fuckin', no statements, none of that

21   shit. Actually, you know what, we'll just probably ya, you want to take

22   him to the hospital. You want to go to the hospital dude? * * * Fuck dude,

23   everybody's fuckin' safe, fuck those guys~~."~~. You want to go to a hospital"

24   ~~54.~~ AGENT GONZALEZ: "No."

25   54.   At three minutes thirty seconds after the last shot was fired

26   TECHNICAL ENFORCEMENT OFFICER BURBANK stated: "everything we

27   / / /

28   say right now is being recorded" on AGENT GONZALEZ' recorder. Seventeen

1    seconds later the recorder was turned off.

2        55.    Despite believing he had mortally injured Plaintiff LLANEZ, none

3    of the AGENTS in the vehicle attempted to call for medical help for Plaintiff

4    LLANEZ. AGENT BARONI, AGENT GONZALEZ and TECHNICAL

5    ENFORCEMENT OFFICER BURBANK had knowledge that LLANEZ was

6    gravely wounded by the shots fired by AGENT GONZALEZ yet none of them

7    called to notify anyone medical attention was needed, nor did they check to see

8    if medical attention was being provided for LLANEZ.

9    56.56. None of the Defendants in the parking lot rendered any type of first

10    aid to Plaintiff LLANEZ. He had been handcuffed by a member of the BCST at

11    the behest and direction of Defendant AGENT JACQLEEN RILEY when she

12    noticed PLAINTIFF LLANEZ was moving, OFFICER MARK MEREDITH

13    was also present at this time. Thereafter Plaintiff LLANEZ was left face-down,

14    on his stomach while handcuffed while he bled to death with no first aid.

15    AGENT DORN, AGENT OSORIO, AGENT SANCHEZ, and AGENT

16    CASTELLANOS, were all at the scene and able to summon medical personnel

17    for Plaintiff LLANEZ, however none did.

18        57.    JOINT TASKFORCE OPERATION personnel could not

19    effectively communicate with each other as some were communicating via text,

20    some had two-way radios and others were using cellular telephones. At the time

21    Plaintiff LLANEZ arrived at the scene, any one of the Defendants could have

22    and should have immediately ceased the operation due to risk of loss of the

23    contraband stemming from an excessive number of suspects on scene. Although

24    none of the Defendants made any attempt to stop the transfer and arrest

25    individuals. With the exception of AGENT BARONI, the Defendants lost sight

26    of AGENT GONZALEZ as he started to run away from the van. Only AGENT

27    SANCHEZ was able to hear AGENT GONZALEZ' microphone and she was

28    unable to transmit the information to the other JOINT TASKFORCE

1  OPERATION personnel fast enough for them to react. Only AGENT BARONI
2  noticed AGENT GONZALEZ was running before shots were fired so AGENT
3  BARONI immediately sped in his truck to recover AGENT GONZALEZ and
4  remove him from the area. This was done so fast that the other Defendants left at
5  the scene panicked because they were not aware of a problem until some hear
6  gunfire, or heard over their radio that shots had been fired. When other
7  Defendants converged at the van, they could not find AGENT GONZALEZ and
8  believed he had been kidnapped. AGENT BARONI transmitted over his radio
9  that he had AGENT GONZALEZ 51 seconds after the last shot was fired,
10  nevertheless the other personnel on the scene were unaware AGENT
11  GONZALEZ was safe and ignored the urgent medical needs of Plaintiff
12  LLANEZ. Thus medical assistance was not immediately called to treat his
13  serious wounds.

14      58.    Upon arriving at the hospital, there was no indication of any injury
15  or discoloration to AGENT GONZALEZ' back to indicate he had been hit by a
16  Taser.

17      ~~57~~59. At the scene of the shooting, there was fired ammunition from
18  AGENT GONZALEZ' firearm consisting of brass bullet casings from four .40
19  Caliber, Smith and Wesson ammunition on the ground along with the keys to the
20  van, all of which were located approximately fifty feet to the East of the van and
21  adjacent to the scene of the shooting. The Taser was destroyed by two of the
22  bullets fired by AGENT GONZALEZ. The Taser's Anti-Felon Identification
23  (AFID) confetti, that typically deploys towards the intended target when a taser
24  is fired, was found with the shattered pieces of the taser several yards behind the
25  body of Plaintiff LLANEZ and very far from any location associated with
26  AGENT GONZALEZ' path as he ran from the van with the only set of keys.
27  ~~Thus indicating that the taser was never fired and instead released the contents~~
28  ~~as a result of AGENT GONZALEZ' shots that hit the taser.~~The Taser prongs

and the electrical wires were found on the ground and intact as though they had been deployed at the time the Taser was shot by AGENT GONZALEZ. The two prongs of the Taser were photographed by the CITY and found to have been pointing towards Plaintiff LLANEZ and away from AGENT GONZALEZ.

5860. On June 14, 2016, at or near 2310 Proctor Valley Road, in the City of Chula Vista, at approximately 1:56 P.M., defendant AGENT RONALDO RICARDO GONZALEZ, acting within the course and scope of his duties as an employee of HSI and acting as a representative of the USA conducting a JOINT TASKFORCE OPERATION with OFFCER MARK MEREDITH of the CITY, intentionally and/or negligently, fatally shot Decedent FERNANDO GEOVANNI LLANEZ, four times, with his firearm, with the final shot into FERNANDO GEOVANNI LLANEZ' back while he was on the ground and unarmed.

5961. The activities undertaken by the Defendant AGENT RONALDO RICARDO GONZALEZ, and Does 15-100, constituted an inappropriate seizure of the person under the Fourth Amendment of the United States Constitution as Decedent FERNANDO GEOVANNI LLANEZ was clearly unarmed when he was fatally shot.

6062. The repeated discharge of his firearm on Decedent FERNANDO GEOVANNI LLANEZ constituted further unconstitutional violations of decedent's civil rights, in that they were excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

6163. The actions of Defendant AGENT RONALDO RICARDO GONZALEZ, and Does 15-100, were in violation of the Fourth and Fourteenth Amendments of the United States Constitution and the actions undertaken by Defendants AGENT RONALDO RICARDO GONZALEZ, and Does 15-100, constituted an unjustified seizure of his person, deprivation of his liberty interest, excessive force and were in violation of decedent's civil rights under

1  color of ~~law~~both state law and federal law while conducting a JOINT

2  TASKFORCE OPERATION with OFFCER MARK MEREDITH of the CITY,

3  under 42 U.S.C. § 1983 and other sections of the United States Code as more

4  fully set forth herein.

5       ~~62~~64. Plaintiffs allege that Defendants AGENT RONALDO RICARDO

6  GONZALEZ, and Does ~~1~~5-100, acted in violation of the United States

7  Constitution and that Decedent FERNANDO GEOVANNI LLANEZ's

8  constitutional rights were violated. Defendants HSI, DEA, CBP, AGENT

9  RONALDO RICARDO GONZALEZ, and Does ~~1~~5-100, and each of them,

10  acted in violation of decedent's constitutional rights under the Fourth and

11  Fourteenth Amendments to the United States constitution. Decedent was

12  subjected to an excessive amount of force where he had committed no criminal

13  act, engaged in no suspicious criminal activity, and was seized without probable

14  cause by Defendants AGENT RONALDO RICARDO GONZALEZ, and Does

15  ~~1~~5-100, while acting under color of law while conducting a JOINT

16  TASKFORCE OPERATION with OFFCER MARK MEREDITH of the CITY,

17  pursuant to their actual and apparent authority.

18       ~~63~~65. Plaintiffs allege that ALL Defendants and Does 5-100, acted in

19  violation of the United States Constitution and that Decedent FERNANDO

20  GEOVANNI LLANEZ's constitutional rights were violated. All Defendants,

21  and Does 5-100, and each of them, acted in violation of decedent's constitutional

22  rights under the Fourth and Fourteenth Amendments to the United States

23  constitution. Decedent was handcuffed at the behest of Defendant JACQLEEN

24  RILEY and left face-down with no calls for immediate medical attention from

25  any Defendants until Plaintiff LLANEZ had bled so much that he could not be

26  revived. All Defendants, and Does 5-100, created a danger by attempting to sell

27  $1,000,000 worth of marijuana in exchange for $100,000. Although the original

28  authorization of the transfer was for a specific DTO, Defendants abandoned their

1  authorized operation and were hell-bent on collecting $200,000 in cash instead

2  of dismantling a DTO. Defendant Supervisors failed to train and supervise their

3  personnel in continuing with this unauthorized operation or properly executing

4  an undercover operation. AGENT BARONI explicitly stated to investigators the

5  he and other Defendants knew the transfer should have been stopped, yet with

6  deliberate indifference he allowed the operation to continue and all Defendants

7  failed to act to stop the operation and make arrests when there was a high risk of

8  loss of contraband when five suspects appeared on scene to complete the

9  transfer. The transfer was conducted in a parking lot that could have easily been

10  blocked by as few as three vehicles in the event of an abduction of an officer, yet

11  no attempt was made to seal the parking lot. Defendants' failure to properly

12  communicate after a shooting occurred significantly increased the time that

13  elapsed before first aid was provided to Plaintiff LLANEZ that was a significant

14  factor in causing his death. Defendants first created the danger and then failed to

15  use reasonable care necessary while conducting undercover operations that

16  resulted in the death of Plaintiff while acting under color of state and federal law

17  while conducting a JOINT TASKFORCE OPERATION with OFFCER MARK

18  MEREDITH of the CITY, pursuant to their actual and apparent authority.

19      66.    Plaintiffs allege that AGENT BARONI, AGENT GONZALEZ and

20  TECHNICAL ENFORCEMENT OFFICER BURBANK provided false

21  testimony to investigators regarding the statements made by AGENT

22  GONZALEZ upon entering the vehicle with AGENT BARONI and

23  TECHNICAL ENFORCEMENT OFFICER BURBANK immediately after the

24  shooting. All three individuals told investigators that AGENT GONZALEZ

25  believed had been shot with a firearm or words to that effect. Contrary to the

26  recording that was recovered from AGENT GONZALEZ that clearly indicated

27  he felt he "was all right" and he said that Plaintiff LLANEZ had a "Taser".

28  These statements were made within one minute of the last shot that was fired.

1    67.    Plaintiffs allege that Defendant Supervisors AGENT DORN,

2    AGENT GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH,

3    had access to the recordings as well as transcripts of the statements made to

4    investigators that were clearly contradictory and indicated that AGENT

5    BARONI, AGENT GONZALEZ and TECHNICAL ENFORCEMENT

6    OFFICER BURBANK provided false testimony to investigators regarding the

7    statements made by AGENT GONZALEZ upon entering the vehicle with

8    AGENT BARONI and TECHNICAL ENFORCEMENT OFFICER BURBANK

9    immediately after the shooting in that all three individuals told investigators that

10   AGENT GONZALEZ believed had been shot with a firearm or words to that

11   effect. Contrary to the recording that was recovered from AGENT GONZALEZ

12   that clearly indicated he felt he "was all right" and he said that Plaintiff

13   LLANEZ had a "Taser". These statements were made within one minute of the

14   last shot that was fired.

15   68.    As a result of the repeated unconstitutional actions of Defendants,

16   and each of them, FERNANDO GEOVANNI LLANEZ died. Plaintiffs

17   therefore have suffered, and continue to suffer, devastating and overwhelming

18   severe emotional distress, disgust, shock, anger, fright, nervousness and terror.

19   Plaintiffs have further suffered economic and non-economic damages.

20   ~~64~~69. Plaintiff ELIZABETH JIMINEZ and FERNANDO LLANEZ filed

21   their Government Claim for monetary damages pursuant to California

22   Governmental Code §910 et seq. and all provisions of the Government Code

23   against the Defendants on December 14, 2016, with the CVPD & HSI, within

24   the six (6) month deadline from the date of the subject incident involving

25   decedent, on June 14, 2016.

26   ~~65~~70. The office of the City Attorney for the City of Chula Vista sent

27   formal notice of rejection of Ms. JIMINEZ' and Mr. LLANEZ' claim. The

28   Complaint on behalf of Ms. JIMINEZ and Mr. LLANEZ was filed on June 13,

1   2017, within the six (6) month deadline from the date of rejection of the claim.

2   As such, the lawsuit is timely filed for State actions.

3       66 71. On June 6, 2017, both plaintiffs filed their Federal Government

4   Tort Claim Forms (Standard Form 95), for monetary damages against

5   defendants HSI, DEA, and CBP (USA), within the two (2) year deadline from

6   the date of the subject incident involving decedent, on June 14, 2016. After the

7   Federal government denied the claim a separate suit was filed on June 13, 2018

8   thus the suit has been timely filed for both Federal and State Defendants.

9

10      **FIRST CAUSE OF ACTION**

11  **VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

12  **(By Plaintiffs Against Defendants AGENT GONZALEZ, AGENT DORN,**

13  **AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENT**

14  **TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT**

15  **CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT**

16  **GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH, and**

17  **Does 1 5-100, inclusive)**

18      67 72. Plaintiffs reallege and hereby incorporate by reference the

19  allegations contained in all other paragraphs, inclusive, of this Complaint.

20      68 73. This cause of action is to redress a deprivation, under color of

21  authority, statute, ordinance, regulation, policy, custom, practice or usage of a

22  right, privilege and immunity secured to Plaintiffs by the Fourth and Fourteenth

23  Amendments to the United States Constitution and the Constitution and laws of

24  the State of California.

25      69 74. Defendants AGENT GONZALEZ, AGENT DORN, AGENT

26  OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENT TECHNICAL

27  ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS,

28  OFFICER MEREDITH and Does 1 5-100, and each of them, owed a duty of

1   ordinary care to avoid harm to Decedent FERNANDO GEOVANNI LLANEZ.

2   70 75. Plaintiffs contend and herein allege that Defendants AGENT

3   GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

4   SANCHEZ, AGENT TECHNICAL ENFORCEMENT OFFICER BURBANK,

5   AGENT CASTELLANOS, OFFICER MEREDITH and Does 15-100, and each

6   of them, breached these aforementioned duties, either negligently or

7   intentionally, in relation to all their interactions with Decedent FERNANDO

8   GEOVANNI LLANEZ, on June 14, 2016, including, but not limited to, the use

9   of a firearm upon Decedent, the use of unauthorized ammunition upon

10  Decedent, failing to protect Decedent, failing to follow Federal

11  DirectivesEnforcement Operation Plan (Exhibit A) for implementing, staging

12  and briefing emergency medical personnel, failing to render timely first aid to

13  Decedent, and fatally shooting Decedent multiple times, while unarmed.

14  Defendants failure to follow established procedure set forth in the Enforcement

15  Operations Plan (Exhibit A) regarding terminating an operation if "it appears

16  that agents are in jeopardy of losing the contraband, the conveyance will be

17  stopped and the narcotics will be seized and secured. Any individual attempting

18  to make contact with the target vehicle with the intent to assist delivery of the

19  vehicle will be arrested or detained pending further investigation." (Exhibit A at

20  p.5) Although Defendant AGENT BARONI stated to investigators after the

21  shooting that ".Five people show up. That's a little ridiculous. That's when I'm

22  like this is, I think at that point, we 're all thinking like, we need to call this, like,

23  get him the hell out of there.". Indicating that not only he believed the operation

24  should have been stopped as soon as the last vehicle arrived with Plaintiff

25  LLANEZ and another individual that made a total of five suspects, AGENT

26  BARONI stated "we're all thinking" to indicate that all of the JOINT

27  TASKFORCE OPERATION Defendants knew they should have stopped the

28  conveyance and arrested everyone for the safety of all of the individuals

1   involved. The Defendants and DOES 5-100 acted with deliberate indifference to

2   a known and/or obvious danger by allowing the operation to continue after the

3   arrival of five suspects on scene. Had the operation been stopped at that time,

4   Plaintiff LLANEZ would have been aware that he was dealing with law

5   enforcement personnel and perhaps not chased an individual he believed was

6   running away with the keys to the van and attempted to stop a faster individual

7   with non-lethal force. Thus there would have been no shooting had Defendants

8   acted appropriately, been trained appropriately and or had been supervised

9   appropriately. Any one of these individually could have prevented the shooting

10  and subsequent death of Plaintiff LLANEZ, yet none existed.

11      ~~71~~76. Plaintiffs contend and herein allege that Defendants AGENT

12  GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

13  SANCHEZ, TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

14  CASTELLANOS, OFFICER MEREDITH and Does 5-100, and each of them,

15  breached these aforementioned duties, either negligently or intentionally, in

16  relation to all their interactions with Decedent FERNANDO GEOVANNI

17  LLANEZ, on June 14, 2016, including, but not limited to, the failure to provide

18  and/or call for immediate medical assistance for Plaintiff LLANEZ after he had

19  been shot. After AGENT GONZALEZ shot Plaintiff LLANEZ, he failed to

20  provide medical assistance or call for any medical assistance for Plaintiff

21  LLANEZ and did not check to see if any other person had called for medical

22  assistance. AGENT BARONI, TECHNICAL ENFORCEMENT OFFICER

23  BURBANK, were in a vehicle with AGENT GONZALEZ when he stated he

24  believed he had shot and possibly killed Plaintiff LLANEZ, neither of the two

25  called for any medical assistance and did not check to see if any other person

26  had called for medical assistance.

27      77.   AGENT RILEY and OFFICER MEREDITH saw Plaintiff

28  LLANEZ, a few seconds after AGENT GONZALEZ left the vicinity, on the

1  ground, moving and bleeding and called for a BCST officer to place handcuffs

2  on Plaintiff LLANEZ and observed him handcuffed, moving and bleeding while

3  laying face down and neither of the two provided any medical assistance nor

4  called for any medical assistance and did not check to see if any other person

5  had called for medical assistance. AGENT DORN and AGENT SANCHEZ saw

6  Plaintiff LLANEZ at about the same time as AGENT RILEY and observed him

7  bleeding yet neither of the two provided any medical assistance nor called for

8  any medical assistance and did not check to see if any other person had called

9  for medical assistance. AGENTS CASTELLANO and AGENT OSORIO

10  observed Plaintiff bleeding and on the ground and neither of the two provided

11  any medical assistance nor called for any medical assistance and did not check

12  to see if any other person had called for medical assistance.

13       78.    Defendants failed to follow provisions of the Enforcement

14  Operation Plan (Exhibit A) for implementing, staging and briefing emergency

15  medical personnel, failing to render timely first aid to Decedent, and after an

16  Agent shot Plaintiff LLANEZ multiple times, while unarmed. Defendants failed

17  to follow established procedure set forth in the Enforcement Operations Plan

18  (Exhibit A) regarding terminating an operation if "it appears that agents are in

19  jeopardy of losing the contraband, the conveyance will be stopped and the

20  narcotics will be seized and secured. Any individual attempting to make contact

21  with the target vehicle with the intent to assist delivery of the vehicle will be

22  arrested or detained pending further investigation." (Exhibit A at p.5) Although

23  Defendant AGENT BARONI stated to investigators after the shooting that

24  ".Five people show up. That's a little ridiculous. That's when I'm like this is, I

25  think at that point, we 're all thinking like, we need to call this, like, get him the

26  hell out of there.". Indicating that not only he believed the operation should have

27  been stopped as soon as the last vehicle arrived with Plaintiff LLANEZ and

28  another individual that made a total of five suspects, AGENT BARONI stated

1   "we're all thinking" to indicate that all of the JOINT TASKFORCE

2   OPERATION Defendants knew they should have stopped the conveyance and

3   arrested everyone for the safety of all of the individuals involved. The

4   Defendants and DOES 5-100 acted with deliberate indifference to a known

5   and/or obvious danger by allowing the operation to continue after the arrival of

6   five suspects on scene. Had the operation been stopped at that time, Plaintiff

7   LLANEZ would have been aware that he was dealing with law enforcement

8   personnel and perhaps not chased an individual he believed was running away

9   with the keys to the van and attempted to stop a faster individual with non-lethal

10  force. Thus there would have been no shooting had Defendants acted

11  appropriately, been trained appropriately and or had been supervised

12  appropriately. Any one of these individually could have prevented the shooting

13  and subsequent death of Plaintiff LLANEZ, yet none existed.

14          79.    After the danger was created by Defendants, they failed to act to

15  protect Plaintiff LLANEZ and delayed medical treatment because Defendants,

16  due to their negligence and lack of training and supervision, they did not have

17  proper communications to know that AGENT GONZALEZ had been safely

18  removed from the area and lost crucial moments focusing on a non-existent

19  abduction of AGENT GONZALEZ instead of rendering first aid to Plaintiff

20  LLANEZ while he was alive, or making sure the Fire Station that was located in

21  the parking lot adjacent to the incident had personnel respond as soon as

22  possible.

23          80.    Plaintiffs contend and herein allege that Defendant Supervisors

24  AGENT DORN, AGENT MUNOZ, AGENT GRIMMING, AGENT

25  GIANNANTONIO, OFFICER MEREDITH failed to properly train the other

26  Defendants in the proper conduct of an undercover operation and the need and

27  ability to safeguard team members, suspects and the general public. Throughout

28  the entire operation, law enforcement personnel frequently and consistently

referred to suspects as "crooks" indicating the law enforcement personnel had a
prejudicial mind-set involving the suspects, thus dehumanizing them in a way
that depriving them of their civil rights was more likely. Defendants did in fact
violate the Civil Rights of Plaintiff LLANEZ by placing him an a dangerous
situation created by the Defendants in selling 2,000 pounds of marijuana and
failing to adhere to reasonable undercover tactics and procedures and then
failing to stop the operation that resulted in his shooting and failure by the
remaining Defendants to provide timely medical treatment which resulted in his
death. Defendant Supervisors failed to stop the conveyance on June 7, 2016,
when HSI attempted to deliver the marijuana to a buyer named Juan under the
terms of the Enforcement Operation Plan, but a Confidential Informant known
as MIGUEL (CI) informed HSI that Juan did not have the money available.
Thus the ICD involving the marijuana involved in the Enforcement Operation
Plan was done because it could no longer achieve the purpose for which the
Defendant UNITED STATES allowed illegal drugs to cross into the sovereign
territory of the United States from Mexico. The purpose was to dismantle a
particular DTO that sought to bring in that particular shipment. The drugs should
have been destroyed at this point. Nevertheless, UNITED STATES and CITY
personnel and supervisors continued to allow the other Defendants to try to sell
the marijuana several times in exchange for $200,000 in "delivery fees" and
created a danger that is involved in many illegal drug transfers, but now created
additional danger because they had no idea of the backgrounds or identities of
the new purchasers. Since the Defendant Supervisors did not know the identities,
they did not know if they were dealing with a legal purchaser of medical
marijuana in California for which Congress has prohibited the expenditure of
funds to in California that would prevent it from implementing its own "laws
that authorize the use, distribution, possession, or cultivation of medical
marijuana" (Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, §

1   542, 129 Stat. 2242, 2332–33 (2015).

2   / / /

3          81.     Plaintiffs contend and herein allege that Defendant Supervisors

4   AGENT DORN, AGENT MUNOZ, AGENT GRIMMING, AGENT

5   GIANNANTONIO, OFFICER MEREDITH failed to properly supervise the

6   other Defendants in the proper conduct of an undercover operation and the need

7   and ability to safeguard team members, suspects and the general public.

8   Throughout the entire operation, law enforcement personnel frequently and

9   consistently referred to suspects as "crooks" indicating the law enforcement

10  personnel had a prejudicial mind-set involving the suspects, thus dehumanizing

11  them in a way that depriving them of their civil rights was more likely.

12  Defendants did in fact violate the Civil Rights of Plaintiff LLANEZ by placing

13  him an a dangerous situation created by the Defendants in selling 2,000 pounds

14  of marijuana and failing to adhere to reasonable undercover tactics and

15  procedures and then failing to stop the operation that resulted in his shooting and

16  failure by the remaining Defendants to provide timely medical treatment which

17  resulted in his death. Defendant Supervisors failed to stop the conveyance on

18  June 7, 2016, when HSI attempted to deliver the marijuana to a buyer named

19  Juan under the terms of the Enforcement Operation Plan, but a Confidential

20  Informant known as MIGUEL (CI) informed HSI that Juan did not have the

21  money available. Thus the ICD involving the marijuana involved in the

22  Enforcement Operation Plan was done because it could no longer achieve the

23  purpose for which the Defendant UNITED STATES allowed illegal drugs to

24  cross into the sovereign territory of the United States from Mexico. The purpose

25  was to dismantle a particular DTO that sought to bring in that particular

26  shipment. The drugs should have been destroyed at this point. Nevertheless,

27  UNITED STATES and CITY personnel and supervisors continued to allow the

28  other Defendants to try to sell the marijuana several times in exchange for

1   $200,000 in "delivery fees" and created a danger that is involved in many illegal
2   drug transfers, but now created additional danger because they had no idea of the
3   backgrounds or identities of the new purchasers. Since the Defendant
4   Supervisors did not know the identities, they did not know if they were dealing
5   with a legal purchaser of medical marijuana in California for which Congress
6   has prohibited the expenditure of funds to in California that would prevent it
7   from implementing its own "laws that authorize the use, distribution, possession,
8   or cultivation of medical marijuana" (Consolidated Appropriations Act, 2016,
9   Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332–33 (2015).

10      82.   Plaintiffs contend and herein allege that the aforementioned

11   negligent/intentional breach of their duties by Defendants AGENT

12   GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

13   SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK,

14   AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100

15   constituted violations of the civil rights of Decedent FERNANDO GEOVANNI

16   LLANEZ, in contravention of 42 U.S.C. §1983 of the Fourth and Fourteenth

17   Amendments of the Constitution of the United States and the laws of the State of

18   California. Plaintiffs further contend and allege that Defendants AGENT

19   GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

20   SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK,

21   AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100's

22   disregard of Decedent's aforementioned civil rights was done by either actual

23   malice or deliberate indifference to Decedent's civil rights.

24      ~~72~~83. Plaintiffs contend and herein allege that Defendants AGENT

25   GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

26   SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK,

27   AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100's

28   intentional use of a firearm upon and failure to follow Federal directives to stage

emergency responders and or, timely render first aid to Decedent FERNANDO GEOVANNI LLANEZ were the legal cause of his death on June 14, 2016.

~~73~~84. On or about June 14, 2016, Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100, and each of them, violated decedent's civil rights under the Fourth and Fourteenth Amendments of the United States Constitution prohibiting unlawful search and seizure and violation of due process of law. The violation was under color of state and federal law. Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100, and each of them, acted in violation of the Fourth and Fourteenth Amendments of the United States Constitution, when decedent was subjected to excessive force and killed.

~~74~~85. The actions of Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100, as aforesaid, violated the Fourth and Fourteenth Amendments of the United States Constitution and violated 42 U.S.C. § 1983. The violation of Decedent's civil rights directly and proximately caused the injuries and damages to Plaintiffs as more fully set forth below.

~~75~~86. The false and illegal seizure and use of excessive force on FERNANDO GEOVANNI LLANEZ was in violation of his civil rights to be free from the unreasonable search and seizure of his person, to be free from the loss of his physical liberty interest, and denial of substantive due process under the Fourth and Fourteenth Amendments of the United States Constitution. In

1  addition, in taking the aforesaid action Defendants AGENT GONZALEZ,

2  AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

3  AGENT TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

4  CASTELLANOS, OFFICER MEREDITH and DOES 15-100, and each of them,

5  violated FERNANDO GEOVANNI LLANEZ's civil rights, by being

6  deliberately indifferent to FERNANDO GEOVANNI LLANEZ's physical

7  security, as set forth in *Wood v. Ostrander*, 879 F.2d 583.

8      7687. Defendants AGENT GONZALEZ, AGENT DORN, AGENT

9  OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENT TECHNICAL

10  ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS,

11  OFFICER MEREDITH and DOES 15-100, and each of their, actions as

12  aforesaid directly and proximately caused injuries and damages to Plaintiffs, as

13  more fully set forth below.

14      7788. On or about June 14, 2016, Defendants AGENT GONZALEZ,

15  AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

16  AGENT TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

17  CASTELLANOS, OFFICER MEREDITH and DOES 15-100 violated

18  FERNANDO GEOVANNI LLANEZ's and Plaintiffs' Civil Rights by using a

19  degree of physical coercion which was not objectively reasonable under the

20  circumstances. FERNANDO GEOVANNI LLANEZ was reacting to a theft of a

21  vehicle with non-lethal force. He was shot three times and no longer could have

22  posed a threat, when he was executed by AGENT GONZALEZ' shot into his

23  mid back when on the ground. Decedent had not committed a crime. Defendants

24  AGENT GONZALEZ, and DOES 15-100's use of excessive force was

25  unreasonable and in violation of FERNANDO GEOVANNI LLANEZ' and

26  Plaintiffs' civil rights under the Fourth and Fourteenth Amendments of the

27  United States Constitution to be free from an unreasonable seizure of his person

28  and to be free from a loss of physical liberty. Defendants AGENT GONZALEZ,

and DOES 1-5-100's use of excessive force was in violation of FERNANDO
GEOVANNI LLANEZ's and Plaintiffs' Fourth and Fourteenth Amendment
Rights.

78-89. Defendants AGENT GONZALEZ, and DOES 1-5-100's use of
excessive force was unreasonable and in violation of FERNANDO GEOVANNI
LLANEZ'S and Plaintiffs' civil rights and violated the Fourteenth Amendment
to the United States Constitution as their actions were sadistic and malicious and
did not further any legitimate legal purpose.

79-90. Each of the Defendants AGENT GONZALEZ, AGENT DORN,
AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENT
TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT
CASTELLANOS, OFFICER MEREDITH and DOES 1-5-100 named herein, is
individually liable for the violation of Decedent FERNANDO GEOVANNI
LLANEZ'S and Plaintiffs' Civil Rights apart and aside from the customs,
policies and practices of USA, CITY and/or HSI, DEA, CBP.

80-91. As a direct and proximate result of the conduct of Defendants
AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI,
AGENT SANCHEZ, AGENT TECHNICAL ENFORCEMENT OFFICER
BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES 1-5-
100, and each of them, Decedent FERNANDO GEOVANNI LLANEZ suffered
the following injuries and damages for which Plaintiffs may recover:

A. Violation of Decedent FERNANDO GEOVANNI LLANEZ'S
Constitutional Rights under the Fourth and Fourteenth Amendments to the
United States Constitution to be free from unreasonable search and seizure of his
person, deprivation of life and liberty and denial of due process of law;

B. Loss of the life of FERNANDO GEOVANNI LLANEZ including the
value of his life;

C. Conscious physical pain, suffering and emotional trauma during the

1  incident.

2      ~~81~~92. As a direct and proximate result of the actions of Defendants

3  AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI,

4  AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER

5  BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-

6  100, and each of them, Plaintiffs have also suffered the following injuries,

7  including but not limited to:

8      A. Loss of love, aide, comfort and society due to the death of Decedent

9  FERNANDO GEOVANNI LLANEZ, according to proof;

10      B. Loss of economic support of Decedent FERNANDO GEOVANNI

11  LLANEZ; and

12      C. Funeral and burial expenses according to proof.

13      ~~82~~93. The conduct of Defendants AGENT GONZALEZ, AGENT DORN,

14  AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~

15  TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

16  CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100, was reckless and

17  acted with callous indifference to the federally protected rights of FERNANDO

18  GEOVANNI LLANEZ and Plaintiffs. Defendants AGENT GONZALEZ,

19  AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

20  ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

21  CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100, and each of them,

22  engaged in despicable conduct by using unreasonable and excessive force and

23  was malicious and in reckless and conscious disregard for the rights and

24  individual safety of Plaintiffs. As such, Plaintiffs ELIZABETH JIMINEZ and

25  FERNANDO LLANEZ are entitled to punitive damages in accord with

26  constitutionally permitted limits to punish and make an example of the

27  individual defendant officers and agents.

28      ~~83~~94. Plaintiffs are entitled to an award of attorneys' fees, costs and

expenses under 42 U.S.C. Section 1988 due to Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, OFFICER MEREDITH and DOES ~~1~~5-100's violations of Decedent FERNANDO GEOVANNI LLANEZ'S and Plaintiffs' Civil Rights.

## SECOND CAUSE OF ACTION
## (DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF LAW)
## [BIVENS ACTION]
## [Bivens v. Six Unknown Named Federal Narcotics Agents,
## 403 U.S. 388 (1971)]
## (Plaintiffs Against Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT GIANNANTONIO and Does ~~1~~5-100, inclusive)

~~84~~95. Plaintiffs reallege and hereby incorporate by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

~~85~~96. Bivens established that "compensable injury to a constitutionally protected interest [by federal officials alleged to have acted under color of federal law] could be vindicated by a suit for damages invoking the general federal question jurisdiction of the federal courts [pursuant to 28 U.S.C. § 1331]." *Butz v. Economou*, 438 U.S. 478, 486 (1978). "Actions under §1983 by a federal actor under Bivens." *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991).

~~86~~97. Plaintiffs bring this Fourth Amendment claim based on excessive force in the shooting and delay of medical treatment that resulted in the death of

1  Plaintiffs' Decedent at the hands of defendants AGENT GONZALEZ, AGENT

2  DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

3  AGENTTECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

4  CASTELLANOS, and Does 1-100, among others.

5  87/ / /

6  CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING,

7  AGENT GIANNANTONIO and Does 5-100, among others.

8      98.    At all times relevant, plaintiffs assert that defendants AGENT

9  GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

10  SANCHEZ, AGENTTECHNICAL ENFORCEMENT OFFICER BURBANK,

11  AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT

12  GRIMMING, AGENT GIANNANTONIO and Does 15-100 were employed by

13  the USA and acted under the color of federal law in carrying out the wrongful

14  conduct complained of herein.

15      8899. Plaintiffs assert that defendants AGENT GONZALEZ, AGENT

16  DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

17  AGENTTECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

18  CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING,

19  AGENT GIANNANTONIO and Does 15-100 acted under the color of law in

20  violating Plaintiffs' Decedent's constitutional right to be free from deprivation

21  of life and liberty and unreasonable seizure. Defendant AGENT GONZALEZ,

22  while acting under color of federal law, used unreasonable deadly force, the

23  remaining defendants created a danger for which they failed to either stop the

24  operation or render aid, which deprived Decedent of his federal civil rights

25  provided by the Fourth Amendment to the Constitution, which resulted in

26  Decedent's death.

27      89100.    Defendant AGENT GONZALEZ deprived Decedent of his

28  4th Amendment rights to be free from unreasonable seizure and to be free from

1   deprivation of his life and liberty, when defendant AGENT GONZALEZ used

2   unreasonable and excessive deadly force when he shot Decedent, while

3   Decedent was unarmed and on the ground, ultimately killing Decedent.

4   ~~90~~101.      Defendants AGENT DORN, AGENT OSORIO, AGENT

5   BARONI, AGENT SANCHEZ, TECHNICAL ENFORCEMENT OFFICER

6   BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ,

7   AGENT GRIMMING, AGENT GIANNANTONIO deprived Decedent of his

8   4th Amendment rights to be free from unreasonable seizure and to be free from

9   deprivation of his life and liberty when they created a danger for which they

10   failed to either stop the operation or render aid, which in fact deprived Decedent

11   of his 4th Amendment rights to be free from unreasonable seizure and to be free

12   from deprivation of his life and liberty, by ultimately killing Decedent.

13   102.   As a direct result of defendants AGENT GONZALEZ, AGENT

14   DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

15   ~~AGENT~~TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

16   CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING,

17   AGENT GIANNANTONIO and Does ~~1~~5-100's unlawful, deliberate conduct,

18   Plaintiffs have suffered irreparable injuries, including, but not limited to, the loss

19   of love, aid and comfort of their son, for which they should receive

20   compensation.

21

22   **THIRD CAUSE OF ACTION**

23   **(WRONGFUL DEATH (C.C.P. § 377.60))**

24   **COUNT ONE**

25   **[Assault and Battery]**

26   **(By Plaintiffs Against Defendants AGENT GONZALEZ, ~~and/or Does 1-100,~~**

27   **~~inclusive)~~**

28   **~~91~~and/or Does 5-100, inclusive)**

103.   Plaintiffs reallege and hereby incorporate by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

~~92~~104.        On or about June 14, 2016, Decedent FERNANDO GEOVANNI LLANEZ was standing alongside a white van located in a shopping center parking lot in Chula Vista, posing no threat to anyone, nor breaking any law.

~~93~~/ / /

105.   Thereafter, Defendant AGENT GONZALEZ, in the course and scope of his employment with Defendants USA and HSI, seized, shot multiple times, and assaulted and battered, unarmed Decedent FERNANDO GEOVANNI LLANEZ when he was on the ground. Plaintiffs are informed and believe and thereon allege that Defendant AGENT GONZALEZ, unnecessary, intentional and unsafe discharging of his firearm at Decedent FERNANDO GEOVANNI LLANEZ resulted in his death.

~~94~~106.        Defendant AGENT GONZALEZ, and Does ~~1~~5-100, intended to cause, and did cause, Plaintiffs to suffer serious physical and emotional harm as the result of the intentional and unnecessary application of force to Decedent FERNANDO GEOVANNI LLANEZ.

~~95~~107.        Defendant AGENT GONZALEZ, and Does ~~1~~5-100, and each of them, are therefore liable for battery upon Decedent FERNANDO GEOVANNI LLANEZ. Additionally, the USA and/or HSI are responsible for the conduct of their employees on a theory of respondeat superior.

~~96~~108.        As a direct and proximate result of the actions of Defendants AGENT GONZALEZ, and/or Does ~~1~~5-100, and each of them, Plaintiffs have also suffered the following injuries, including but not limited to:

A. Loss of love, aide, comfort and society due to the death of Decedent FERNANDO GEOVANNI LLANEZ, according to proof;

B. Loss of economic support of Decedent FERNANDO GEOVANNI

1  LLANEZ; and

2      C. Funeral and burial expenses according to proof.

3  / / /

4  / / /

5  / / /

6  / / /

7  / / /

8  **COUNT TWO**

9  **[Negligence]**

10  **(By Plaintiffs Against Defendants AGENT GONZALEZ, AGENT DORN,**

11  **AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,** ~~AGENT~~

12  **TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT**

13  **CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT**

14  **GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH,**

15  **AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT**

16  **GIANNANTONIO USA, CITY and/or Does 1̶5-100, inclusive)**

17  ~~97~~109.      Plaintiffs reallege and hereby incorporate by reference the

18  allegations contained in all other paragraphs, inclusive, of this Complaint.

19  ~~98~~110.      On or about June 14, 2016, Defendant AGENT

20  GONZALEZ, and/or Does 1̶5-100: negligently discharged their firearms,

21  multiple times at and upon Decedent FERNANDO GEOVANNI LLANEZ, such

22  that he sustained fatal injuries and died. All other named Defendants and Does

23  1̶5-100: negligently failed to follow normal law enforcement procedures to stop

24  the under-cover operation when several suspects arrived on the scene indicating

25  a higher level of risk in violation of Federal Directives~~;~~ (Exhibit A); failed to

26  properly brief personnel for the location of the operation and actions that would

27  trigger the termination of the operation; failed to make adjustments to

28  emergency personnel then the location of the operation was changed; failed to

provide proper medical emergency personnel in the event of an injury; failed to

promptly call for first aid when Plaintiff had been shot.

~~99~~111.        As a direct, legal and proximate result of Defendants

AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI,

AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER

BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ,

AGENT GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH,

AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT

GIANNANTONIO, USA, CITY, and/or Does ~~1~~5-100's negligence, Plaintiffs

suffered emotional distress.

~~100~~112.        At all times herein mentioned, Defendants AGENT

GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER BURBANK,

AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT

GRIMMING, AGENT GIANNANTONIO OFFICER MEREDITH, AGENT

RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT GIANNANTONIO,

USA, CITY, and/or Does ~~1~~5-100 failed to follow procedural directives and

intentionally, recklessly and/or negligently caused injuries and the death of

Decedent FERNANDO GEOVANNI LLANEZ.

~~101~~113.        Each of the individual defendants and the municipal

defendants acted in concert and without authorization of law and each of the

individual defendants, separately and in concert, acted willfully, knowingly,

negligently with reckless disregard and callous indifference, and purposely with

the intent to deprive Plaintiffs of their rights and privileges, and did in fact

violate the aforementioned rights and privileges.

~~102.~~ 114.    As a direct and proximate result of the actions of Defendants

AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI,

AGENT SANCHEZ, ~~AGENT~~ TECHNICAL ENFORCEMENT OFFICER

1 BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ,

2 AGENT GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH,

3 AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT

4 GIANNANTONIO, USA, CITY, and/or Does 15-100, and each of them,

5 Plaintiffs have also suffered the following injuries, including but not limited to:

6      A. Loss of love, aide, comfort and society due to the death of Decedent

7 FERNANDO GEOVANNI LLANEZ, according to proof;

8 / / /

9      B. Loss of economic support of Decedent FERNANDO GEOVANNI

10 LLANEZ; and

11      C. Funeral and burial expenses according to proof.

12

13 **FOURTH CAUSE OF ACTION**

14 **(WRONGFUL DEATH/SURVIVAL PURSUANT TO THE FEDERAL**

15 **TORT**

16 **CLAIMS ACT BASED ON BATTERY)**

17 **(Plaintiffs against defendant USA)**

18 103115.     Plaintiffs reallege and hereby incorporate by reference the

19 allegations contained in all other paragraphs, inclusive, of this Complaint.

20 104116.     This claim for relief is brought pursuant to the Decedent

21 FERNANDO GEOVANNI LLANEZ, when AGENT GONZALEZ, while acting

22 within the course and scope of his employment used unlawful deadly force in

23 shooting and killing Decedent, on June 14, 2016, notwithstanding that Decedent

24 was defenseless, when the fatal shot was fired by AGENT GONZALEZ.

25 105117.     Plaintiffs are informed and believe, and thereon allege, that at

26 all times alleged in this Complaint, Defendant AGENT GONZALEZ was acting

27 under color of law while employed as an Agent of HSI for Defendant USA. In

28 such capacity, Defendant AGENT GONZALEZ intentionally shot Decedent on

or about June 14, 2016, while Defendant AGENT GONZALEZ was in the course and scope of his employment with Defendant. Plaintiffs are informed and believe and thereon allege, that while acting under color of law during the performance of his law enforcement functions, Defendant AGENT GONZALEZ had a duty to refrain from the use of excessive force in the taking into custody of decedent. In shooting decedent under such circumstances, Defendant AGENT GONZALEZ perpetrated a non-consensual touching of decedent's body.

~~106~~ / / /

118.   As a direct and proximate result of the acts and omissions of Defendant AGENT GONZALEZ, while in the course and scope of his employment with Defendant USA, decedent suffered fatal injuries for which Plaintiffs now complain. Plaintiffs are informed and believe, and thereon allege, that such acts and omissions by such Defendants fall within the purview of 28 U.S.C. §2680, et seq.

~~107~~119.      As a direct and proximate result of the actions of Defendants AGENT GONZALEZ and USA, Plaintiffs have suffered loss of love, aid, comfort, and society of decedent, loss of financial support, loss of value of life to himself and any and all other damages allowed under the Federal Tort Claims Act for which Plaintiffs seek compensatory damages against Defendants.


**FIFTH CAUSE OF ACTION**

**(FOR WRONGFUL DEATH/SURVIVAL PURSUANT TO THE FEDERAL**

**TORT CLAIMS ACT BASED ON NEGLIGENCE)**

**(Plaintiffs against defendant USA)**

~~108~~120.      Plaintiffs reallege and hereby incorporate by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

~~109~~121.      On June 14, 2016, Defendants AGENT GONZALEZ,

1   AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ,

2   ~~AGENT~~TECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT

3   CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING,

4   AGENT GIANNANTONIO, and Does ~~1~~5-100 had a duty, while acting in the

5   course and scope of their employment with Defendant USA, to not violate the

6   rights of decedent under the 4th and 14th Amendments of the United States

7   Constitution. Defendants AGENT GONZALEZ, AGENT DORN, AGENT

8   OSORIO, AGENT BARONI, AGENT SANCHEZ, ~~AGENT~~TECHNICAL

9   ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, AGENT

10  RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT GIANNANTONIO,

11  and Does ~~1~~5-100 had a further duty to act with due care including, but not

12  limited to, following appropriate policies and procedures (Exhibit A) and to not

13  allow a situation to develop in which they would, through a lack of due care,

14  cause the death of another human being.

15      ~~110~~122.      On or about June 14, 2016, Defendants AGENT

16  GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

17  SANCHEZ, ~~AGENT~~TECHNICAL ENFORCEMENT OFFICER BURBANK,

18  AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT

19  GRIMMING, AGENT GIANNANTONIO, and Does ~~1~~5-100 negligently or

20  otherwise wrongfully breached their duty of due care when they placed

21  themselves in a position such as to discharge a firearm at decedent, resulting in

22  Decedent's death. At all times herein mentioned, Defendants AGENT

23  GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT

24  SANCHEZ, ~~AGENT~~TECHNICAL ENFORCEMENT OFFICER BURBANK,

25  AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT

26  GRIMMING, AGENT GIANNANTONIO, and Does ~~1~~5-100, either negligently

27  or through other wrongful conduct, as alleged herein, caused the death of

28  decedent when AGENT GONZALEZ ~~shot decedent on June 14, 2016~~, acting as

part of a JOINT TASKFORCE OPERATION with Defendants, shot decedent on June 14, 2016, and named Defendants failed to provide or call for immediate medical assistance which was delayed because of their negligence and or lack of supervision and training.

111123.    The negligence of other wrongful conduct of Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENTTECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT GIANNANTONIO, and Does 15-100, resulted in the death of decedent and gives rise to a cause of action under the Federal Tort Claims Act, 28 U.S.C. sec. 2680, et seq. At all times herein mentioned, Defendants AGENT GONZALEZ, AGENT DORN, AGENT OSORIO, AGENT BARONI, AGENT SANCHEZ, AGENTTECHNICAL ENFORCEMENT OFFICER BURBANK, AGENT CASTELLANOS, AGENT RILEY, AGENT MUNOZ, AGENT GRIMMING, AGENT GIANNANTONIO, and Does 15-100 should have maintained appropriate precautions and avoided a palpably dangerous situation such as to not to create a condition where AGENT GONZALEZ would need to discharge his firearm and cause the death of decedent and. Defendant AGENT GONZALEZ breached these duties when he negligently or otherwise wrongfully shot decedent causing, and other DEFENDANTS failed to act to stop the operation before the point AGENT GONZALEZ pulled the trigger the fourth time, and thereafter failed to provide medical care or make sure medical care was provided in a timely manner, the lack of which caused decedent's untimely death.

112124.    As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered loss of love, aid, comfort, and society of decedent, loss of financial support, loss of value of life to himself and any and all other damages allowed under the Federal Tort Claims Act for which Plaintiffs seek

1    compensatory damages against Defendants.

2    / / /

3    / / /

4    / / /

5    / / /

6    / / /

7    / / /

8    / / /

9    / / /

10   / / /

11   **SIXTH CAUSE OF ACTION**

12   **VIOLATION OF FEDERAL CIVIL RIGHTS UNDER**

13   **42 U.S.C. §§ 1983 & 1985**

14   **CLAIM FOR CONSPIRACY**

15   **(By Plaintiffs Against Defendants AGENT GONZALEZ, AGENT**

16   **BARONI, TECHNICAL ENFORCEMENT OFFICER BURBANK,**

17   **AGENT MUNOZ, AGENT DORN, AGENT GRIMMING, AGENT**

18   **GIANNANTONIO, OFFICER MEREDITH, and Does 5-100, inclusive)**

19        125.   Plaintiffs reallege and hereby incorporate by reference the

20   allegations contained in all other paragraphs, inclusive, of this Complaint.

21        126.   The Defendants AGENT GONZALEZ, AGENT BARONI,

22   TECHNICAL ENFORCEMENT OFFICER BURBANK, and Does 5-100,

23   inclusive, reached an understanding to state AGENT GONZALEZ believed he

24   had been shot with a firearm, engaged and continued to engage in a course of

25   conduct, and otherwise jointly acted and/or conspired among and between

26   themselves to conceal the fact that AGENT GONZALEZ knew he could have

27   only been Tasered, and delay medical treatment for Plaintiff LLANEZ in

28   violation of his constitutional rights, by making completely false, inaccurate, and

- 64 –

misleading reports, and to make false statements to investigating officers in order to conceal their wrongdoing.

127.   Supervisors AGENT DORN, AGENT GRIMMING, AGENT GIANNANTONIO, OFFICER MEREDITH, and Does 5-100, inclusive had access to both the audio recordings and the completely false, inaccurate, and misleading reports, and access to notes of false statements made to investigating officers in order to conceal the wrongdoing.

128.   In furtherance of this conspiracy or conspiracies, the Defendants committed the overt acts as alleged in this complaint.

129.   These conspiracies are continuing.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, for each cause of action, as follows:

1. For all special damages including, but not limited to, lost wages and future earning capacity;

2. For all general damages including, but not limited to, severe emotional distress, disgust, terror, fright, anger, anxiety, worry, nervousness, shock, loss of enjoyment of life, loss of ability to engage in normal and customary activities, loss of comfort, society, care and companionship;

3. For other and further special damages in a sum according to proof at the time of trial;

4. For other and further general damages in a sum according to proof at the time of trial;

5. For funeral and burial expenses of Decedent, according to proof;

6. For prejudgment interest according to proof;

7. For punitive damages against the following individuals: AGENT GONZALEZ, and/or Does 15-100, in an amount according to proof at the time of trial;

8. For costs of suit incurred herein;

1    9. For other and further relief as this court may deem just and proper; and

2    10. For legal fees, expenses and costs incurred in prosecution in the

3 present action for violation of Civil Rights pursuant to 42 U.S.C. §1988, to the

4 extent provided by law.

5

6 DATED:  ~~January 30, 2019~~July 15, 2020      /s/ Jorge I. Hernandez

7

8                              Jorge I. Hernandez, Esq.
                               Attorney for Plaintiff

9

10   / / /

11   / / /

12                    **DEMAND FOR JURY TRIAL**

13    Plaintiff hereby demands a jury trial in the instant action on all stated

14 causes of action.

15

16 DATED:  ~~January 30, 2019~~July 15, 2020        /s/ Jorge I. Hernandez

17

18                              Jorge I. Hernandez, Esq.
                               Attorney for Plaintiff

19

20 c:\docs\jihlaw\clients\12l\12-17\12-17-0001\p-pleadings\200715 complaint sac consol f.doc

21

22

23

24

25

26

27

28