JORGE I. HERNANDEZ, ESQ. (SBN 263617)
Law Offices of Jorge I. Hernandez
823 Anchorage Place
Chula Vista, CA 91914
Ph: (619) 985-0348
Email; jorge@jihlaw.com

JORGE I. HERNANDEZ Daniel M. Smith, Esq. (SBN 149334)
SAN DIEGO DEFENDERS APC
585 Third Avenue
Chula Vista CA 91910
Ph: (619) 233-6900; Fax: (619) 374-8477
Email: dsmith@sandiegodefenders.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH JIMINEZ, individually, and as successor in interest of FERNANDO GEOVANNI LLANEZ, deceased; FERNANDO LLANEZ, individually, and as successor in interest of FERNANDO GEOVANNI LLANEZ, deceased<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA; CITY OF CHULA VISTA, a public entity; RONALDO RICARDO GONZALEZ, an individual; MARCUS OSORIO, an individual; CHRIS BARONI, an individual; ANGELA SANCHEZ, an individual; MICHAEL BURBANK, an individual; JEREMY DORN, an individual; ANTHONY CASTELLANOS, an individual; MARK MEREDITH, an individual; and DOES 1-100, inclusive,<br><br>Defendants. | CASE NO. 3:18-cv-1269-BTM-AGS (CONSOLIDATED 3:17-cv-1205)<br><br>**PLAINTIFF'S NOTICE OF LODGMENT IN RE CONSOLIDATED RESPONSES IN OPPOSITION TO THE CITY OF CHULA VISTA, UNITED STATES OF AMERICA'S AND RONALDO GONZALEZ' MOTIONS FOR SUMMARY JUDGMENT** |

Notice of Lodgment of Exhibits

Exhibit A HSI ICD Tac Plan

1   Exhibit B Transcript Gonzalez

2   Exhibit C CVPD DiTomasso re Meredith Burbank

3   Exhibit D Transcript Burbank

4   Exhibit E Gonzalez Back Image

5   Exhibit F CVPD Deaner Taser Inv

6   Exhibit G Llanez right hand

7   Exhibit H Llanez left hand

8   Exhibit I Llanez Face

9   Exhibit J Llanez Back

10   Exhibit K CVPD Witness interview shot in back on ground

11   Exhibit L CVPD Factual Diagram scene

12   Exhibit M Baroni Transcript

13

14   DATED:  July 7, 2021                     /s/ Jorge I. Hernandez

15                                                   _____
                                                    Jorge I. Hernandez, Esq.
16                                                   Attorney for Plaintiff

17   c:\docs\jihlaw\clients\12l\12-17\12-17-0001\m-motions\m-8 msj usa\210707 reply rule 56.doc

18

19                        **CERTIFICATE OF SERVICE**

20

21          I, the undersigned, declare: I am and was at the time of the service of the

22   papers herein referred over the age of 18 years and not a party to the action.  I

23   am a citizen of the United States and employed in San Diego, California; my

24   business address is 823 Anchorage Place, Chula Vista, CA 91914.  I am readily

25   familiar with the business practices of the collection and processing of

26   correspondence for mailing with the United States Postal Service.

27   Correspondence is deposited with the United States Postal Service on the same

28   day it is collected and processed in the ordinary course of business.

On July 7, 2021, a true and correct copy of the following pleadings: **PLAINTIFF'S NOTICE OF LODGMENT IN RE PLAINTIFF'S CONSOLIDATED RESPONSES IN OPPOSITION TO THE CITY OF CHULA VISTA, UNITED STATES OF AMERICA'S AND RONALDO GONZALEZ' MOTIONS FOR SUMMARY JUDGMENT** was served as follows:

**BY THE COURT VIA NEF**: Pursuant to controlling General Order(s) and in accordance with the Administrative Procedures and Guidelines for Electronic Filing, the foregoing document(s) will be served by the Court via Notice of Electronic Filing ("NEF") and hyperlink to the document. On July 7, 2021, I checked the CM/ECF docket for this case and the persons listed below are on the Electronic Mail List to receive NEF transmission at the email address listed.

U S Attorneys Office Southern District of CA   Efile.dkt.civ@usdoj.gov
Karen Lynn Rogan                              krogan@chulavistaca.gov
United States Department of Justice Torts Branch   siegmund.f.fuchs@usdoj.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 7, 2021 at Chula Vista, California.

       /s/ Jorge I. Hernandez
Jorge I. Hernandez

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

### ENFORCEMENT OPERATION PLAN

| HSI Office: DSAC San Ysidro | Case Number: SY13MR16SY0635 |
| --- | --- |
| Case Agent: Marcus Osorio | Contact Number(s): |
| HSI Supervisor: Jeff Grimming | Contact Number(s): |
| Team Leader (if separate): Mark Meredith | Contact Number(s): |
| AUSA or Other Prosecutor: TBD | Contact Number(s): |

Type of Operation: ☒ Controlled Delivery ☐ Search Warrant Execution ☐ Arrest Warrant Execution ☐ U/C Meeting ☐ Flashroll ☐ Other: Controlled delivery of narcotics

| High Risk Operation? ☐ Yes ☒ No | SRT Risk Analysis Completed? ☐ Yes ☒ No |
| --- | --- |
| Will SRT Conduct or Participate in Operation? ☐ Yes ☐ No | |

| | Date | Time | Location |
| --- | --- | --- | --- |
| BRIEFING | 06/02/16 | 5:00 pm | DSAC San Ysidro (HT Building conference room) |
| STAGING | 06/02/16 | 6:00 pm | DSAC San Ysidro (HT Building conference room) |
| EXECUTION OF OPERATION | 06/02/16 | 8:00 pm | Otay Mesa POE (Crossing) Unknown location (landing) |

Type of Premises: ☐ House ☐ Apartment ☐ Business ☒ Other:

Description of Premises: Otay Mesa Port of Entry

Violations of Law/Charges: 21 USC 841 (a) (1) and 21 USC 952 and 960

Conveyance Type/Description: Unknown

Type/Quantity of Contraband: 2000 pounds of marijuana

**Operational Objectives**

On June 2, 2016, DSAC San Ysidro HSI Agents intend on conducting an International Controlled Delivery (ICD) of an unknown conveyance containing approximately 2000 pounds of marijuana from the pre-primary area (U.S. territory) of the Otay Mesa Port of Entry (POE) to an unknown location in San Diego, California.

An unidentified individual will drive the narcotic-laden vehicle from Mexico to the pre-primary inspection area (U.S. territory) at the Otay Mesa POE. A HSI UC Agent will take possession of the vehicle in the pre-primary area (U.S. territory) and, through coordination with CBP Officers and Agents, be allowed to drive the vehicle through the inspection booth.

After the vehicle has crossed into the U.S., the UC Agent will use various driving techniques to assist surveillance Agents in identifying counter-surveillance and co-conspirators that may be following the vehicle. If it is determined that there is no counter-surveillance, and if it would not jeopardize the ICD, the UC will then take the vehicle to a pre-determined location. At a safe location, Agents will confirm the existence of the narcotics.

000151

| Brief Summary of Investigation |
| --- |

On or about May 17, 2016, U.S. Homeland Security Investigations (HSI) agents received information from a Source of Information (SOI) that he/she had information about a drug trafficking organization (DTO) that approached the SOI about providing assistance in the smuggling and transportation of narcotics through the San Diego Ports of Entry to San Diego, California.

Agents intend to conduct an International Controlled Delivery (ICD). Agents will only conduct the ICD if Agents have determined it will be successful and will ensure that all coordination required is completed and the operation is conducted in a safe manner.

A HSI UC Agent will take control of the unknown conveyance containing the marijuana in the pre-primary area of the Otay Mesa Port of Entry (U.S. territory) and drive to San Diego. This investigation will attempt to identify members of the DTO in the United States thereby disrupting and dismantling a portion of this DTO.

| Title 21 Coordination (if applicable) |
| --- |

Title 21 Investigation: ☒ Yes ☐ No

Is there a clearly articulable nexus to the international border?   ☒ Yes ☐ No

DEA Notified: ☒ Yes ☐ No

| Notifying HSI Supervisor: Jeffrey Grimming | DEA Supervisor Notified: James Pokryfke |
| --- | --- |
| HSI Title 21 Coordinator Delivering Operational Plan: Juan Munoz Assistant Special Agent In Charge (ASAC) | DEA Coordinator Receiving Operational Plan: |

| Deconfliction | | |
| --- | --- | --- |
| Operation Deconflicted? ☒ Yes ☐ No | Results of Deconfliction: ☐ Positive ☒ Negative | Method of Deconfliction/Systems or Centers Used: Location of delivery is unknown, agents will clear all operation locations before delivery and any enforcement actions with de-confliction center and local law enforcement |

If results were positive, describe results and steps taken in response:

| Local Police Notified? ☐ Yes  Date & Time: ☒ No | Local Police Official Notified: TBD |
| --- | --- |

Name, Address, and Contact Number(s) of Local Police:

| Undercover Operative (Attach additional information if more than one U/C operative) |
| --- |

Is U/C Operative?
☒ HSI Agent ☐ Other LEO ☐ CI ☐ Cooperating Defendant ☐ Other:

Name or Source Number of U/C Operative:

Physical Description:

Contact Number(s):

U/C Vehicle Description and License: N/A

HSI Enforcement Operation Plan                    2                    For Official Use Only

00162

| Officer Safety Information | |
|---|---|
| Distress Code<br>Audio: Don't Hurt Me<br>Visual: Hands in the Air | Arrest Signal<br>Audio: N/A<br>Visual: N/A |
| Nearest Hospital:  ⌧ Map Attached<br>Scripps Memorial Hospital<br>435 H. Street<br>Chula Vista, CA<br>619-691-7290 | Nearest Trauma Center (if different):  ⌧ Map Attached<br>Mercy Hospital<br>4077 5th Avenue<br>San Diego, CA        619-260-7000 |

Potential Hazards/Public Safety Concerns:
☐ High crime area ☐ Pets/Animals ☐ Children ☐ Elderly ☐ Persons with Disabilities ☐ Known Weapons
☐ Hazardous Materials/Chemicals ☐ Other:

Additional Details/Notes:


| Communications | |
|---|---|
| Radio Channels<br>Primary: 1A WA1 OM<br>Secondary: 1A JOP OM | Out of AOR Radio Channels:<br>Primary:<br>Secondary: |

| National Law Enforcement Communications Center (Sector) Contact Number: | |
|---|---|

| Local Command Center Location (if applicable): | Local Command Center Contact Number(s) (if applicable): |
|---|---|

| Air Support | | | |
|---|---|---|---|
| Air Support To Be Utilized?<br>☐ Yes ⌧ No | Call Sign: | Type of Aircraft: | Maximum Flight Time: |

Air Support Notes/Instructions:


| Other Considerations |
|---|
| Equipment Required: Body Wire, Binoculars, Tactical Gear, GPS |
| Attire: ☐ Tactical Dress ⌧ Plain Clothes ☐ Other: |
| Prisoner Processing Location: N/A |
| Anticipated Evidence To Be Transported: Marijuana |

| Seized Property Specialist<br>Participating?     ☐ Yes ⌧ No | Name and Contact Number(s): |
|---|---|

Foreign Language Required? ☐ Yes ⌧ No   If "Yes," Language(s) Required:
If foreign language is required, how need will be met (e.g., HSI personnel with language ability, interpreters):

| Computer Forensics Agent Needed?<br>☐ Yes  ⌧ No | Name and Contact Number(s): |
|---|---|
| Technical Enforcement Officer<br>Needed? ⌧ Yes  ☐ No | Technical equipment or services needed:<br>GPS, Video and Audio Monitoring Equipment |

| Victim/Witness Assistance Needed? ☐ Yes ⌧ No | Coordinator Name and Contact Number(s): |
|---|---|

| Potential Media Attention? ☐ Yes ⌧ No | Public Affairs Officer Name and Contact Number(s): |
|---|---|

For Official Use Only<br>Law Enforcement Sensitive

00153

## Suspect Information
### (Attach additional copies if more than one suspect)

| | |
|---|---|
| Name of Suspect: Unknown | Date of Birth (DOB): |

Address of Suspect:  Unknown

Photograph Attached?  ☐ Yes  ☒ No

Physical Description:  Unknown

Vehicle(s):  Unknown

History of Violence or Weapons:
Unknown

Prior Criminal History:  ☐ No  ☐ Yes  (Criminal History Attached ☐ )

Summary of Prior Criminal History:
Unknown

Citizenship: ☐ U.S. Citizen  ☒ Non-U.S. Citizen     Citizenship: Unknown

| Immigration Status: | A-Number (if known): |
|---|---|

Other Pertinent Information:
The SOI and the UC will provide any and all associated  numbers of the DTO.  The numbers will be queried through
DARTS, DICE, NADDIS, TECS and other de-confliction tools.

00164

| Report Assignments | |
|---|---|
| Name: | Assignment: |
| All Agents | Surveillance Notes |
| Marcus Osorio | Investigative report |
| Ronnie Gonzalez | Investigative report (UC) |
| Christopher Baroni | S/A/S |

## Additional Information

Once the existence of the narcotics has been confirmed, the HSI Undercover Agent (UCA) will contact a representative of the DTO and arrange for the delivery of the narcotics and pickup of the transportation fees. HSI agents will utilize a tracking device to assist in maintaining control of the narcotic laden vehicle, once it is in the possession of the DTO. Air support will also be requested and utilized if available. The SOI is currently communicating with the DTO to agree on a general area of delivery in San Diego, California (CA).

Upon arrival to the yet to be determined location in San Diego, HSI agents will wait for the UC agent to park and exit the vehicle, leaving the keys inside. The UC agent will coordinate with a DTO representative for payment and delivery. Once the UC is clear of the scene, local authorities will take over surveillance of the load vehicle and will coordinate independent enforcement action in an attempt to arrest, seize, and prosecute any suspects involved with the load vehicle.

This ICD will fall under one of the established exceptions to the Jones Ruling. All other requirements in the DEA-HSI MOU for de-confliction and coordination have been met and an ICD number should be issued.

If at any time during the surveillance it appears that agents are in jeopardy of losing the contraband, the conveyance will be stopped and the narcotics will be seized and secured. Any individual attempting to make contact with the target vehicle with the intent to assist delivery of the vehicle will be arrested or detained pending further investigation.

Agents will also query all known locations, vehicles, and persons for de-confliction.

NO CONFIDENTIAL SOURCES/INFORMANTS OR UNDERCOVER OPERATIONS WILL BE CONDUCTED IN THE REUBLIC OF MEXICO IN FURTHERANCE OF THIS OPERATION.

This operation is part of a certified undercover (CUC) operation entitled, Operation Road Kill, and will use assets from this operation as deemed necessary.

| Approval(s) (if required) | |
|---|---|
| Signature: | Date: |
| Name and Title: Jeffrey Grimming Supervisory Special Agent | |
| Signature: | Date: |
| Name and Title: Lori Giannantonio Assistant Special Agent In Charge (ASAC) | |

00165

## Personnel Assignments
(Attach additional copies if needed)

| # | Name | Call Sign | Contact Number(s) | Vehicle Description | Assignment(s) |
|---|------|-----------|-------------------|---------------------|---------------|
| | Jeffrey Grimming | | | | Group Supervisor |
| | Marcus Osorio | | | | Case Agent |
| | Ronnie Gonzalez | | | | UC |
| | Mark Meredith | | | | Team Leader / Cover Team |
| | Christopher Baroni | | | | Cover Team/Surveillance |
| | Mitch Martinez | | | | Surveillance / UC Close Cover "Otay Ped" |
| | Jacqleen Riley | | | | Surveillance |
| | Anthony Castellano | | | | Surveillance |
| | Jeremy Dorn | | | | Surveillance |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

1                           **TRANSCRIPT**

2

3   CASE NUMBER:   1609053

4

5

6

7

8

9                         INTERVIEW OF:

10         SPECIAL AGENT RONALDO GONZALEZ

11

12

13

14                    INTERVIEWED BY:

15            DETECTIVE A. MOLINA (ID 840)

16           CHULA POLICE DEPARTMENT

17

18

19

20

21

22

23

24

25

26

27   Transcribed By:  Kathy Koeppel

28

1

PL Rule 56 Exhibit B
Page 1

**001245**

| 1 | LEGEND | |
| 2 | AM: | Detective Anthony Molina (ID 840) |
| 3 | AC: | Special Agt. Ronaldo Gonzalez |
| 4 | DO | Sgt. David Oyos (ID 752) |
| 5 | JJ: | Associate General Counsel Jeffrey J. Jacobson, Esq. |
| 6 | (inaud) | Unintelligible |

7

8   AM     OK, uh, my name is Detective Anthony Molina.  I'm with the Crimes of Violence
9          Unit with the Chula Vista Police Department.  My ID number is 840.  It is
10         Monday, um, June 20th, 2016, and the time is approximately 1402 hours.  And I'm
11         gonna be passing this around for others in the room with me.

12  DO     Uh, Sgt. David Oyos, Chula Vista PD, ID number 752.

13  JJ     Jeffrey Jacobsen, Associate General Counsel, Federal Law Enforcement Officers
14         Association.

15  RG     Uh, Ronaldo Gonzalez, Special Agent, Homeland Security Investigations.

16  AM     OK, great.  OK, um, Ronaldo, I know, uh, prior to walking into the room I've
17         introduced myself to you and so, uh, you know who I am.  But I'm gonna kind of
18         go through that again.  We have, uh, as you know, we are recording this…

19  RG     OK.

20  AM     …Um, interview.  So, um, again I'm the d-detective assigned as the, uh, case agent
21         for this case.  And that encompasses, um, basically the officer-involved shooting,
22         um, uh, and also the c-circumstances around it, meaning that there are several
23         people in custody for this incident and that I'm also the case agent, uh, assigned
24         for that case.  Just so that you're un…you're aware of that, OK?  So as we go into
25         this, obviously we're going to be asking you a number of questions.  Uh,
26         obviously your attorney is present and we're open to him, um, chiming in, um,
27         advising you about things.  Obviously that's why he's here.  So as we begin this
28         we're gonna go ahead and just start with reading you, um, your Miranda Rights.

| 1 |  | And I go through them, I always like to read it right off of here, OK? |
|---|---|---|
| 2 | RG | Sure. |
| 3 | AM | So I'll be reading right through this.  OK, so Ronaldo, you have the right to say |
| 4 |  | nothing.  Anything you say can be used against you and will be used against you |
| 5 |  | in a court of law.  You have the right to talk with an attorney and to have an |
| 6 |  | attorney present before and during questioning.  If you cannot pay for an attorney, |
| 7 |  | one will be appointed free of charge to represent you before and during |
| 8 |  | questioning.  Do you understand those rights? |
| 9 | RG | I do. |
| 10 | AM | OK.  And obviously in this case we have your attorney present with us.  Um, and |
| 11 |  | I, again, like I said, I have every intention of questioning you about this case, and I |
| 12 |  | want to make sure you are aware of that? |
| 13 | RG | I'm aware. |
| 14 | AM | OK.  And that you're OK speaking with me about this case? |
| 15 | RG | I'm OK. |
| 16 | AM | OK.  Great.  OK, so, um, Ronaldo, do you, do you go by Ronnie? |
| 17 | RG | I go by Ronnie. |
| 18 | AM | OK, and that's what I've heard, uh, in interviews and speaking with your partners |
| 19 |  | and stuff, so I'm gonna call you Ronnie if that's OK? |
| 20 | RG | Absolutely. |
| 21 | AM | You're welcome to call me Tony.  That's what I go by here.  Um, so I'm gonna |
| 22 |  | just as we start through here aside from me calling you Ronnie, we're gonna go |
| 23 |  | through and actually get full spelling and all that, OK?  So your first, uh, legal f- |
| 24 |  | first name...Ronaldo? |
| 25 | RG | Ronaldo. |
| 26 | AM | Spell it for me. |
| 27 | RG | R-O-N-A-L-D-O. |
| 28 | AM | Do you have a middle name? |

| 1 | RG | It's Ricardo. R-I-C-A-R-D-O. |
| 2 | AM | And your last name? |
| 3 | RG | GONZALEZ. G-O-N-Z-A-L-E-Z. |
| 4 | AM | Ronnie, your date of birth? |
| 5 | RG | ▮▮▮▮▮, 1976. |
| 6 | AM | And your, do you know your Social Security Number offhand? |
| 7 | RG | …inaud… |
| 8 | AM | And a good phone number to contact you at? |
| 9 | RG | ▮▮▮▮▮▮. |
| 10 | AM | Your work address? |
| 11 | RG | 2297 Niels, spelled N-I-E-L-S, Bohr is the next word B-O-H-R Court C-O-U-R-T. |
| 12 | AM | And is there a particular suite number or anything like that? |
| 13 | RG | Uh, it's the first floor. I'm not sure the suite number. |
| 14 | AM | And that's San…considered San Diego? |
| 15 | RG | San Diego, 92154. |
| 16 | AM | Do you have a desk number? |
| 17 | RG | I do I don't know what it is. |
| 18 | AM | That's OK. And Ronnie do you have a badge number? |
| 19 | RG | I do it's, uh. Alpha 6301. |
| 20 | AM | And I know I got your birthdate that puts you at how old? |
| 21 | RG | I will be 40 in ▮▮▮, on ▮▮▮▮▮. So I'm 39. |
| 22 | AM | And I know you guys have a ranking structure of like GS, right? What is your |
| 23 | | current rank? |
| 24 | RG | GS 13. |
| 25 | AM | Do you recall your date of hire? |
| 26 | RG | Uh, approximately November 11th of '06. |
| 27 | AM | And what is your current assignment with the agency? |
| 28 | RG | I am currently assigned to a narcotics group at the Deputy Special Agent In |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

PL Rule 56 Exhibit B
Page 4

001248

| | | |
|---|---|---|
| 1 | AM | Mm-hmm. |
| 2 | RG | Um, so I'd for Christmas I purchased some Puma shoes.  Uh, our group we call |
| 3 | | them low driver shoes because I've worked a lot of cases at the port of entry and |
| 4 | | we arrest a lot of people bringing drugs across from Mexico into the United States, |
| 5 | | and oftentimes we find them wearing some sort of Puma or, um, Lacoste shoes |
| 6 | | and so it's kind of I got some ribbing for it… |
| 7 | AM | Sure. |
| 8 | RG | But I got the Puma shoes so that's, that's what I was wearing on the day of.  Puma |
| 9 | | shoes, uh, jeans, and then a, a button-down shirt, short-sleeve. |
| 10 | AM | OK.  And actually since I didn't actually bring it up yet, um, your, your role in this |
| 11 | | particular group that your with, Group, the 7, Group 7 that you're with, um, my |
| 12 | | understanding is you, you have an undercover capacity, correct? |
| 13 | RG | Yes. |
| 14 | AM | And which is different than say just plainclothes, um, which might be surveillance. |
| 15 | RG | Mm-hmm.  Correct. |
| 16 | AM | OK. |
| 17 | RG | Yeah, I was certified about a year ago, um, by the agency at FLETC, which is our |
| 18 | | Federal Law Enforcement Training Center in, uh, Brunswick, Georgia.  Um, and |
| 19 | | in order to be certified, you have to go through, uh, it's I think two or, I can't |
| 20 | | remember if it's a two or a three-week class.  And at the end you're certified.  Uh, |
| 21 | | as part of my persona, I also act as a truck driver, so I have a Class, Class A |
| 22 | | license. |
| 23 | AM | And when did you say you went through that, uh, certification? |
| 24 | RG | Uh, I believe it was June or July of 2015, for undercover school. |
| 25 | AM | OK. |
| 26 | RG | And I got my, uh, CDL about, uh, two years ago, two and a half. |
| 27 | AM | So how long have you been…I know that you know that sometimes you don't |
| 28 | | necessarily have to have gone through the school to work undercover.  How long |

| 1 | | have you been working in an undercover capacity? |
|---|---|---|
| 2 | RG | A year. |
| 3 | AM | OK. So you have, you were certified and then you went? |
| 4 | RG | Yes. |
| 5 | AM | OK. OK. Now, on this date when you were working in an undercover capacity, |
| 6 | | um, were you wearing a vest, a body-armor type vest? |
| 7 | RG | I was not. |
| 8 | AM | And that is pretty standard correct? For a person working an undercover capacity? |
| 9 | RG | It is. |
| 10 | AM | Gotcha. Did you have a badge on you, on your person? |
| 11 | RG | I did not. |
| 12 | AM | And again that is pretty standard for someone working an undercover capacity, |
| 13 | | correct? |
| 14 | RG | Correct. Usually we'll turn in our, we will provide our, our badge, our credentials, |
| 15 | | any keys, uh, that might have a logo on it, uh, we usually turn that over to one of |
| 16 | | the p-people in our team as the cover team… |
| 17 | AM | OK. |
| 18 | RG | To hold onto it until, uh, the undercover deal is completed. |
| 19 | AM | Gotcha. And is it fair to say to you probably…did you have anything on your |
| 20 | | person that even has your own identification? |
| 21 | RG | I had a, an undercover identification. |
| 22 | AM | Undercover identification. Gotcha. OK. Um, prior to this incident, have you ever |
| 23 | | been involved in an officer-involved shooting? |
| 24 | RG | No. |
| 25 | AM | OK. OK, Ronnie, uh, that, that gets us through most of the robot stuff, my robot |
| 26 | | questions. Here's what I'd like to do now. So I want to, um, a little less formal |
| 27 | | but kind of bring it back a bit. Um, and we'll, we'll just start kind of, um, a little |
| 28 | | bit before this particular transaction. Um, as we get a little closer to the actual |

13

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

**001257**

| 1 | | shooting, we'll slow it down a bit, obviously go through some things there, OK? |
| 2 | RG | Sure. |
| 3 | AM | But what I want to do is we'll go ahead and let's back up to, um, excuse me...this |
| 4 | | particular operation as I understand it involving, uh, well, let's just say this, this |
| 5 | | particular crew, um, I understand that there was, this particular marijuana that was |
| 6 | | in, um, Op Alliance's possession, that was actually purchased a few weeks ago, is |
| 7 | | that correct? |
| 8 | RG | Uh, we didn't purchase it, we transported it. |
| 9 | AM | Exactly.  I'm sorry I worded that wrong. |
| 10 | RG | Yes. |
| 11 | AM | So it was actually transported by your group? |
| 12 | RG | Correct. |
| 13 | AM | A few weeks ago? |
| 14 | RG | On June 2nd or June 3rd, it was a Thursday. |
| 15 | AM | OK. |
| 16 | RG | Uh, it was while I was in Mexico.  Sound right? |
| 17 | AM | OK.  So now the informant in this case which by the way I've already interviewed |
| 18 | | him.  Um, but for this case, I'm gonna let's just call him, uh, I'm, I'm thinking |
| 19 | | ahead here.  So give me a second.  But we'll call him, uh, well, well, how would |
| 20 | | you typically refer to him if you were talking...the source? |
| 21 | RG | Can we talk to him...refer to him as the CI?  The Confidential Informant? |
| 22 | AM | CI is perfect for me. |
| 23 | RG | OK. |
| 24 | AM | OK, so in this interview we'll call him... |
| 25 | RG | There's only one, so... |
| 26 | AM | The CI.  OK. |
| 27 | RG | Yeah. |
| 28 | AM | Um, so, um, from my understanding what the CI is, this actually the beginnings of |

14

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

| | | |
|---|---|---|
| 1 | | this, even transporting across, began about somewhere between three to six weeks |
| 2 | | ago. |
| 3 | RG | Yes.  That's correct. |
| 4 | AM | OK.  So let's back up to about there.  OK? |
| 5 | RG | OK. |
| 6 | AM | Because what I'm looking to get, uh, out of this and again, uh, I know we've |
| 7 | | talked, uh, as you came into here, we're also working on this case as far as the, |
| 8 | | you know, what led up to it, and this investigation as far as the people we have in |
| 9 | | custody, OK?  So, let's back up to about then as far as your knowledge of what |
| 10 | | happened in that?  Like, how did we come across this marijuana the beginnings of |
| 11 | | that transaction? |
| 12 | RG | OK, so, in about, uh, May, mid-May of 2016, I received a phone call from the CI. |
| 13 | AM | OK. |
| 14 | RG | He mentioned to me that he had been in communication with some folks, um, that |
| 15 | | were interested in transporting marijuana.  Um, actually we can even go back a |
| 16 | | little bit further.  Um, maybe in, so maybe in April, um, we were in contact with |
| 17 | | Sergio.  Sergio is what I understand is a narcotics broker that the CI was in |
| 18 | | communication with.  And the broker had, uh, had requested assistance in |
| 19 | | transporting a ton of marijuana from Tijuana to Santa Barbara, California.  Uh, I |
| 20 | | can't remember where I was but I wasn't, I wasn't present, uh… |
| 21 | AM | And we're still talking about April? |
| 22 | RG | April. |
| 23 | AM | OK. |
| 24 | RG | Yes.  And that deal fell through. |
| 25 | AM | OK. |
| 26 | RG | For whatever reason, um, we, we attempted to, to transport the marijuana from |
| 27 | | Mexico into the United States and that, that deal fell through. |
| 28 | AM | OK.  So just so I'm clear, the one in April…? |

| | | |
|---|---|---|
| 1 | RG | Mm-hmm. |
| 2 | AM | You were not present for? |
| 3 | RG | No. |
| 4 | AM | You, it's just your understanding of how it started? |
| 5 | RG | Yes. |
| 6 | AM | And so at that time, um, what was your role as it relates to the CI in April? |
| 7 | RG | I had no role at that point. |
| 8 | AM | OK.  Um, so he had a different handler at that time? |
| 9 | RG | Yes.  Yes, that was, um, Angela Sanchez. |
| 10 | AM | OK.  And he was also working with my understanding, uh, do you know if he was |
| 11 | | working with...does he go by Bill, I think Bill? |
| 12 | RG | Yes, he was working with Bill.  Bill was, uh, yes, in communication as well. |
| 13 | AM | OK.  OK.  So that was April.  Now we come, what happens after that?  Because |
| 14 | | they, that... |
| 15 | RG | Oh... |
| 16 | AM | ...was the same person they were dealing with, right?  Sergio? |
| 17 | RG | Yes, oh, I know what happen...so I was, so in...during that timeframe I was in |
| 18 | | Georgia for training... |
| 19 | AM | Gotcha. |
| 20 | RG | And so that's why I was not available when they were trying to do this deal to |
| 21 | | Santa Barbara. |
| 22 | AM | OK.  Um, now you mentioned at that time Sergio.  Had you met Sergio at that |
| 23 | | point at all? |
| 24 | RG | No. |
| 25 | AM | OK. |
| 26 | RG | I believe Bill had met him. |
| 27 | AM | OK.  And had you, uh, had you talked to him in any way? |
| 28 | RG | No. |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

**001260**

| 1 | AM | OK. So now that brings us into May. |
|---|---|---|
| 2 | RG | Yes. |
| 3 | AM | OK. So what happens in May? |
| 4 | RG | In May, uh, the CI contacts me. And he says hey, um, remember that deal to Santa |
| 5 |  | Barbara that fell through? And I said yes, I do remember. He said well, it looks |
| 6 |  | like they have a deal, um, that they want the marijuana now to go to San Diego. |
| 7 |  | Um, and would, would you be able to, to do the meeting? And I said well, let me |
| 8 |  | run it by my boss and let me see if it's something that he'd be interested in. I said |
| 9 |  | what are the details? And he said well, supposedly they have a warehouse |
| 10 |  | somewhere in Otay Mesa where, where we could off-load the narcotics. And, and |
| 11 |  | I said well, if we off-loaded the narcotics there, um, would it, are you sure that it |
| 12 |  | belongs to the crooks? And would we be able to receive transportation fees as a |
| 13 |  | result of delivering it there, and, and how much would the transportation piece be? |
| 14 |  | And he said, well, I think we could get about two hundred thousand dollars for the |
| 15 |  | transportation fees. So I ran it by the boss. And I said, uh, Jeff, this is the deal. |
| 16 |  | Uh, and he said OK, it sounds like a good deal. Um, he said is there any way that |
| 17 |  | we can meet with the, the narcotics broker who resides in Tijuana. And I said I |
| 18 |  | think so. Um, I think we can arrange a meeting. So I believe it was May 14th or |
| 19 |  | May 16th, uh, we met, uh, myself, the CI, and Sergio met at the McDonalds on |
| 20 |  | Roll Drive in Otay Mesa. Uh, during this meeting, uh, we, we discussed |
| 21 |  | particulars, uh, about the transportation. Uh, I explained to him that we needed a |
| 22 |  | little bit of time, uh, because we weren't ready. We weren't prepared. But that |
| 23 |  | when we were ready, we would reach out to him. At that point during that |
| 24 |  | meeting we exchanged phone numbers. |
| 25 | AM | OK. |
| 26 | RG | And so I, I, I have two or between two and five text messages with Sergio. |
| 27 | AM | OK. |
| 28 | RG | Those were the only communications I had. |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001261

| 1 | AM | OK, so let's back up just a second here regarding the May incident.  When the CI |
| 2 | | reaches out to you, um, why is he reaching out to you versus somebody else? |
| 3 | | Because before he was dealing with somebody else. |
| 4 | RG | Our office had been going through a, a change of personnel.  So as some people |
| 5 | | were leaving, some people were coming, and it was kind of, we were kind of in |
| 6 | | flux. |
| 7 | AM | OK. |
| 8 | RG | As far as who was gonna be here long term.  And the rumor was that at the time |
| 9 | | that Angela Sanchez was not gonna be... |
| 10 | AM | OK. |
| 11 | RG | ...uh, in our group for very much longer. |
| 12 | AM | So it's fair to say that he was, it was, he was assigned to contact you then at that |
| 13 | | time? |
| 14 | RG | Yes. |
| 15 | AM | OK.  So, CI reaches out to you, and he tells you about, um, a potential deal for |
| 16 | | marijuana to be transported here to San Diego again with the same guy Sergio? |
| 17 | RG | Yes. |
| 18 | AM | And you had not met Sergio at that point? |
| 19 | RG | Correct. |
| 20 | AM | So you, uh, cleared it through your supervision? |
| 21 | RG | Correct. |
| 22 | AM | They said yes, and again your understanding for about two hundred K for was |
| 23 | | gonna be what your group was paid? |
| 24 | RG | Correct. |
| 25 | DO | Can I, can I interject real quick here? |
| 26 | AM | Yep. |
| 27 | DO | Uh, is that, like a common thing to where you'll be like hey, a, a CI's gonna |
| 28 | | contact you now and is, uh, how was your comfort level with just getting cold |

| 1 | | called from a CI like that?  Is this a CI that is trusted by your group…inaud…? |
|---|---|---|
| 2 | RG | This, this is a CI that, that I have worked with in the past and other agents have |
| 3 | | worked with.  Um, so, uh, he does have a good reputation a-among the agents as |
| 4 | | being able, as being a case maker. |
| 5 | DO | So it wasn't anything that you felt was out of the ordinary? |
| 6 | RG | No, absolutely not. |
| 7 | DO | OK.  OK.  That's all I wanted.  Thank you. |
| 8 | AM | The, the, well, we'll go to this part.  OK, so you guys arrange to meet Sergio, uh, it |
| 9 | | was either the 14th or 16th of May? |
| 10 | RG | Yes. |
| 11 | AM | And you said that the agreed upon meeting place was gonna be McDonalds, Otay |
| 12 | | Mesa, you said off of Roll Drive? |
| 13 | RG | Roll Drive. |
| 14 | AM | About what time of the day did you meet Sergio there? |
| 15 | RG | It was approximately three, three p.m.?  It was in the afternoon for sure. |
| 16 | AM | Inside or outside McDonalds? |
| 17 | RG | We met inside. |
| 18 | AM | And up to the point when you went to McDonald's, was it just the CI in contact |
| 19 | | with Sergio? |
| 20 | RG | Yes. |
| 21 | AM | OK.  And you, and your understanding is that's just via text, phone calls? |
| 22 | RG | Correct. |
| 23 | AM | OK.  So… |
| 24 | RG | And prior to doing this meeting, I felt it was i-in order for us to commit to it, I |
| 25 | | wanted to have direct communication with the broker. |
| 26 | AM | Gotcha.  And that would be pretty standard, correct? |
| 27 | RG | Yes. |
| 28 | AM | Once, um, once the CI does the intro, then you would, that would give you the |

| | | |
|---|---|---|
| 1 | | opportunity now to be…? |
| 2 | RG | Correct. |
| 3 | AM | …the one doing the communication? |
| 4 | RG | Exactly. |
| 5 | AM | OK. What, what did you know about Sergio prior to meeting him at the |
| 6 | | McDonalds that day? |
| 7 | RG | I know that he had met with Bill Pena, um, during the, while they, in April, while |
| 8 | | they were trying to get that deal going to, uh, Santa Barbara. |
| 9 | AM | OK. |
| 10 | RG | Uh, so that's how we were able to identify who he was. Uh, I don't believe he had |
| 11 | | a criminal history. Uh, I know that he was a Tijuana resident or he resided in |
| 12 | | Tijuana, and he would cross into the United States. |
| 13 | AM | OK. |
| 14 | RG | Um, and he was a narcotics broker according to the CI. |
| 15 | AM | OK. Um, however, when you, when you met him at the McDonalds that day, did |
| 16 | | you have some sort of security element with you? |
| 17 | RG | Yes, uh… |
| 18 | AM | OK, well, tell me about that? |
| 19 | RG | Yeah, so, uh, it's pretty standard when we do, um, uh, what we would call a dry |
| 20 | | meet where there's no narcotics, and no, no, uh, money, uh, being exchanged, uh, |
| 21 | | it's a dry meet. And we try to keep it a little lower key because we feel like there's |
| 22 | | a less risk. Although of course we, we still need to be cautious, um, and I did have |
| 23 | | some personnel that were outside of the McDonald's. I believe there might have |
| 24 | | been one or two people inside as well. Uh, so we had p-probably two or three |
| 25 | | people outside and maybe one or two people inside. |
| 26 | AM | OK. And explain for me what is their role? Like, why are they there and what, |
| 27 | | what would that…? |
| 28 | RG | Well, we are, we know that we're meeting with a, with someone who is potentially |

| | | |
|---|---|---|
| 1 | | a criminal element who is, uh, involved in criminal organizations, or has contact |
| 2 | | with criminal organizations, and their purpose is to, uh, contract with us to |
| 3 | | transport narcotics, uh, from Mexico into the U.S. Uh, so whenever you're |
| 4 | | dealing with these types of, uh, characters, you always want to be cautious. |
| 5 | AM | OK. |
| 6 | RG | Uh, and for that reason we have a, a cover team basically just kind of keeping an |
| 7 | | eye on me and, and the CI and, and we're also trying to identify potentially any |
| 8 | | other people that may be, uh, along with him but they're not making themselves |
| 9 | | known. |
| 10 | AM | And, and, and again why, like, what would be the concerns about why you need a |
| 11 | | safety element there? What would be the concerns with let's say in this case with |
| 12 | | Sergio? Uh, would you be concerned, uh…? |
| 13 | RG | Well, for one, I, this is not the first undercover deal that I've done. Um, so it |
| 14 | | could, it's possible that he could recognize me as someone who had, you know, |
| 15 | | uh, he had seen me before. Maybe I had arrested one of his friends. And so it's |
| 16 | | possible that knowing, if he had recognized who I was, uh, I could've been in |
| 17 | | danger. |
| 18 | AM | OK. And speaking about that danger, in your training and experience in working |
| 19 | | narcotics, are you concerned about, um, them being armed, weapons involved? |
| 20 | | What, what's your training and experience tell you about that? |
| 21 | RG | Absolutely. Anytime you have, um, narcotics, any time you're discussing |
| 22 | | narcotics, um, I've been working, uh, in law enforcement for 15 years, if you |
| 23 | | include the time while I was a, I, I worked for the DEA as a contractor. Uh, and |
| 24 | | prior to that I was, I was in the military. So I do have a great deal of experience, |
| 25 | | um, dealing with, with crime and, and narcotics in general. And I know that |
| 26 | | anytime you're dealing with a, with, with people who are involved in those circles, |
| 27 | | uh, there's always a potential for danger. That because whenever you're talking |
| 28 | | about narcotics usually firearms and, and weapons go hand in hand. As well as, |

| 1 | | uh, other people along with the people that you're meeting with. |
|---|---|---|
| 2 | AM | OK. |
| 3 | RG | Oftentimes we will see that not only is there if you're talking to one person, but |
| 4 | | there, they could have three or four or more people along with them. |
| 5 | AM | Gotcha. |
| 6 | RG | So that's why we usually try to have several, uh, agents that are in plainclothes, |
| 7 | | uh, surveilling and, and observing the meetings. |
| 8 | AM | Got it.  So how long does this meeting go that day when you meet Sergio at the |
| 9 | | McDonald's? |
| 10 | RG | It was really quick.  I would say maybe ten minutes, maybe a ten minute meeting? |
| 11 | AM | Meaning you were face-to-face with him? |
| 12 | RG | Face-to-face ten minutes.  Correct. |
| 13 | AM | And then you said you exchanged numbers with him at that time? |
| 14 | RG | Yes. |
| 15 | AM | And so when you exchanged numbers, um, you're using an undercover phone, |
| 16 | | correct? |
| 17 | RG | I have an undercover phone but I, I connect it to a system we call Callyo. |
| 18 | AM | Mm-hmm. |
| 19 | RG | Um, and the only communications that I had with him were via Callyo.  Uh, I'm |
| 20 | | not sure if you're familiar with it, but basically it's a, it's an Application and, uh, |
| 21 | | with that Application we're able to record, uh, phone conversations and text |
| 22 | | messages. |
| 23 | AM | Got it.  And so all of your communication would've gone through Callyo? |
| 24 | RG | Through Callyo, correct. |
| 25 | DO | Is that with both Sergio and the, uh, CI? |
| 26 | RG | No, with the CI, um, I communicate, uh, on, on a government phone. |
| 27 | DO | OK.  Without Callyo? |
| 28 | RG | Without Callyo. |

| 1 | DO | OK. |
|---|----|-----|
| 2 | AM | OK.  OK.  So what...tell me about the, the substance of that conversation then |
| 3 | | with Sergio, and then also what his, you know, demeanor was as far as, uh, you |
| 4 | | know, how things were flowing? |
| 5 | RG | So the CI and I entered the McDonalds, uh, we went towards the, uh, towards I |
| 6 | | guess it would be the east side, yeah, the east side of the restaurant, um, where the |
| 7 | | door, where the patio is, there's a double door or, uh, the door that leads to the |
| 8 | | patio. |
| 9 | AM | OK. |
| 10 | RG | We were sitting in one of those, uh, tables.  Um, and as I sat down I could see that |
| 11 | | he was looking at me kind of cautiously... |
| 12 | AM | Mm-hmm. |
| 13 | RG | He was kind of looking up and down, just trying to make sure that I didn't have, |
| 14 | | you know, I wasn't a cop... |
| 15 | AM | Mm-hmm. |
| 16 | RG | And, and, um, he was just feeling me out. |
| 17 | AM | OK. |
| 18 | RG | Uh, so during the conversation, which I believe is, I have a recording of it, uh, I |
| 19 | | asked him about the details that of what he wanted from us.  Uh, and he explained |
| 20 | | to me that they had a ton of marijuana.  The marijuana that was supposed to go to |
| 21 | | Santa Barbara.  The, that deal fell through but he was able to get another deal to |
| 22 | | San Diego, um, and that they would have the money prepared, uh, upon delivery. |
| 23 | | Um, so at that point I explained to him well, you're gonna have to give us some |
| 24 | | time but I think we'll be, it's something that we'll be able to help you out with. |
| 25 | | And once we are ready, uh, to, to, to, to transport it, we will reach out to you so |
| 26 | | that we can, so you can help us facilitate this. |
| 27 | AM | OK.  And was there still talk even though he had already previously told the CI |
| 28 | | about a mon...a dollar amount, did you guys talk about it again there?  Was there |

| 1  |    | an agreed upon amount there? |
|----|----|-----------------------------|
| 2  | RG | I don't recall. |
| 3  | AM | OK. |
| 4  | DO | And you said it was recorded?  You weren't live-wire? |
| 5  | RG | Yes. |
| 6  | DO | OK. |
| 7  | AM | And did you complete a report?  Like a UC report as related to that? |
| 8  | RG | I don't believe so. |
| 9  | AM | OK.  Anybody else identified besides Sergio during that meet as far as you know? |
| 10 | RG | No. |
| 11 | AM | OK.  And again at that time you guys already knew who Sergio was? |
| 12 | RG | Yes. |
| 13 | AM | You've dealt with him in the past? |
| 14 | RG | Correct. |
| 15 | AM | Uh, you not, not you personally, but now you had his number? |
| 16 | RG | Correct. |

17    Um, to deal directly with.  OK.  So what was the, um, did you guys agree?  I know

18    you said you would be in contact with him once you guys were ready.  So what

19    was kind of the next thing that occurred with Sergio as it relates to this?

20  RG  We had some internal, um, issues with the paperwork in order, we, we have to go

21    through several layers in order to get permission to do these types of deals.  We

22    have to get the authorization from headquarters, from the U.S. Embassy in, in

23    Mexico City.  Uh, we need the assistance of Tijuana, of the, of the I.C.E.

24    representatives in Tijuana.  So it, there's a lot of moving parts.

25  AM  Sure.

26  RG  And then D.E.A. of course also has to be involved.  And so that took us

27    approximately three weeks, maybe four weeks, to get all that paperwork and all

28    the signatures, um, prepared so that we could then coordinate with the CI to

| 1  |    | transport the marijuana. |
|----|----|--------------------------|
| 2  | AM | And most of the paperwork and stuff that falls, uh, probably under other people |
| 3  |    | not yourself? |
| 4  | RG | Myself. |
| 5  | AM | Oh, you have to, you had to generate that paperwork for it? |
| 6  | RG | Yes. |
| 7  | AM | OK. Um, OK. So what was the next communication then between either as far as |
| 8  |    | you know either the, the CI and him or you and him? |
| 9  | RG | So while I was in Mexico, um, that week, I got word from DEA or from Dorn |
| 10 |    | from, through D.E.A. that the number, we call it a I.C.D. number, an International |
| 11 |    | Controlled Delivery Number, that number had been issued. |
| 12 | AM | OK. |
| 13 | RG | So and it was on a Thursday. |
| 14 | AM | OK. |
| 15 | RG | So it was a June, June 2nd, June 3rd, something like that. And so while I was in |
| 16 |    | Mexico, I called, uh, Jeremy Dorn, and I said Jeremy, well, it looks like we got the |
| 17 |    | authorization to do the what we call the jump. So we could jump the dope from |
| 18 |    | Mexico to the U.S. So Dorn then coordinated with the CI and, uh, the team |
| 19 |    | members who were available to transport the marijuana, and that's what we did. |
| 20 |    | So it was transported on the second or the third of June. And then it was stored, |
| 21 |    | um, at our office nearby for about a week or so, maybe eight days. |
| 22 | AM | So the transportation you, you had nothing to do with other than letting them know |
| 23 |    | it was, uh, it was authorized. |
| 24 | RG | Correct. |
| 25 | AM | Uh, Dorn took care of that with the CI? |
| 26 | RG | Yes. |
| 27 | AM | OK. Um, so the marijuana gets transported across? |
| 28 | RG | Correct. |

25

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001269

| | | |
|---|---|---|
| 1 | AM | And that goes to a facility? |
| 2 | RG | Yes. |
| 3 | AM | And what was your understanding as to that transaction?  Like, did it go successful |
| 4 | | or? |
| 5 | RG | Everything went fine during that transaction, um, according to the CI. |
| 6 | AM | OK. |
| 7 | RG | There was no suspicion or anything like that.  Everything was done well. |
| 8 | AM | OK.  Now when would that marijuana…?  Because you guys wouldn't house it |
| 9 | | forever, right? |
| 10 | RG | Correct. |
| 11 | AM | When should that have actually…inaud…? |
| 12 | RG | We told them, we explained to them that we needed about a week or so, um, to |
| 13 | | jump it even though it was already in the United States. |
| 14 | AM | Sure. |
| 15 | RG | The CI was telling the broker it was my understanding is that he needed a few |
| 16 | | more days in order to, to bring it across because he wanted to do it in a safe |
| 17 | | manner. |
| 18 | AM | Got it. |
| 19 | RG | He would call it the window or something like that.  Like, we need our window, |
| 20 | | and our window is not ready yet.  So that's how he's able to buy, uh, buy us some |
| 21 | | more time if we needed to. |
| 22 | AM | Got it.  So then what was the next step in this transaction? |
| 23 | RG | So if it was jumped on June 2nd or June 3rd, uh, returned to the United States or San |
| 24 | | Diego approximately, what was it June 9th…? |
| 25 | AM | OK. |
| 26 | RG | Um, so, we, I knew that as soon as I got back and I was the undercover agent for |
| 27 | | this case… |
| 28 | AM | Mm-hmm. |

26

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001270

| 1 | RG | So that's k-kind of why we needed to buy some additional days so that… |
| 2 | AM | OK. |
| 3 | RG | So to allow me an opportunity to get back into town. |
| 4 | DO | And when you were out of town, Ronnie, you were, uh, not working?  It was not |
| 5 | | work-related? |
| 6 | RG | It was work-related. |
| 7 | DO | Oh, it was work-related. |
| 8 | RG | Yes. |
| 9 | DO | OK.  All right…inaud… |
| 10 | RG | Not related to this…related… |
| 11 | DO | OK.  Gotcha. |
| 12 | RG | …But it was work-related. |
| 13 | DO | OK. |
| 14 | AM | Gotcha. |
| 15 | RG | Um, so I got back on a Friday.  And then we coordinated, um, with at that point |
| 16 | | BCST, which is the San Diego Sheriff's Department Border Crime Suppression |
| 17 | | Team I believe? |
| 18 | AM | Mm-hmm. |
| 19 | RG | Uh, we had met with them on that Monday.  Um, I, I figured, I told the CI, like, |
| 20 | | because I hadn't had any more communication with Sergio. |
| 21 | AM | OK. |
| 22 | RG | And I told the CI, hey, tell him that we'll do it on Tuesday just b-because we need |
| 23 | | Monday to prepare. |
| 24 | AM | So, so when did you as far as you know, when did the CI tell him, tell Sergio that |
| 25 | | you guys were moving forward with this? |
| 26 | RG | On…so you mean after the jump? |
| 27 | AM | Yeah, meaning, when you were kind of back for the weekend… |
| 28 | RG | Right, I think he told them, like, when he jumped it I think he told them, like, hey, |

27

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001271

| 1 |     | I'm gonna still need another week. |
| 2 | AM | OK. So, like, when you came back on Friday…? |
| 3 | RG | Yes. |
| 4 | AM | Was, were any wheels already starting to be in motion as far as it's gonna take |
| 5 |     | place next week? |
| 6 | RG | Yes. |
| 7 | AM | On the, uh, law enforcement side?  Or on the other side? |
| 8 | RG | From the, the CI telling, um, Sergio, hey, we'll be ready next week. |
| 9 | AM | Got it. So do you know when that happened? |
| 10 | RG | I don't know. |
| 11 | AM | When did, uh, now you talked with the CI right? |
| 12 | RG | I told him on Thursday that we did the jump. And I said, hey, as soon as I get |
| 13 |     | back into town, we'll be able to deliver it. So you do what you need to do in order |
| 14 |     | to keep them at ease. |
| 15 | AM | Gotcha. |
| 16 | RG | But let them know that they need to be ready next week, and I, and I believe I told |
| 17 |     | him Tuesday.  Well, that was kind of our target date. |
| 18 | AM | OK. So now we're looking at, um, and I'll, and I'll just say, like, this is important |
| 19 |     | because we're, we're also looking at when these guys started putting their own |
| 20 |     | stuff in motion, in motion, Sergio…? |
| 21 | RG | Do you, do you mind if I take my phone out to look at a calendar? |
| 22 | AM | No absolutely, in fact, that's what I was doing. |
| 23 | RG | …inaud… |
| 24 | AM | So yeah Thursday was the 16th and that's the day we're talking about, right?  The |
| 25 |     | Thursday preceding this incident?  I'm sorry, I'm, I'm already a week behind. |
| 26 |     | Thursday was the 9th. |
| 27 | RG | Yes. |
| 28 | AM | And because this incident happened on Tuesday, the 14th, so it's Thursday the 9th, |

| | | |
|---|---|---|
| 1 | RG | Yes. |
| 2 | AM | That you tell the CI, hey, just put him at bay until I get back… |
| 3 | RG | Yeah. |
| 4 | AM | …but let them know, probably next week. |
| 5 | RG | Put him on ice but let him know to be ready so that when we, um, when we are |
| 6 | | prepared to deliver that they are ready on their end. |
| 7 | AM | OK.  Now at this point outside of Sergio, did you know anything about the other |
| 8 | | players that were going to be involved in purchasing or picking up this marijuana? |
| 9 | RG | I did not. |
| 10 | AM | OK. |
| 11 | RG | Uh, if I can r-retract a little bit.  Um, so this deal, my understanding was that |
| 12 | | Sergio… |
| 13 | JJ | Not retract… |
| 14 | RG | I'm sorry… |
| 15 | JJ | Go back. |
| 16 | RG | Let me go back a little bit. |
| 17 | AM | Yeah, I just understood it.  Yeah. |
| 18 | RG | OK.  Let me go back a little bit.  So this deal to, to Santa Barbara, it was the owner |
| 19 | | was some guy named Juan… |
| 20 | AM | OK. |
| 21 | RG | Uh, so the owner, my understanding is the owner is this guy Juan, whoever Juan |
| 22 | | is… |
| 23 | AM | OK. |
| 24 | RG | And Sergio was dealing directly with Juan. |
| 25 | AM | OK. |
| 26 | RG | When we jumped the narcotics, there was some suspicion from Juan that we were |
| 27 | | law enforcement. |
| 28 | AM | OK. |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001273

| 1 | RG | Um, so the CI was telling me, hey, he, they may have some suspicions about us |
| 2 | | because of some, some things that occurred in the past… |
| 3 | AM | OK. |
| 4 | RG | So, I'm gonna have to, I, I'm gonna get another buyer for the narcotics. |
| 5 | AM | Now this is being said to you by Sergio or by the CI? |
| 6 | RG | By the CI. |
| 7 | AM | And he's saying I'm gonna, who's saying I'm gonna get another buyer? |
| 8 | RG | The C…uh, the CI told me that. |
| 9 | AM | Uh, but the CI…? |
| 10 | RG | No, I'm, the CI told me that that's what Sergio told him. |
| 11 | AM | OK.  So just to be clear, C…CI is relaying to you… |
| 12 | RG | Yes. |
| 13 | AM | That Sergio told the CI that Sergio is going to be looking for another buyer? |
| 14 | RG | Correct. |
| 15 | AM | Because basically Juan is, is having cold feet? |
| 16 | RG | Correct.  Exactly. |
| 17 | AM | OK.  All right.  So that brings us back to Thursday the 9th right? |
| 18 | RG | Yes. |
| 19 | AM | OK. |
| 20 | RG | Let me just get my, uh, calendar out. |
| 21 | AM | Yeah, go for it. |
| 22 | RG | OK, so we jumped, we did the jump on, on the 9th?  Is that right?  The 9th? |
| 23 | AM | The 9th is a Thursday…inaud… |
| 24 | RG | Oh no, I'm sorry we did the jump on the, on the second. |
| 25 | AM | Got it. |
| 26 | RG | Of June. |
| 27 | AM | So Thursday the 2nd of June you guys, uh, do whatever you need to do to cross… |
| 28 | RG | Correct. |

30

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

| 1 | AM | …that marijuana from Mexico. |
| 2 | RG | Yes. |
| 3 | AM | Into San Diego? |
| 4 | RG | Yes. |
| 5 | AM | OK. And basically from that point up through the 9th which is a Thursday, that, |
| 6 | | uh, that is now in law enforcement possession at that time? |
| 7 | RG | Correct. |
| 8 | AM | You're in Mexico, uh, at least on Thursday, the 9th? |
| 9 | RG | Yes. |
| 10 | AM | And now there's some contact between you, you've already got the authorization. |
| 11 | | You let Dorn know, and you're also in contact with the CI to start everything in |
| 12 | | motion. Right? |
| 13 | RG | Correct. |
| 14 | AM | OK, so take me into, was there any discussion over the weekend between either |
| 15 | | you and the CI or you and Sergio? |
| 16 | RG | So during the, we, you know, we actually attempted to deliver it the prior…the |
| 17 | | week prior. So between the 6th and the 9th we attempted to deliver it. |
| 18 | AM | When you say we, that would've been your team…? |
| 19 | RG | My team. Yes. |
| 20 | AM | …outside of you? |
| 21 | RG | Uh… |
| 22 | AM | Correct? You weren't here? |
| 23 | RG | Uh, you know what? So I was actually in Mexico the 31st, the 1st, the 2nd, the 3rd. |
| 24 | | So the 31st of May, so that week…that's when I was in Mexico. |
| 25 | AM | OK. And you're noticing this now because you have a calendar in front of you? |
| 26 | RG | Because I have a calendar in front of me, correct. |
| 27 | AM | And now it's refreshing you're kind of like… |
| 28 | RG | Yeah, it's refreshing my memory. So I was in Mexico, uh, or I was out of town |

| 1 | | let's just say from May 31st to June 3rd. |
| 2 | AM | OK. |
| 3 | RG | And the jump took place on June 2nd.  Because I was out of town. |
| 4 | AM | OK. |
| 5 | RG | So, so we actually attempted to deliver it on I believe the 7th, Tuesday the 7th, but |
| 6 | | that's when negotiations started going south on us in the sense that the owners |
| 7 | | starting suspecting that something was going on. |
| 8 | AM | OK. |
| 9 | RG | So that week we attempted but it just, it fizzled out.  We didn't meet with |
| 10 | | anybody.  We didn't deliver to anybody.  It just sat in storage. |
| 11 | AM | OK, so back me up then to that, that attempt on the 7th. |
| 12 | RG | On the 7th, um, that's when the CI called me.  He said he had spoken with Sergio. |
| 13 | AM | OK. |
| 14 | RG | Sergio said that Juan…there was a lot of questions.  They didn't have the money |
| 15 | | available.  And the one thing was I said look, we need to make sure that they have |
| 16 | | the money available.  Because we're not gonna be playing any games that you |
| 17 | | guys can take the dope and come back later with the money.  Like, I wanted to |
| 18 | | make sure that everybody's on the same page. |
| 19 | AM | OK. |
| 20 | RG | And so throughout that week, um, the CI was in contact with Sergio to see if, if |
| 21 | | Juan was gonna be available. |
| 22 | AM | OK.  Was there any, were you at all in contact with Sergio during that week? |
| 23 | RG | No. |
| 24 | AM | OK.  He didn't even try reaching out to you? |
| 25 | RG | No. |
| 26 | AM | He was just doing everything through the CI? |
| 27 | RG | Through the CI. |
| 28 | AM | All right.  So then that takes us through…when did you tell them that you were |

| 1 | | ready? |
|---|---|---|
| 2 | RG | So, we attempted it a couple times the week of the 6th. |
| 3 | AM | And when you say attempted, sorry? |
| 4 | RG | We attempted meaning… |
| 5 | AM | Does that mean you guys actually took the marijuana somewhere? |
| 6 | RG | No, mean…attempted meaning we briefed several times saying hey, if, if the guys |
| 7 | | call us and say that they're ready with the money, we will be prepared to go and do |
| 8 | | the delivery. |
| 9 | AM | Got it.  There was no movement… |
| 10 | RG | No. |
| 11 | AM | However, on that side. |
| 12 | RG | No. |
| 13 | AM | Other than the CI talking with Sergio? |
| 14 | RG | Correct.  Exactly. |
| 15 | AM | OK. |
| 16 | RG | There was no movement of dope.  I never met with anybody in person. |
| 17 | AM | You were just ready to go? |
| 18 | RG | We were just ready to go. |
| 19 | AM | And then so at this point the, there was already authorization at this point? |
| 20 | RG | Yes. |
| 21 | AM | So… |
| 22 | RG | The authorization is good for about 30 days. |
| 23 | AM | OK. So now attempted on that day a couple times…? |
| 24 | RG | Right. |
| 25 | AM | What's the next event that happens? |
| 26 | RG | So, so then there's some new developments in that Sergio is telling the CI, hey, |
| 27 | | this, this deal's not done yet.  We still have a shot.  Because even if Juan is not, |
| 28 | | doesn't want to purchase or pay you for your transportation fees, I have another |

| 1 |  | guy that…could be interested. |
| 2 | AM | And do you know any, like, did, was there any discussion between the CI and |
| 3 |  | Sergio as far as who is this other guy? |
| 4 | RG | No. |
| 5 | AM | OK. |
| 6 | RG | Not that I'm aware of. |
| 7 | AM | Um, at this point when he says other guy, any…are you guys develop any, any |
| 8 |  | intelligence on who this other guy might be? |
| 9 | RG | No.  He didn't, he didn't have a phone number.  It was all, all the communications |
| 10 |  | were done through Sergio. |
| 11 | AM | OK…inaud… |
| 12 | RG | All…I asked for a phone number and at that point and I don't believe I received |
| 13 |  | one. |
| 14 | AM | OK and Sergio is in Mexico during this time? |
| 15 | RG | Yes. |
| 16 | AM | As far as we know, right? |
| 17 | RG | He's a…I know he crosses the border.  But, uh, he's a resident of, of Tijuana. |
| 18 | AM | So you…it's not like you guys had a surveillance team…? |
| 19 | RG | No. |
| 20 | AM | …following him around? |
| 21 | RG | No, he was in Mexico. |
| 22 | AM | OK.  So that brings us closer towards the weekend of the 9th… |
| 23 | RG | Yes. |
| 24 | AM | …10th, 11th? |
| 25 | RG | The weekend of the 9th, 10th, um, the deal, the transaction actually took place on |
| 26 |  | the 14th.  So we attempted it like I said the week of the 6th a couple times, in, in the |
| 27 |  | sense that…through the phone. |
| 28 | AM | OK. |

| | | |
|---|---|---|
| 1 | RG | Very quickly, within… |
| 2 | AM | And |
| 3 | RG | I don't know, one or two seconds. |
| 4 | AM | Was there any pause that you could remember between any of those? |
| 5 | RG | No. |
| 6 | AM | When you fired the…started firing, what were your observations of number four, |
| 7 | | this person you're firing at. What were your observations? What was happening |
| 8 | | to him as you were firing? |
| 9 | RG | As I fired the first round I was on my knee and I shot center mass, and he sort of |
| 10 | | stumbled to the north, like, one step? |
| 11 | AM | OK. |
| 12 | RG | And, uh, at that point I, I succeeded to fire, or I, I continued to fire two or three |
| 13 | | more rounds. |
| 14 | AM | OK. |
| 15 | RG | Um, until the threat was, until I felt that the threat was, had been stopped. |
| 16 | AM | And what made you believe that that threat was stopped? |
| 17 | RG | He collapsed. |
| 18 | AM | OK. |
| 19 | RG | After, after the last round that I fired, he, he collapsed. |
| 20 | AM | OK. Um, what…? |
| 21 | RG | (sighs) |
| 22 | JJ | You OK? |
| 23 | RG | OK. |
| 24 | AM | Yeah and actually I, and, um, and like my sergeant said, I, I think it's important we |
| 25 | | don't breeze past that. Do you, do you have a family? |
| 26 | RG | I do. |
| 27 | AM | OK. Do you have children? |
| 28 | RG | I do. |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001340

| | | |
|---|---|---|
| 1 | AM | OK. Um, did any of that, anything come up for you?  You said you thought you |
| 2 | | were going to… |
| 3 | RG | I thought I was gonna die. |
| 4 | AM | OK.  Um, and I'll make, you know, for again my sergeant made the observation |
| 5 | | but I, you know, I see that your eyes are tearing up and that that was, a, um, I |
| 6 | | mean, I see that it's obviously causing you a little more emotional reaction right |
| 7 | | now. |
| 8 | RG | I'm sorry (voice breaking). |
| 9 | DO | It's all right.  We can take a break if you need to, Ronnie. |
| 10 | JJ | Nothing to apologize for. |
| 11 | RG | (crying) |
| 12 | (door opens) | |
| 13 | AM | Here you go, man. |
| 14 | RG | Thank you. |
| 15 | AM | Uh, Ronnie again I just, I want to make sure that you know like our understanding |
| 16 | | around these…we all hope that this is something we never have to do and so it's |
| 17 | | important for us to cover these things especially for this kind of investigation.  So, |
| 18 | | uh, we appreciate you being willing to go there with us. |
| 19 | RG | OK. |
| 20 | AM | Um, at, at this point when you saw the threat was no longer there, were there any |
| 21 | | other, was there any other sort of judgement at that point at, um, what kind of |
| 22 | | weapon this guy had at the point when you saw that he was now down? |
| 23 | RG | Yes.  Uh, after he was down, um, it set in that it may have been a taser, uh, |
| 24 | | because I had heard, um, uh, I guess a taser sound.  I don't carry a taser.  I've |
| 25 | | never been issued a taser.  I've never been shot with a taser.  Um, but, uh, |
| 26 | | afterwards I, I, I was able to glance down, and, uh, and I, and I saw, um, what |
| 27 | | appeared to be more like a, a taser that I've seen with a fellow CVP officers and, |
| 28 | | and, and other officers carry. |

97

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

| 1 |  | back to see if I had any wounds on my back. |
|---|---|---|
| 2<br>3 | AM | Yeah, tell me that? So, you know, initially when you had that feeling, you weren't sure if you'd been shot or not is what you said? |
| 4 | RG | I wasn't sure. |
| 5<br>6 | AM | And when you made it over to the bank, were, was there still a question in your head about that? |
| 7<br>8<br>9 | RG | Yes, I, I wasn't sure if I had been shot and, and adrenaline was keeping me alive. Um, and, and I just knew that I needed to get out of that area in order to, to save myself if I had been shot. |
| 10<br>11 | AM | OK, so are you still at that point having, I know you said you, you still may have been shot, are you still concerned that you might die? |
| 12 | RG | Yes. |
| 13 | AM | OK. So at what point do you actually realize that you hadn't been shot? |
| 14<br>15 | RG | While I was in the van and they were, we were driving quickly out of the parking lot, I was asking… |
| 16 | AM | The van or the truck? |
| 17 | RG | Yeah, I'm sorry, the truck. |
| 18 | AM | OK. |
| 19<br>20 | RG | I was asking Mike, uh, Burbank to please check my back, check my back, uh, to make sure, I, I didn't have a wound. |
| 21<br>22<br>23 | AM | Do you remember how you were asking him? Like, do you remember how that was? Was it, were you yelling at him, OK, check my back? Like, what? Tell me about that. |
| 24<br>25<br>26 | RG | I was breathing heavily, uh, and I said is, how's my back? Check my back? Check my back? And he was patting me and he said no. I, I don't see anything. I don't see anything. |
| 27 | AM | OK. And what were they acting like at this time? |
| 28 | RG | They were trying to keep me calm. They were doing a great job. |

| 1 | AM | OK. |
|---|---|---|
| 2 | RG | Um, and they knew that they just needed to, to get me to safety. |
| 3 | AM | OK. |
| 4 | RG | Um, so that we can, uh, kind of analyze what just transpired. |
| 5 | AM | And so at what point did you realize you hadn't been shot?  Was it when you |
| 6 | | asked him and he…? |
| 7 | RG | It wasn't until, uh, I got, until we stopped and then I removed my shirt, uh, and I |
| 8 | | took off my T-shirt, and then he looked at my back and he said no, I, I don't see a, |
| 9 | | a shot. |
| 10 | AM | OK.  Was that like a big burst of relief for you, or? |
| 11 | RG | It was, it was a huge relief for me. |
| 12 | AM | OK. |
| 13 | RG | It was a huge relief. |
| 14 | AM | All right.  OK, um… |
| 15 | RG | Uh, I, it, I mean, I've, the stone might have been the probe in retrospect.  I'm not |
| 16 | | sure. |
| 17 | AM | And when you say stone we're talking about that feeling, right? |
| 18 | RG | The feeling of some… |
| 19 | AM | I know you said it felt, it could've been? |
| 20 | RG | Some, some, something hit me. |
| 21 | AM | OK. |
| 22 | RG | Something hit me in my back. |
| 23 | AM | OK.  And when you say a probe, that's after you think about? |
| 24 | RG | Yes. |
| 25 | AM | After processing in your head you're thinking about what it could've been? |
| 26 | RG | Correct. |
| 27 | AM | Um, now are you aware at this point?  Were you aware obviously prior to coming |
| 28 | | into this room that it was in fact a taser? |

| | | |
|---|---|---|
| 1 | RG | Uh…I have not been told officially… |
| 2 | AM | OK. |
| 3 | RG | What it was. |
| 4 | AM | And so all of your, your reasoning afterwards is what you kind of thought back |
| 5 | | through? |
| 6 | RG | Correct. |
| 7 | AM | OK. |
| 8 | JJ | Did the fact that, uh, you saw some yellow initially the first time you saw this |
| 9 | | weapon, did that, uh, mean anything to you as a law enforcement officer?  Or did |
| 10 | | the fact that there was some yellow mean that it wasn't a firearm? |
| 11 | RG | Uh, in my training and experience, colors of weapons, um, um, have nothing to do |
| 12 | | with whether or not they're a, a, a real firearm or a taser or a toy or a nerf gun. |
| 13 | | Um, I've never actually seized one.  Uh, but I, I'm privy to law enforcement |
| 14 | | bulletins, um, where manufacturers and people make firearms, uh, different colors, |
| 15 | | pink, blue, green, red.  Uh, so, so I would never take into consideration the color |
| 16 | | of, of, of a weapon to determine whether or not it's real or not. |
| 17 | AM | OK.  Cool. Um, I think we covered that pretty well in there. |
| 18 | DO | When you, uh, they drove you away and you were there with Burbank and, uh…? |
| 19 | RG | Agent Baroni. |
| 20 | DO | Baroni?  Um, did they ask what happened?  Or did you give them a statement at |
| 21 | | that point as to what just went down?  Do you remember? |
| 22 | RG | Yes.  At that point, uh, I, I told them I believe I was, I was shot.  I was shot in my |
| 23 | | back.  Um, and then after it's kind of set in, and then I said it might've been a |
| 24 | | taser… |
| 25 | DO | OK. |
| 26 | RG | And, um… |
| 27 | JJ | But you still weren't sure? |
| 28 | RG | I still wasn't sure.  And I, I asked them to continue to check me to make sure I |

**001350**

| 1 | | wasn't bleeding. |
|---|---|---|
| 2 | AM | Did you make any statements to them about what you thought at the time?  Like, |
| 3 | | what you thought was happening? |
| 4 | RG | No. |
| 5 | AM | OK.  In other words… |
| 6 | JJ | You mean about, about the person that had attacked him? |
| 7 | AM | Yeah, like, what the intentions were?  Did you make any, uh, statement to Baroni |
| 8 | | or anybody in the car, like, you know, I think they were gonna do this, or anything |
| 9 | | like that? |
| 10 | RG | Uh, if anything I, I might've said that they were trying to rip me, or… |
| 11 | AM | OK. |
| 12 | RG | Uh, I'm not, I don't recall. |
| 13 | AM | Did you, did it ever, did you ever think that they were trying to kidnap you? |
| 14 | RG | Yes. |
| 15 | AM | And what, when did that? |
| 16 | RG | I didn't, I didn't, I, that was not my initial thought.  I didn't think that they were |
| 17 | | trying to kidnap me.  I thought they were trying to, to… |
| 18 | AM | OK. |
| 19 | RG | To kill me. |
| 20 | AM | OK. |
| 21 | RG | Uh, but afterwards while I was in the van… |
| 22 | AM | OK. |
| 23 | RG | Or I'm sorry the pickup truck… |
| 24 | AM | Yes. |
| 25 | RG | Uh, I heard radio traffic something to the effect that they thought that you had |
| 26 | | been kidnapped. |
| 27 | AM | And when you say that they thought you had been kidnapped, what are |
| 28 | | you…inaud…? |

107

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001351

| 1 | RG | A surveillance team, whoever, I'm not sure who put it out on the radio.  But when |
| 2 | | the, when, when, when the commotion started…? |
| 3 | AM | OK. |
| 4 | RG | Somebody I believe mentioned, hey, I think Ronnie was kidnapped. |
| 5 | AM | OK, obvious because you weren't there anymore and they see…? |
| 6 | RG | Correct. |
| 7 | AM | So did you, when you were putting this together after you're hearing that, was |
| 8 | | there thoughts coming into your mind that you thought they, that might've been |
| 9 | | their plan? |
| 10 | RG | That might've been their motive.  I'm not sure. |
| 11 | AM | OK. |
| 12 | RG | Uh, anything is possible…it's e-either they were trying to kidnap me or kill me. |
| 13 | AM | But that wasn't till the kidnap part, that as being a, an idea…? |
| 14 | RG | That, that came later. |
| 15 | AM | Later? |
| 16 | RG | Yes. |
| 17 | AM | OK.  And that was, would've been in the truck when you were…? |
| 18 | RG | Correct. |
| 19 | AM | OK. Um… |
| 20 | RG | And then from…after we went to the dirt parking lot, or the dirt road in San |
| 21 | | Miguel Ranch, we went to the hospital to, to, to verify that I was…inaud… |
| 22 | AM | OK. OK.  Um, there's a, I, I think we covered this part right here.  And what I |
| 23 | | want to shift towards now and I'm, I'm hoping to, if there's any other questions |
| 24 | | that you have just before we go past that… |
| 25 | DO | Yeah, real briefly, um, you know, I think it's everybody's human nature, uh, when |
| 26 | | you think someone's trying to kill you that, you know, self-preservation is gonna |
| 27 | | kick in no matter who you are.  And it sounds like that was pretty evident.  You |
| 28 | | tried to get yourself away, car pulls up, your, get in, boom, you go.  At any point |

108

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001352

| 1 | | were you, did the thought process, like, oh, my god, Anthony's still out there, |
| 2 | | like...? |
| 3 | RG | Yes. |
| 4 | DO | ...Did you, uh, did you guys tell anybody, hey, what's going on with Anthony? |
| 5 | RG | I did. |
| 6 | DO | Did you fear for his safety?  Can you talk a little bit about Anthony and, or what |
| 7 | | your thought process was on that? |
| 8 | RG | That was a big concern of mine.  I was, I think I was trying to, um, keep him a |
| 9 | | little bit isolated in this particular case.  Because this was his first narcotics |
| 10 | | transaction as far as I'm aware.  Um, and, and I felt like I kind of brought him into |
| 11 | | this deal just kind of like because there was nobody else available with more |
| 12 | | experience.  And so I, I for that reason I, I kind of tried to keep him at bay.  Um, |
| 13 | | and just kind of have like a lesser role just to kind of, kind of work his way up |
| 14 | | and... |
| 15 | AM | Mm-hmm. |
| 16 | RG | You know, as, as far as these cases are concerned.  Uh, but as soon as I was picked |
| 17 | | up by the pickup truck, my first concern was Anthony's safety.  Because I wasn't |
| 18 | | sure if, you know, because two of the guys already knew that Anthony was with |
| 19 | | me. |
| 20 | AM | Mm-hmm. |
| 21 | RG | And so I didn't want them to try to, to do something to him. |
| 22 | AM | OK. |
| 23 | DO | So that was a concern of yours? |
| 24 | RG | That was a concern to me... |
| 25 | DO | And did you do anything?  Did you tell anybody or...inaud...? |
| 26 | RG | I, I did.  I told, uh, Baroni call and make sure that, that Anthony is OK.  Make sure |
| 27 | | Anthony's OK. |
| 28 | DO | OK. |

| 1 | AM | Uh, regarding the guy that you shot.  Um, did you know at the time his status? |
| 2 | RG | No. |
| 3 | AM | And when did you? |
| 4 | RG | I, I, I thought I, I thought I hit him.  I thought I shot him… |
| 5 | AM | OK. |
| 6 | RG | Uh, I wasn't sure if he was deceased.  But I thought, well, if I shot him center |
| 7 | | mass a, a couple times, a few times, uh, there was a chance that he was gonna be |
| 8 | | dead. |
| 9 | AM | OK, so you knew there was a possibility…? |
| 10 | RG | Yes. |
| 11 | AM | …that he was…inaud…Did you find out at some point his status? |
| 12 | RG | Uh, while I was at the hospital. |
| 13 | AM | OK.  And who was it that told you? |
| 14 | RG | I don't recall.  I was getting so many phone calls. |
| 15 | AM | OK.  So but basically when you went to the hospital right after…? |
| 16 | RG | It might've been Dorn.  I believe…it might've been Dorn. |
| 17 | AM | OK.  And you went to the hospital right after the dirt road thing? |
| 18 | RG | Yes. |
| 19 | AM | They, someone took you over there? |
| 20 | RG | Correct. |
| 21 | AM | Uh, that was Scripps? |
| 22 | RG | Uh…the Medical Center Drive? |
| 23 | AM | OK…uh, gotcha. |
| 24 | RG | Is that Sharp? |
| 25 | AM | It's Sharp. |
| 26 | RG | Sharp. |
| 27 | AM | OK.  And that's where, um, Deaner, our, one of our… |
| 28 | RG | Yes. |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001354

| 1 | AM | …agents went and met you? |
|---|----|----|
| 2 | RG | Correct. |
| 3 | AM | OK. Um, let me actually ask you about what, when the guy was falling, um… |
| 4 | RG | He staggered to the north. |
| 5 | AM | OK. |
| 6 | RG | I'm not sure that's what your question was. |
| 7 | AM | Yeah, I was gonna ask you more about the position as he was falling.  But I'm, |
| 8 |    | I'm trying to picture as he's, when you say he staggered?  So if he's, if he was |
| 9 |    | originally facing you and you said he staggered towards the north, so did his body, |
| 10 |   | like, had it turned towards the north? |
| 11 | RG | Sidestepped. |
| 12 | AM | He sidestepped? |
| 13 | RG | He sidestepped. |
| 14 | AM | And then do you remember which way he, like, what he collapsed on?  So in other |
| 15 |    | words, did he collapse on his left side?  Did he…? |
| 16 | RG | I believe the left side, yes. |
| 17 | AM | OK.  The left side? |
| 18 | RG | Because, uh, it was a blur but I believe I saw his face facing me as like towards the |
| 19 |    | ATM? |
| 20 | AM | OK. |
| 21 | RG | So that, which would've meant he would've been lying on his left side. |
| 22 | AM | OK.  And do you recall at any point where like how he came to rest.  Like, if he |
| 23 |    | came to rest, stayed on his left side?  Face down?  On his back?  Do you remember |
| 24 |    | seeing anything like that? |
| 25 | RG | I remember his face was facing…I, I don't recall. |
| 26 | AM | OK. |
| 27 | RG | I don't recall. |
| 28 | AM | OK.  OK.  Um, any other questions you can think of as far as this part? |

001355

| | | |
|---|---|---|
| 1 | DO | Um, so when you, I guess if, if I'm, uh, if I'm reading this report later that, that |
| 2 | | we're gonna write about the statement that you gave us, um, and somebody's |
| 3 | | trying to picture in their head, you hear the commotion. You look over your |
| 4 | | shoulder. You see a weapon. Uh, you feel, you know, oh my god, I think I just |
| 5 | | got shot. You reach down. You draw. I mean, it all happens in the matter of like |
| 6 | | a few seconds. Um, after you pull the trigger prior to, you know, self-preservation |
| 7 | | and running over to that bank to get cover or to get, to get yourself, did you ever |
| 8 | | stop and re-set and ever, you know, because a, a law enforcement training, that's a |
| 9 | | lot about like what we do after every, you know, typical range training, you shoot, |
| 10 | | and then you stop and you re-set. Was there anything like that? Or was it just like |
| 11 | | I need to get the heck out of here? |
| 12 | RG | I need to get out of here. |
| 13 | DO | OK. So you boogied? So it was just, pulled the trigger, you saw him go down, |
| 14 | | and then you got the heck out of there? |
| 15 | RG | Yes. |
| 16 | DO | OK. OK. I think that paints a, a little clearer picture in my head at least. |
| 17 | RG | There was no re-setting. I was just trying to find cover and I couldn't find cover. |
| 18 | DO | Right. OK. Lineup? |
| 19 | AM | Yeah, so what I wanted to ask you now is obviously we talked about, uh, some key |
| 20 | | players in this. And we kind of numbered them out one through four. Before we |
| 21 | | go into those, Sergio, you've had somewhat regular contact with him, OK? Um, |
| 22 | | so we'll, we'll cover that. Then the guys one through four. Let's start with one. |
| 23 | | He was the guy we, we talk about pink shirt? Went and checked the product and |
| 24 | | all of that. If, if you saw that guy a picture of him or whatever, do you think you'd |
| 25 | | be able to pick him out? |
| 26 | RG | Yes. |
| 27 | AM | OK. Um, and then we'll go through, the number two, guy who was with him. |
| 28 | | You talked with him for a while? |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

| 1 | RG | Yes. |
| 2 | AM | You saw him on the phone?  And this was the guy right that you described as |
| 3 | | having the hair kind of outside the hat a little bit? |
| 4 | RG | Yes. |
| 5 | AM | OK. |
| 6 | RG | Had longer bangs. |
| 7 | AM | Gotcha.  And you feel like you'd be able to recognize him? |
| 8 | RG | Yes. |
| 9 | AM | Um, the third one.  This is the one you described as skinny. |
| 10 | RG | Yes. |
| 11 | AM | Um, him, do you think you'd be able to recognize him? |
| 12 | RG | Yes. |
| 13 | AM | How much time do you think you had with that guy there before this whole thing |
| 14 | | went down? |
| 15 | RG | Uh, enough to where I made good eye contact with him. |
| 16 | AM | OK. |
| 17 | RG | Uh, and to be honest, uh, like the fourth guy, uh, I, I'm not positive I could |
| 18 | | identify him. |
| 19 | AM | It's, it's OK on him.  Um, but we'll go with, uh, what I'd like to do is show you |
| 20 | | some lineups. |
| 21 | RG | Sure. |
| 22 | AM | OK?  There's one I had these ready and there's one I wasn't happy with, so I need |
| 23 | | to take some time right now, about 15, 20 minutes… |
| 24 | RG | Sure. |
| 25 | AM | So hopefully that also will give you kind of some time to take a break, use the |
| 26 | | bathroom.  Um, I don't anticipate the line-ups taking very long at all.  I just need |
| 27 | | time to put it together.  So are you OK on food for now? |
| 28 | RG | I'm fine… |

| 1 | AM | Unfortunately if you said no, I don't really have a whole lot to offer you (laughs). |
| 2 | | Um… |
| 3 | RG | No, I'm good. |
| 4 | AM | So, I'll, I'm gonna go ahead and shut the recording off. We'll…inaud…to do that. |
| 5 | DO | Time…inaud…? |
| 6 | AM | And the, yeah the time is 4:47. So 1647 hours. |
| 7 | (pause) | |
| 8 | AM | OK again Detective Anthony Molina. Uh, it is still June 20th, 2016, and the time is |
| 9 | | now 1739 hours. Uh, again as we took a break so that I had some time to |
| 10 | | assemble or put together some, uh, photo lineups. And so we're now back on |
| 11 | | recording. In the room right now though is still, uh, Sgt. Oyos and then, um, uh, |
| 12 | | speaking with Agt. Gonzalez still. Um, however, at this time, uh, just for the |
| 13 | | record, his attorney is no longer here in the room with us. Now, uh, we're gonna |
| 14 | | start off by having, um, Ronnie is going to initial the maps that we utilized in front |
| 15 | | of him during the interview. And again I labeled them ahead of time, um, A, B |
| 16 | | and C. And I put those at the upper right corner of each page. There's three pages |
| 17 | | total. So again A, B, and C. Um, there is nothing that we marked on A. Uh, there |
| 18 | | is also nothing that we marked on B. Uh, I will still have him just initial those to |
| 19 | | show these are the ones that were put in front of him. And you're, I'll have you |
| 20 | | initial at the bottom right of these. So those are initialed in black |
| 21 | | marker…inaud…B. OK, so Ronnie just audibly for the recording, did you initial |
| 22 | | A and B? |
| 23 | RG | Yes, I initialed A and B. |
| 24 | AM | OK. And then C is the map that we were pretty much mark, you were marking on |
| 25 | | for the, during our whole interview. Um, again, I just labeled where it says C. As |
| 26 | | you're looking at this with me now, did you, in fact, make, uh, all the other |
| 27 | | markings with the exception of there's a scribble in pen where I, where I crossed |
| 28 | | out, you had, you had put down, like, where the people were standing, and I |

| 1 | | scribbled out one because we realized no one was standing there.  Correct? |
| 2 | RG | Correct.  Yes. |
| 3 | AM | OK.  So all the black marker is stuff that you marked? |
| 4 | RG | Yes, those are all of my markings. |
| 5 | AM | OK.  So I'm gonna have you initial bottom right corner of C.  OK.  So that, um, |
| 6 | | that was just for the maps.  OK.  Um, OK, so I'm gonna place this picture in front |
| 7 | | of you.  Uh, who do you recognize that as? |
| 8 | RG | That is Sergio. |
| 9 | AM | OK. |
| 10 | RG | Uh, I know him as Sergio and he's the one who I believe brokered, uh, this |
| 11 | | transaction. |
| 12 | AM | OK, so… |
| 13 | RG | He was the guy that I met with in mid-May. |
| 14 | AM | Gotcha. |
| 15 | RG | And then I also, uh, and I communicated with him on the phone a couple text |
| 16 | | messages. |
| 17 | AM | OK. |
| 18 | RG | Uh, and then, uh, on, um, June 14th, uh, he was the first guy that I met, and he |
| 19 | | introduced me to the others. |
| 20 | AM | OK.  Perfect.  So what I'm gonna have you do is, um, I'm gonna have you go |
| 21 | | ahead and initial at the bottom right corner for me?  And we could put today's date |
| 22 | | next to that one. |
| 23 | RG | Today is what? |
| 24 | AM | Today is the 20th.  OK.  And now I'm marking in black marker, um, who you |
| 25 | | recognize it as…Sergio.  And I'm writing in his last name.  OK.  So OK the, uh, |
| 26 | | remaining ones, I have three photo lineups in front of me.  Again I'm gonna read |
| 27 | | you a photo lineup admonishment.  Have you ever done a photo lineup before? |
| 28 | RG | I've shown photo lineups. |

| 1 | AM | So you have shown photo lineups? |
| 2 | RG | Yes, six, uh, six-packs? |
| 3 | AM | Yeah, six packs. |
| 4 | RG | Mm-hmm. |
| 5 | AM | And, like, roughly how many, do, do you have an idea how many you've shown in |
| 6 | | the past? |
| 7 | RG | Hundreds? |
| 8 | AM | Hundreds? |
| 9 | RG | Yes. |
| 10 | AM | OK.  So you're obviously, you, you, do you give an admonishment before you |
| 11 | | show those lineups? |
| 12 | RG | Um… |
| 13 | AM | Uh, do you tell the, the people that you're showing it to some sort of |
| 14 | | admonishment? |
| 15 | RG | Typically, yes. |
| 16 | AM | OK.  So the lineup that I'm gonna, or I'm sorry the admonishment I'm gonna read |
| 17 | | you is probably similar to what you've said and these lineups are probably the |
| 18 | | similar fashion, um… |
| 19 | RG | Sure. |
| 20 | AM | So I'm gonna go ahead and…OK, I've, um, I've marked the envelope solely so |
| 21 | | that I can recognize them one, two, and three. |
| 22 | RG | OK. |
| 23 | AM | And t-those numbers have no other significance.  They're only just for me to know |
| 24 | | which ones are which when I show them.  OK?  So, uh, let me go ahead and I'm |
| 25 | | just gonna read you the admonishment right now I'll put this back in. |
| 26 | RG | Sure. |
| 27 | AM | OK, so Ronnie you will be asked to look at a group of photographs.  The fact that |
| 28 | | the photographs are shown to you should not influence your judgement.  You |

001360

| | | |
|---|---|---|
| 1 | | should not conclude or guess that the photographs contain the picture of the person |
| 2 | | who committed the crime. You are not under any obligation to identify anyone. It |
| 3 | | is just as important to free innocent persons from suspicion as to identify guilty |
| 4 | | parties. Do not be influenced by the fact that some persons in photographs may |
| 5 | | have beards, mustaches, or long hair. Do not be influenced by the fact that some |
| 6 | | of the pictures may be in color while others are in black and white. And please do |
| 7 | | not discuss this case with any other witnesses nor indicate in any other way that |
| 8 | | you have or have not identified someone. Do you understand that Ronnie? |
| 9 | RG | Yes. |
| 10 | AM | OK. So I'm placing in front of you now the one I labeled number one. And go |
| 11 | | ahead and take your time with it. |
| 12 | (pause) | |
| 13 | RG | I recognize this picture, uh, as being the guy that we, uh, talked about, uh, with the |
| 14 | | TMT hat. I believe he was number two in your notes. |
| 15 | (pause) | |
| 16 | RG | He was the guy who was holding the, uh, a small cell phone that resembles your |
| 17 | | recording. |
| 18 | (pause) | |
| 19 | AM | OK, so, um, I put down, uh, part of what you told me right now so that I have it for |
| 20 | | reference on here. And so tell me if I have this correct, uh, again, I'm |
| 21 | | summarizing what you said, but you said I recognize this picture as being the guy |
| 22 | | with the TMT on his hat? |
| 23 | RG | Yes. |
| 24 | AM | I believe you referred to him as number two. |
| 25 | RG | Yes. |
| 26 | AM | OK. So I'm gonna have you initial for me, um, of course, I've, initials in the |
| 27 | | wrong area, let me, so I'm gonna have you initial where I just created a circle. |
| 28 | RG | OK. |

117

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

**001361**

| 1 | AM | OK? And you understand obviously that the admonishment applies to all these |
| 2 | | lineups? |
| 3 | RG | Yes, I do. |
| 4 | AM | OK. So I'm handing you the packet I numbered 2. |
| 5 | (pause) | |
| 6 | RG | This guy looks like, like, the third, one of the two, uh, subjects that came, number |
| 7 | | 3 and number 4, I think that was number 3. |
| 8 | AM | OK. So you said this guy looks like one of the two that came and then you paused |
| 9 | | so I put a period there but the number 3 and number 4 I think that was number 3? |
| 10 | RG | Yes. |
| 11 | AM | OK. Can I have you initial again where it says witness initials? OK. OK. And |
| 12 | | then the last one that I marked, uh, labeled number 3. There you go. |
| 13 | (pause) | |
| 14 | RG | This was number one. |
| 15 | AM | And when you say number one, what was it that number one, uh, did? |
| 16 | RG | Number one was, uh, the first guy, uh, who walked towards the van to, uh, inspect |
| 17 | | the marijuana. |
| 18 | AM | OK. |
| 19 | RG | He was number two's partner. |
| 20 | AM | OK. So I know it might not be the exact words but I'll obviously that's on the |
| 21 | | recording... |
| 22 | RG | He was wearing the pink shirt. Uh, and we discussed, uh, narcotics, uh, actually |
| 23 | | future narcotics endeavors as well. |
| 24 | AM | OK. So I have this was number one, the guy who walked towards the van to |
| 25 | | inspect the marijuana and I put pink shirt you said that's what he was wearing. |
| 26 | RG | Yes. |
| 27 | AM | And, and again for the record, I...the lineups that you saw, were they in color or in |
| 28 | | black and white? |

| | | |
|---|---|---|
| 1 | RG | They're all black and white. |
| 2 | AM | All the ones I showed correct? |
| 3 | RG | Yes. |
| 4 | AM | And can you tell the color of any of their shirts? |
| 5 | RG | No. |
| 6 | AM | From looking at this?  OK. |
| 7 | RG | …inaud… |
| 8 | AM | OK.  Um, so that actually concludes… |
| 9 | DO | …inaud…initial that? |
| 10 | AM | After I have you initial, witness initials, thank you.  So that concludes our lineups. |
| 11 | | So, I'm gonna end our recording now.  We're actually done with our interview. |
| 12 | | Uh, prior to me ending the recording, is there anything you need to add to this or? |
| 13 | RG | No…inaud… |
| 14 | AM | OK.  All right.  I'm gonna go ahead and end the recording now.  The interview… |
| 15 | DO | Uh, do you have any questions for us, Ronnie, before, uh…inaud…or any |
| 16 | | questions about the investigation and what happens now? |
| 17 | RG | Yeah, I would like to know what, what's gonna happen now?  Um, if you can, I |
| 18 | | don't know if you're able to elaborate on that or if it's too early to, to…because I |
| 19 | | really don't know. |
| 20 | AM | Sure, no that's a fair question.  Um, so, uh, you can imagine especially working in |
| 21 | | this type of field, you know, you're working in this field, a lot of meetings going |
| 22 | | on, a lot of discussions.  Uh, as I told you at the very beginning, my, my job as the |
| 23 | | case agent in this is not only the investigation of the officer involved shooting, but |
| 24 | | also the, um, case in general, and, um, working with the District Attorney's Office |
| 25 | | who is prosecuting, um, the guys who we arrested that night. |
| 26 | RG | OK. |
| 27 | AM | So we will be basically working very hard over these next probably couple weeks |
| 28 | | at least in getting all our reports and everything over to their office, uh, for |

119

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

001363

| 1 | | prosecution purposes.  That's kind of one, one angle with this. |
| 2 | RG | OK. |
| 3 | AM | Um, as far as the officer involved shooting goes, um, my understanding is that at |
| 4 | | this point in time, it is the Office of Professional, um… |
| 5 | DO | Responsibility. |
| 6 | AM | Responsibility, uh, of I.C.E. who is going to receive the packet that I complete. |
| 7 | RG | OK. |
| 8 | AM | And in basic it's going to be pretty much the same packet that I complete for the |
| 9 | | DA's Office for the, um, the undercover narcotics deal… |
| 10 | RG | OK. |
| 11 | AM | Um, they will get all of that, um, and it is going to be their job at that point to |
| 12 | | review it. |
| 13 | RG | Got it.  OK. |
| 14 | AM | OK?  Um, so that you are aware at, at least at this point in time the local District |
| 15 | | Attorney is not, they've chosen not to be involved in that part. |
| 16 | RG | OK. |
| 17 | AM | Um, so that's my understanding of, of where it's going.  As far as the, just so that |
| 18 | | you're aware since it was your team who put so much effort and time into working |
| 19 | | these guys, um, we've made it very clear with the other, with the, uh, folks at your |
| 20 | | office, supervisors and, um, others involved, that we, our interest in this goes to a |
| 21 | | certain point.  Meaning once we've identified the people directly involved in this, |
| 22 | | however, we will be turning over information that we have to, um, to investigators |
| 23 | | at your agency. |
| 24 | RG | OK. |
| 25 | AM | Um, for anything else that they, they need to do. |
| 26 | RG | Perfect. |
| 27 | AM | So, so, that's, that's kind of like an overall picture. |
| 28 | RG | OK. |

| | | |
|---|---|---|
| 1 | AM | Of where it's at. Um, I think at this point if we need to reach out to you again… |
| 2 | RG | Yes. |
| 3 | AM | I'll still do it through your attorney first? |
| 4 | RG | Sure. |
| 5 | AM | I'll still call him and, and at least let him know… |
| 6 | RG | OK. |
| 7 | AM | Or see what they, he wants to do with that.  Um…you're gonna, you know, you'll |
| 8 | | still be in contact obviously with other members of your team.  So I ask that you |
| 9 | | guys refrain from discussing, uh, the incidents of that day.  I get that there will be |
| 10 | | some sort of tactical debriefs about things. |
| 11 | RG | Yes. |
| 12 | AM | Um, but we, one thing at least in these first early stages, the, the first week, week |
| 13 | | and a half while we're still figuring out who we may still need to talk to… |
| 14 | RG | Mm-hmm. |
| 15 | AM | It's important that we keep those interviews clean. |
| 16 | RG | OK. |
| 17 | AM | So that people can give individual statements.  Because as you know in your job, if |
| 18 | | you are talking it over with somebody, sometimes their statement can melt into |
| 19 | | yours. |
| 20 | RG | …inaud…sure. |
| 21 | AM | Yeah.  So that's it.  That's kind of… |
| 22 | RG | …inaud…All right.  Thank you for, for, for, uh, your professionalism and, uh, and |
| 23 | | I appreciate it…inaud… |
| 24 | DO | And along those lines Ronnie, um, it's always important at the end of stuff that as |
| 25 | | a supervisor I ask do you feel like you've been treated fairly…? |
| 26 | RG | I do. |
| 27 | DO | In, in this process so far?  Do you feel like Detective Molina was respectful |
| 28 | | and…? |

| | | |
|---|---|---|
| 1 | RG | Absolutely |
| 2 | DO | OK. |
| 3 | RG | You guys are doing a wonderful job. |
| 4 | DO | OK.  Um, I, normally I like to ask that when your attorney's here.  Obviously, uh, |
| 5 | | he, he could not be here any longer. |
| 6 | RG | Yes. |
| 7 | DO | But, um, but, uh, I just want to make sure when we leave that there's no, um, |
| 8 | | feeling like, um, you know, we, uh, we, we didn't try to surprise you with |
| 9 | | anything. |
| 10 | RG | No. |
| 11 | DO | That we didn't, uh, that we were very forthright, um, you know, it's a pretty |
| 12 | | straight forward process.  We, we got answers that we, uh, to the questions we |
| 13 | | need answers to and… |
| 14 | RG | Absolutely. |
| 15 | AM | Uh, we try not to, um, especially in a scenario like this we try not to be, um, uh, |
| 16 | | deceitful or suspicious in how we get those, and we just want to be very straight |
| 17 | | forward. |
| 18 | RG | I felt you guys were extremely straightforward and I appreciate that. |
| 19 | DO | OK.  Cool. |
| 20 | AM | All right I'm gonna end the recording now.  It is, uh, 1756 hours. |
| 21 | END OF RECORDING. | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Case 1609053 Interview of Special Agent Ronaldo Gonzalez

**001366**



# Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13925**

**1**

Page 1 of 5

## GENERAL CASE INFORMATION

| Special Studies: | Related Cases: |
|---|---|

| Location, City, State, ZIP:<br>2310 PROCTOR VALLEY ROAD, Chula Vista, CA 91913 | Occurred On:<br>6/14/2016 11:16:00 AM (Tuesday) |
|---|---|

| Jurisdiction:<br>Chula Vista - CV | Beat:<br>32 | Call Source: | (and Between): |
|---|---|---|---|

## INDIVIDUAL/S

| Name:<br>SANCHEZ, ANGELA | | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | | | Res. Country: | | County Residence: | Undocumented: |
|---|---|---|---|---|---|---|

| Race | Sex<br>F | Date of Birth / Age<br>- | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status:<br>E - Employed | Occupation/Grade:<br>AGENT | Employer/School:<br>HOMELAND SECURITY | Employer Address, City, State, ZIP:<br>2297 Nielsbohr Court #111 San Diego, CA 92154 |
|---|---|---|---|

CONTACT INFORMATION:

| Type:<br>WP - Work Phone | Number/Address:<br>619 666-9328 |
|---|---|

IDENTIFICATION:

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

| Name:<br>MEREDITH, MARK | | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | | | Res. Country: | | County Residence: | Undocumented: |
|---|---|---|---|---|---|---|

| Race | Sex<br>M | Date of Birth / Age<br>- | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status:<br>E - Employed | Occupation/Grade:<br>AGENT | Employer/School:<br>CVPD | Employer Address, City, State, ZIP:<br>315 Fourth Avenue Chula Vista, CA 91910 |
|---|---|---|---|

CONTACT INFORMATION:

| Type:<br>WP - Work Phone | Number/Address:<br>619 691-5151 |
|---|---|

IDENTIFICATION:

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

| Name:<br>BURBANK, MICHAEL | | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | | | Res. Country: | | County Residence: | Undocumented: |
|---|---|---|---|---|---|---|

| Race | Sex<br>M | Date of Birth / Age<br>- | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status:<br>E - Employed | Occupation/Grade:<br>TECHNICAL ENFORCEMENT OFFICER | Employer/School:<br>HOMELAND SECURITY | Employer Address, City, State, ZIP:<br>2297 Nielsbohr Court San Diego, CA 92154 |
|---|---|---|---|

CONTACT INFORMATION:

| Type:<br>WP - Work Phone | Number/Address:<br>619 247-8219 |
|---|---|

IDENTIFICATION:

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

## REPORT NARRATIVE

I am a detective with the Chula Vista Police Department Criminal Investigations Division currently assigned to the Family Protection Unit (FPU). On 06/14/16, I assisted our Crimes of Violence Unit with investigating an officer involved shooting, involving a Homeland Security Task Force.

On 06/14/16, at approximately 1530 hours, I responded to the area of 2300 Proctor Valley Road to assist. Because I was not needed there, I responded back to the Chula Vista Police Station to assist with interviewing Homeland Security Agents who were involved in the shooting. At approximately 1700 hours, I interviewed Angela Sanchez. Sanchez was interviewed in one of our non-secure interview rooms. Sanchez had a peer support person in the room with us. The entire interview was audibly

| Reporting Officer<br>CV0850 - Ditomaso, David | Division / Organization<br>COV / INV - Investigations | Reviewed By<br>CV0840 - Molina, Anthony |
|---|---|---|
| Report Date<br>6/15/2016 10:18:45 AM | Detective Assigned<br>CV0499 - Thunberg, Eric | Reviewed Date<br>6/27/2016 10:30:37 AM |

PL Rule 56 Exhibit C

Page 1

Printed: June 27, 2016 - 12:43 PM

000270



# Chula Vista Police Department
## Officer Report

CAD Event No.                                    Case No.    **1609053**

                                                 Report No.   **13925**

**2**

Page 2 of 5.

and visually recorded. The recording was burned onto DVD and given to Detective Monreal #905 to be logged in for evidence. The following is a summary of the interview:

Sanchez is employed by Homeland Security. She works specifically on commercial based smuggling. She is assigned to the Carrot Team, but was assisting the Roadkill Team on this incident. She said that there were Sheriffs assigned to the Border Crime Task Force that were assisting as well. She said that this investigation started approximately a week and a half ago when they facilitated crossing a load of marijuana across the Tijuana/San Diego border. The marijuana was taken to their office and stored until the day that they get paid to release it to someone else.

On this day they picked up a van that was left by the suspects. The van was loaded with the marijuana and taken to The Shops at San Miguel Ranch parking lot at 2310 Proctor Valley Road by one of their undercover officers. Two of their undercover officers went to the parking lot to meet the suspects for the exchange of money for the van containing marijuana. The undercover officers were later identified as Anthony Castellanos and Ronnie Gonzalez. Prior to the meet, Sanchez and her team set up at the parking lot so that they could surveil the exchange. They didn't tell the suspects the location until they were all set up. The van containing the marijuana was parked in the northeast corner of the lot and left.

During this operation Sanchez was sitting in an undercover vehicle with Marcus Osorio and Jeremy    Dorn and a Confidential Informant who they used to arrange the exchange. They were parked on the southeast corner of the parking lot. Gonzalez was wearing a recorder, which Sanchez was listening to, with an earpiece. She then relays what she hears to the rest of the team. She can only hear what is going on and is not able to see anything.

The two undercover officers then waited at a nearby Starbucks. They separated themselves from the van to prevent getting robbed. The suspects were given the location of where the undercover officers were at so that they could meet up. The first suspect showed up and met with Castellanos and Gonzalez. This suspect showed up at approximately 1241 hours. She said that there was a white Ford Escort and a red Chevy Trailblazer involved but didn't know for sure which suspects showed up in which car. The first suspect talked to Castellanos and Gonzalez for approximately five minutes when a second car arrives. Then three more suspects arrive. One of the suspects walks to the van to look at the quality of the marijuana. This suspect is wearing a pink shirt. She believes all the suspects were Hispanic. One of the suspects is not happy with the color of the marijuana. The suspects tell them that they want to move the Marijuana to the Terra Nova Plaza so that their boss can check the marijuana. Sanchez said that they decline to do this.

The suspects open a second package of marijuana and like the quality of this package. At approximately 1328 hours, some of the suspects leave because they said they had to talk to their boss and would be back in 15 minutes. Castellanos, Gonzalez and at least one of the suspects stayed at the parking lot. At approximately 1356 hours, the suspects that left the parking lot, came back. She knows this because she can hear the undercover officers and suspects exchanging greetings. Sanchez said that approximately 10-30 seconds after the greetings, she heard Gonzalez yelling, "help, help, help."

They then drove their undercover car towards where the van was parked. As they are driving that way, she heard approximately 1-5 gunshots. As they arrive, Sanchez saw a suspect on his stomach in handcuffs, with his head facing northeast. She couldn't see Gonzalez anywhere, but said that Castellanos was there asking where Gonzalez was. She couldn't see any other suspects. Sanchez said that she found out later that Gonzalez jumped into a vehicle with officers from the Border Crimes Suppression Team. She stayed on seen to make sure someone called 911 and made sure first aid was being rendered. Sanchez also later took photos of the suspects that were arrested. This concluded my interview with Sanchez.

The audio and video recording was transcribed by Family Protection Unit Secretary, Kathy Koeppel. For further on this interview, see the DVD recording and the attached transcription.

At approximately 1815 hours, I interviewed Mark Meredith. Meredith was interviewed in one of our non-secure interview rooms. The entire interview was audibly and visually recorded. The recording was burned onto DVD and given to Detective Monreal #905 to be logged in for evidence. The following is a summary of the interview:

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0850 - Ditomaso, David | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 10:18:45 AM | CV0499 - Thunberg, Eric | 6/27/2016 10:30:37 AM |

NetRMS_CASDCR.rtf v11-15-06

Printed: June 27, 2016 - 12:43 PM



# Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13925**

**3**

Page 3 of 5

Meredith is employed by the Chula Vista Police Department and currently assigned to the Operation Alliance Task Force and on the Roadkill Team. The focus of his team is on the transportation of illegal goods. Meredith said that this operation began on 06/02/16. On 06/14/16, he had to be at the station around 0830-0900 hours to be briefed on the operation for the day. He was told that the team needed to pick up a van that was dropped off by a suspect. They were then going to use the van to transport a load of marijuana they had been storing. Meredith said that their undercover officer, Tony Castellanos picked up the van that morning. Meredith's job was to make sure Castellanos got away safe with the van. They accomplished this. They then took the van back to the office and loaded it up with the load of marijuana.

They later set up surveillance at 2310 Proctor Valley Road because that is where they decided that they would exchange the marijuana with the suspects. Meredith said that he and his partner, Jackie Riley started by doing surveillance in the Subway restaurant. They set up at approximately 1200 hours. Meredith said an undercover officer, Ronnie Gonzalez and Tony Castellanos met with one of the suspects, in the courtyard in front of Starbucks. Meredith assumed that Gonzalez had called the suspect to tell the suspect where to meet him. They talked to the first suspect for approximately 20-30 minutes. Gonzalez and the suspect walked towards the van with the marijuana. The van was in the northeast corner of the parking lot, facing northbound. A white car then showed up.

Three to four additional suspects got out of the white vehicle. They all started talking. Meredith then got a text message that the suspects were leaving and going to be back in 15 minutes. Gonzalez, Castellanos and the first suspect stayed at the parking lot. At some point Meredith and Riley moved to the Starbucks so that they could get a better view of Castellanos, Gonzalez and the first suspect. Meredith and Riley went back out and sat in the courtyard. Approximately 15 minutes later, the white car came back. Castellanos, Gonzalez and the first suspect walked back towards the parking lot. At this point, Meredith couldn't see what was going on. Riley could see and was relaying what was going on to him.

Riley told him that everyone was walking around and that one of the suspects might have actually got into the van. He couldn't remember for sure. Meredith then heard one "pop" and then four more. He knew they were gun shots. Meredith then started running in the direction of the van. He saw the male, that he found out later had been shot, falling towards the ground. Meredith said that before he could see the male hit the ground, he moved his attention to the road because the white suspect car was coming towards him at a high rate of speed. He was thinking that that the suspects in the white car would try to shoot he and Riley. Because of this, he pulled out his firearm and pointed it at the car. He yelled, "police, stop, stop, stop." The vehicle appeared to be coming right at him. As the vehicle came by him, it got approximately 5-10 feet away and continued by him. He could see at least two people in the car. He didn't know which direction they went.

He started running again towards where the shooting was. He attempted to look for the undercover officers. He found the suspect shot and lying on one of his shoulders. The suspect was not responding to his commands. He could see that blood was coming from him, but didn't know where exactly the blood was coming from. At this point, Riley was with him and one of the Officers from the Border Crimes Suppression Team, whose name was possibly "Mike." "Mike" handcuffed the shot suspect. Meredith then noticed Gonzalez over by the old Albertson's building with his gun out. Meredith then ran over to Gonzalez, who told him that he was okay. He found out later that Gonzalez was picked up by other Homeland Security Agents. He then ran back over to the shot suspect to make sure no one else was hurt and that an ambulance was coming.

Meredith said that he "kind of" figured out how the shooting occurred because he saw half a black taser and a taser cartridge near where the suspect had been shot. He knew that Gonzalez didn't carry a taser. Meredith called Gonzalez and asked him to come back to the scene. Gonzalez told him that he didn't feel safe and wanted to go to the hospital. Meredith asked Gonzalez to give him a safety statement and explained to him what it was. Gonzalez told him that he had fired approximately 3-5 times in the general direction of the area between the old Albertson's building and the bank. He also told Meredith that he knew he got shot by a taser and he felt the darts. This concluded my interview with Meredith.

The audio and video recording was transcribed by Family Protection Unit Secretary, Kathy Koeppel. For further, see the DVD recording and the attached transcription.

At approximately 2021 hours, I interviewed Michael Burbank. Burbank was interviewed in one of our non-secure interview rooms. The entire interview was audibly and visually recorded. The recording was burned onto DVD and given to Detective Monreal #905 to be logged in for evidence. The following is a summary of the interview:

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0850 - Ditomaso, David | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 10:18:45 AM | CV0499 - Thunberg, Eric | 6/27/2016 10:30:37 AM |

NetRMS_CASDCR.rtf v11-15-06

PL Rule 56 Exhibit C

Page 3

Printed: June 27, 2016 - 12:43 PM





**Chula Vista Police Department**
**Officer Report**

CAD Event No.                                    Case No.    **1609053**

                                                 Report No.  **13925**                **4**
                                                                              Page 4 of 5

Burbank is employed by Homeland Security as a Technical Enforcement Officer. He is not assigned to a specific team, but assists all teams with technical services. On this day he was assisting team Roadkill. His understanding of this operation was that they were going to bring the marijuana to the location, which they would exchange for money. The suspects would leave and be stopped by the Sheriff's Department later. At approximately 0830-0900 hours, Burbank fitted Gonzalez with a "transmitter recorder." This recorder only recorded audio. He said that Castellanos had an I-phone case that had an audio and video recorder.

At approximately 1100-1130 hours, he and Special Agent Chris Baroni set up at 2310 Proctor Valley Road so they could surveil the operation. They were both set up in a Chevy Silverado in the southwest corner of the parking lot. They were looking northbound from there. Burbank said that he had a "pretty" unobstructed view of the van and where the exchange would take place except for where a F150 was parked in the parking lot, which was blocking part of his view. He said that Baroni could see the area that he could not.

At approximately 1200 hours, Castellanos and Gonzalez showed up. A white car showed up, which three suspects get out of. Castellanos and Gonzalez met up with the suspects in the parking lot in front of Starbucks and Subway. He could see the suspects and Gonzalez, but not Castellanos. He and Baroni were getting some updates on what was going on but didn't have audio of what was being said. The suspects and Gonzalez talked for approximately five minutes. Two of the suspects walked over to the van. The van was locked so the suspects went back to Gonzalez. Eventually the suspects got the van open. The suspects got in and out of the van and on and off their phones. Burbank said that the suspects would pace back and forth between the van and where Gonzalez was standing. One of the updates said that they didn't like the quality of the marijuana and they needed to call their boss.

At some point Gonzalez went with the suspects to the van. They found out that the suspects needed to talk to their boss. Some of the suspects left in the white vehicle. The suspects came back approximately 7 to 10 minutes later. When the white car came back, it backed in three spots from the van and kept their foot on the brake for a couple minutes. Burbank said this caught his attention, because they didn't park right away. He thought they might have done this so they could leave quickly. The suspects got out and met with Gonzalez. They heard over the radio that the suspect's boss wanted to see the marijuana. Burbank kept his eyes on Gonzalez except for when the F150 blocked his view. Burbank said that the suspects continued to go back and forth. He wasn't able to track everyone's movement.

A red Chevy Trailblazer came into the parking lot, dropped two more suspects off and then left the parking lot. Baroni got on the radio to tell their air unit to follow the Trailblazer. As he did this, Baroni then said, "Holy shit, Ronny is running." Burbank looked to where Gonzalez was and saw him running past the van towards the old Albertson's building. Burbank said that he didn't hear any gunshots. They then drove their truck towards Gonzalez. When they got to Gonzalez, they used the truck to block him from the area of the van. He pulled Gonzalez into the vehicle and they left the parking lot. As soon as Burbank Pulled Gonzalez into the vehicle, Gonzalez said, "I've been shot in the back, I've been shot in the back." And also something like, "I shot the guy, I might have killed him." Burbank checked Gonzalez for holes or blood, but didn't find anything. They drove down a dirt road, which was possibly Old Proctor Valley Road and parked.

When they parked, Burbank had Gonzalez take off his shirt. Burbank said that he saw a red, pin-sized spot between Gonzalez' shoulder blades. He said there was also red discoloration around the spot. Burbank said that at some point while they were in the truck before they parked on the dirt road, Gonzalez said something like, "He had a taser," or "I got tased." They decided that they should take Gonzalez to the hospital and took him to Sharp, in Chula Vista.

Burbank said that the incident should have been captured on Gonzalez' audio recorder. He turned the recorder off approximately 5 minutes after the incident, while they were in the truck. This concluded my interview with Burbank.

The audio and video recording was transcribed by Family Protection Unit Secretary, Kathy Koeppel. For further, see the DVD recording and the attached transcription.

During the interview, Burbank used a piece of notebook paper to try to draw the layout of the parking lot, where the incident happened. Not knowing that I was going to keep the sketch, he crumpled it up. I retrieved the sketch from him. A copy of the

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0850 - Ditomaso, David | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 10:18:45 AM | CV0499 - Thunberg, Eric | 6/27/2016 10:30:37 AM |



# Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13925**

**5**

Page 5 of 5

sketch is attached to this report. The original sketch was given to Detective Monreal to be logged into evidence. This concludes my involvement in this investigation.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0850 - Ditomaso, David | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 10:18:45 AM | CV0499 - Thunberg, Eric | 6/27/2016 10:30:37 AM |

NetRMS_CASDCR.rtf v11-15-06

PL Rule 56 Exhibit C

Page 5

Printed: June 27, 2016 - 12:43 PM



1　　　　　　　　　　　　　　**TRANSCRIPT**

2

3　CASE NUMBER:　1609053

4

5

6

7

8

9　　　　　　　　　　　　INTERVIEW OF:

10　　　　　　　　　　　　MICHAEL BURBANK

11

12

13　　　　　　　　　　　INTERVIEWED BY:

14　　　　　　DETECTIVE D. DITOMASO (ID 850)

15　　　　　　　CHULA POLICE DEPARTMENT

16

17

18

19

20

21

22

23

24

25

26

27

28　Transcribed By:  Kathy Koeppel

| | | |
|---|---|---|
| 1 | LEGEND | |
| 2 | DD: | Detective D. Ditomaso (ID 850) |
| 3 | MB: | Michael Burbank |
| 4 | (inaud) | Unintelligible |
| 5 | | |
| 6 | DD | Thank you.  Come on in and have a seat over there.  Well, I appreciate you talking |
| 7 | | to me…inaud…and who do you…you work for H.S.I.? |
| 8 | MB | Yep, I'm a Technical Enforcement Officer. |
| 9 | DD | Technical? |
| 10 | MB | Enforcement Officer. |
| 11 | DD | OK.  Got it.  And are you assigned to the, the Team Road Kill?  Or Road Kill |
| 12 | | Team? |
| 13 | MB | No, no, I'm, I'm assigned generally to the office.  I'm, uh, part of the Technical |
| 14 | | Services Group.  So we support basically the entire A.O.R.  It doesn't matter if it's |
| 15 | | downtown or… |
| 16 | DD | So you support all the teams? |
| 17 | MB | Every single one. |
| 18 | DD | So today you were just assisting Road Kill? |
| 19 | MB | Yeah. |
| 20 | DD | Got it.  What's a good address for work? |
| 21 | MB | Uh, it's 2297 Neilsbohr Court. |
| 22 | DD | Spell it for me. |
| 23 | MB | N-I-E-L-S-B-O-H-R. |
| 24 | DD | Court? |
| 25 | MB | Court, yep, San Diego, 92154. |
| 26 | DD | And a work phone? |
| 27 | MB | 6-1-9 |
| 28 | DD | Mm-hmm. |

| 1 | MB | 247-8219. |
|---|---|---|
| 2 | DD | 8219.  OK, before we start, um, I always say this is a completely voluntary |
| 3 | | interview.  You don't have to answer anything you don't want to answer |
| 4 | MB | Mm-hmm. |
| 5 | DD | You can pick the questions you want to answer. |
| 6 | MB | Yeah. |
| 7 | DD | Um, you can feel free to leave any time you decide you want to leave.  I'll show |
| 8 | | you where the exit is.  You can take off. |
| 9 | MB | Yeah. |
| 10 | DD | This is completely voluntary.  So it's up to you as far as wanting to talk to me. |
| 11 | MB | No, we're good. |
| 12 | DD | OK. |
| 13 | MB | Whatever helps you guys out. |
| 14 | DD | OK, great.  Um, so you were basically just assisting today?  You don't have a |
| 15 | | whole lot of knowledge about the case or as far as the…inaud…? |
| 16 | MB | I, I, I do…inaud…team does, or I do preliminary, uh, preliminary needs, um, with |
| 17 | | the, uh, agents.  I do all the support with the undercovers, and I meet with them to |
| 18 | | talk a little bit about what generally the scenario is, if it's a buy walk, if it's buy |
| 19 | | bust… |
| 20 | DD | Right. |
| 21 | MB | …and stuff like that.  As far as the interactions with, uh, crooks or the |
| 22 | | conversations between crooks and CI's or whatever, I, I don't get involved with |
| 23 | | that stuff. |
| 24 | DD | OK.  So you're just the technology side of it basically? |
| 25 | MB | Basically, yeah.  I do all the video, audio, um, video, audio trackers, um, any, any |
| 26 | | kind of tech stuff that, that's required for the investigation. |
| 27 | DD | Got it.  Now, do you, do they give you a background on what was gonna go on |
| 28 | | today, or? |

| 1 | MB | Yeah, my understand… |
| 2 | DD | Did you guys have a brief this morning or? |
| 3 | MB | Yeah, we had a brief this morning about it. |
| 4 | DD | Is that kind of the first you've learned of everything? |
| 5 | MB | No, it, it's been going on a little bit.  Um, I think there were some, um, preliminary |
| 6 | | conversations about next week, the last week about we're going to do a, a buy, a |
| 7 | | buy, a reverse buy walk I guess we would…inaud… |
| 8 | DD | W-what exactly does that mean? |
| 9 | MB | So we were gonna, um, get the transportation proceeds from, um, these guys, and |
| 10 | | then the Sheriff's Department would do a follow out and do a takedown. |
| 11 | DD | So, uh, let me get this right.  You guys basically, um, are, you guys are getting |
| 12 | | paid or you guys are paying someone…inaud…? |
| 13 | MB | They, they were getting, no, they were, we were going through a broker, our, uh, |
| 14 | | uh, uh, CI, and they were brokering this, this, this exchange. |
| 15 | DD | And what, what does that mean? |
| 16 | MB | Um, just what it, well, just what I said.  We bring, we transport the dope to a said |
| 17 | | location… |
| 18 | DD | Mm-hmm. |
| 19 | MB | The money, money and dope is exchanged.  These guys leave.  The Sheriff's |
| 20 | | Department wall stops it and that's… |
| 21 | DD | OK. |
| 22 | MB | That's my, the level of my knowledge of it. |
| 23 | DD | OK. |
| 24 | MB | …inaud… |
| 25 | DD | So do you know, I mean, do you know the background of when the dope was |
| 26 | | brought across or any of that stuff? |
| 27 | MB | I have no idea. |
| 28 | DD | OK.  So let's just go with what, what you know, um, today, with what, what was |

4

Case 1609053 Interview of Michael Burbank

| 1  |    | being told to you. |
|----|----|---|
| 2  | MB | So basically, um, generally, we were doing, um, speaking, we were doing a what I, |
| 3  |    | what I just described, um, transportating, uh, transportation of, uh, marijuana to |
| 4  |    | that location where the… |
| 5  | DD | OK |
| 6  | MB | …where everything went down. |
| 7  | DD | So did you take part in that? |
| 8  | MB | Yes. |
| 9  | DD | Because I know, uh, apparently there was a suspect that, um, what, dropped a van |
| 10 |    | off, right? |
| 11 | MB | Yeah, I was… |
| 12 | DD | And you guys were gonna use that van to, to load the dope. |
| 13 | MB | Yeah, and I wasn't… |
| 14 | DD | Were you part of that? |
| 15 | MB | No, I wasn't part of that… |
| 16 | DD | No?  OK. |
| 17 | MB | …in the morning. |
| 18 | DD | OK. |
| 19 | MB | I was there, um… |
| 20 | DD | But you knew about that? |
| 21 | MB | I knew about that.  I was briefed at the morning, um, uh, briefing. |
| 22 | DD | …inaud… |
| 23 | MB | About what happens, uh, the van was gonna be loaded.  The van was gonna be |
| 24 |    | brought to that location.  The crooks were gonna supposedly exchange money and |
| 25 |    | keys.  And then they would be taken out by BCST. |
| 26 | DD | OK.  So, um, did, so you, I'm sorry.  You weren't any part, didn't any part, of, um, |
| 27 |    | actually picking up the van?  What, what part of this did you kind of jump into? |
| 28 | MB | I jumped into, um, providing the audio equipment for the undercover guys. |

PL Rule 56 Exhibit D
Page 5

000448

| | | |
|---|---|---|
| 1 | DD | OK. |
| 2 | MB | Uh, which I turned into your… |
| 3 | DD | And what, so what time did you start? |
| 4 | MB | Probably about eight-thirty, nine o'clock, I was in my office, and I didn't start on |
| 5 | | this op until God I want to say ten? I wasn't, um, really looking at the clock so I |
| 6 | | don't want to be too inaccurate but I'm just kind of guessing. |
| 7 | DD | But you knew ahead of time that your guys were basically gonna load the van up |
| 8 | | with marijuana, take it to a point, get money for it, and then those guys were gonna |
| 9 | | roll with the marijuana?  That was basically what was supposed to happen. |
| 10 | MB | Yeah.  Yeah, that's the basics…inaud… |
| 11 | DD | That's…inaud… |
| 12 | MB | Yeah. |
| 13 | DD | So eight-thirty, nine o'clock, you start providing these guys with the wire or? |
| 14 | MB | Yeah, um, pretty close to the same gear that you guys use.  A, a body wire with a |
| 15 | | recorder and transmitter. |
| 16 | DD | Is that on both UC's? |
| 17 | MB | Um, the, when we, only Ronnie was, um, wearing a transmitter recorder.  Um, the |
| 18 | | other UC had a, an i-Phone case that has a audio and video, um, recorder. |
| 19 | DD | And that was, uh, Tony? |
| 20 | MB | Yeah, that was Tony. |
| 21 | DD | You said audio and video recorder? |
| 22 | MB | Yeah, um, I believe it was looked at and there was no, nothing on it.  But I think |
| 23 | | we're gonna turn it over to you guys anyway. |
| 24 | DD | OK.  Now the, the wire Ronnie was wearing, um, that recorded just audio? |
| 25 | MB | Yeah. |
| 26 | DD | OK.  But that should've recorded the whole incident? |
| 27 | MB | Oh, the whole, yeah, from go.  Yeah from the morning he turned it on till, till we |
| 28 | | actually shut it off in the van.  I'm sorry, the pick-up truck that we pulled in out of |

| | | |
|---|---|---|
| 1 | | the, off scene. |
| 2 | DD | When he got picked up? |
| 3 | MB | We were the ones that, well, Chris and myself, are the ones that pulled him into |
| 4 | | the vehicle and took him…inaud… |
| 5 | DD | Oh, OK. |
| 6 | MB | Yeah. |
| 7 | DD | OK. And Tony's is the same way? His should've recorded everything, too? |
| 8 | MB | It should've but I, I think they looked at it preliminary and he was kind of fiddling |
| 9 | | with it, turning it on and off. I think he had some issues with, um, operation of the |
| 10 | | gear. So I haven't seen it yet so I'm speaking kind of, maybe speaking out of turn |
| 11 | | about what's on it. But from what I overheard that 20 second snips of… |
| 12 | DD | Yeah. |
| 13 | MB | …worthless stuff. |
| 14 | DD | Got it. Now do you know everybody that's on your team? Or on this team? |
| 15 | MB | Yes. |
| 16 | DD | From H.S.I.? Because there was H.S.I. and then there was the S.O. guys, right? |
| 17 | MB | Yes, I've, not, like, personally, but I've seen…seen everybody and I've interacted |
| 18 | | with everybody at some point… |
| 19 | DD | OK. |
| 20 | MB | …whether I remember what their name is or not… |
| 21 | DD | OK. |
| 22 | MB | Because I deal with everybody in my office. |
| 23 | DD | OK. |
| 24 | MB | So I knew who everybody was on the Sheriff's Department. I've dealt with them, |
| 25 | | them before… |
| 26 | DD | Right. |
| 27 | MB | I had a meeting last week with them. And I know everybody that was on the |
| 28 | | H.S.I. team, um… |

| | | |
|---|---|---|
| 1 | DD | OK. |
| 2 | MB | …in dealing with them. |
| 3 | DD | So you, you started this incident by going out to the Albertson's and setting up |
| 4 | | there?  Is that kind of when you started? |
| 5 | MB | Yeah. |
| 6 | DD | OK.  Do you know about what time that was? |
| 7 | MB | Oh God, um… |
| 8 | DD | Just approximate… |
| 9 | MB | Maybe eleven, eleven-thirty, guessing?  About lunchtime because I know I |
| 10 | | grabbed a sandwich there. |
| 11 | DD | OK.  And that was with the rest of the, uh, Road Kill Team? |
| 12 | MB | Just Chris Baroni and myself were by ourselves when we deployed out there. |
| 13 | DD | And everybody started trickling in? |
| 14 | MB | Everybody else, yeah, they started, we didn't, we didn't have eyes on some of the |
| 15 | | other team guys.  They, they came in different areas and different locations.  We |
| 16 | | were not really paying attention to, uh… |
| 17 | DD | So you didn't really know where everybody was? |
| 18 | MB | I knew where everybody was but I didn't see them get where they were. |
| 19 | DD | OK. |
| 20 | MB | Because, uh, we, that was covered in the morning, uh, plan where everybody was |
| 21 | | gonna post up, who was gonna take away people… |
| 22 | DD | Right. |
| 23 | MB | Uh, if we were gonna do some follow outs on the suspects, um, so… |
| 24 | DD | Got it. |
| 25 | MB | I knew where everybody was posted up. |
| 26 | DD | OK.  So you guys start setting up.  Uh, is it just you, now are you in a vehicle? |
| 27 | MB | Yes. |
| 28 | DD | The whole time? |

Case 1609053 Interview of Michael Burbank

PL Rule 56 Exhibit D
Page 8

000451

| 1  | MB | Yep. |
| 2  | DD | OK.  What kind of vehicle were you in? |
| 3  | MB | A Chevy Silverado, black. |
| 4  | DD | And who's in there with you? |
| 5  | MB | Chris Baroni, Special Agent. |
| 6  | DD | And are you guys on the aisle or just...? |
| 7  | MB | Yeah, we have...inaud... |
| 8  | DD | Working on the radio? |
| 9  | MB | I had visibility, we had eyes, um... |
| 10 | DD | Where were you guys parked at? |
| 11 | MB | So...could, do you have a, can you grab me a piece of paper? |
| 12 | DD | Sure. |
| 13 | MB | Maybe that would explain it a little bit better to how everything as I'm kind of |
| 14 |    | talking you through it might be easier.  Let's see here.  So here's the Albertson's. |
| 15 |    | Here's the bank.  Here's the exit. |
| 16 | DD | OK, so we're facing westbound this way, right? |
| 17 | MB | Uh, yeah, we're facing westbound. |
| 18 | DD | OK. |
| 19 | MB | We were set up over here. |
| 20 | DD | OK.  Facing which way? |
| 21 | MB | Facing, oh, towards the park.  South. |
| 22 | DD | OK. |
| 23 | MB | Facing south.  This way.  We had an eye out the back window. |
| 24 | DD | So you guys are in the, let's see that would be the, uh, southwest corner of that |
| 25 |    | huge parking lot? |
| 26 | MB | Yeah, right where that, um, um, we were right next to that Pilates place or Yoga |
| 27 |    | place, there's, there's right there on the corner... |
| 28 | DD | OK. |

| 1 | MB | Of that, so… |
| 2 | DD | And you guys were facing south? |
| 3 | MB | We were facing south.  Uh, we were looking out.  We were turned around looking |
| 4 | | out the back window. |
| 5 | DD | Got it. |
| 6 | MB | So as not to give up our position to these guys. |
| 7 | DD | North out back window.  OK. |
| 8 | MB | So I had a basically, I had an unobstructed view.  The van was parked to the, |
| 9 | | approximately here. |
| 10 | DD | OK. |
| 11 | MB | Maybe my math's a little bit off on this but… |
| 12 | DD | No, it's, this is kind of…southeast corner of Albertson's… |
| 13 | MB | Yeah, it's not to scale |
| 14 | DD | …OK. |
| 15 | MB | …but, you know, you kind of get it.  So I had an unobstructed view.  These guys |
| 16 | | were going back and forth like this.  I had a pretty unobstructed view except for |
| 17 | | there was an F150 parked right here.  So I would lose the visibility to what was |
| 18 | | happening from the time they got to about right off the driver's side of the van… |
| 19 | DD | Mm-hmm. |
| 20 | MB | …to, um, just on the other side of this F150, so probably a good 50 feet, uh, I lose |
| 21 | | visibility.  Where the truck was parked, uh, Special Agent Baroni had visibility to |
| 22 | | the stuff that I could not see. |
| 23 | DD | Got it. |
| 24 | MB | Out his.  And of course, you know, we're looking backwards through the truck |
| 25 | | so… |
| 26 | DD | So anything that you miss he picked up? |
| 27 | MB | Yeah, he should've picked up. |
| 28 | DD | Got it.  So, uh, we start out with, um, Tony and Ronnie.  They're at the Starbucks, |

| 1 | | right? |
|---|---|---|
| 2 | MB | Yes. |
| 3 | DD | Isn't that kind of how this started? |
| 4 | MB | Yeah. |
| 5 | DD | And they call in one of the guys, right? |
| 6 | MB | Yeah, and they called… |
| 7 | DD | Do you know about what time that was? |
| 8 | MB | Around noon. |
| 9 | DD | OK. |
| 10 | MB | Sometime around noon. |
| 11 | DD | And, and are they just sitting? |
| 12 | MB | They show up in a white vehicle. |
| 13 | DD | No, no, your, your UC's. |
| 14 | MB | Oh, um. |
| 15 | DD | Anthony and, uh, Ronnie. Where are they at? |
| 16 | MB | They, they were at the Starbucks and then… |
| 17 | DD | Just sitting, chilling? |
| 18 | MB | I think so, I lost visibility at the beginning. |
| 19 | DD | OK. |
| 20 | MB | Until such a time as the, the, the suspects showed up in that white, uh, Honda or |
| 21 | | Sonata or whatever it was, I don't remember, at the time. |
| 22 | DD | Now are they in, do you know about where they were? Did you hear on the radio? |
| 23 | | Ronnie and Tony? |
| 24 | MB | Uh, I think that, all we hear, all I heard was they were on scene. |
| 25 | DD | Mm-hmm. |
| 26 | MB | And I assume they were at the Starbucks. |
| 27 | DD | OK. |
| 28 | MB | So at that time because I lose a little bit of visibility going where that Subway is |

| 1 | | and stuff… |
|---|---|---|
| 2 | DD | Sure. |
| 3 | MB | That's a little bit off.  There's some stuff in the way.  And at the time they're, |
| 4 | | when they showed up, there was a, I remember a big rig doing a off-load to one |
| 5 | | the businesses there. |
| 6 | DD | Oh, yeah, of course. |
| 7 | MB | So I, I lost some visibility there. |
| 8 | DD | Got it.  So what kind of car shows up? |
| 9 | MB | So it was a white Sonata or a Honda Accord 4-door. |
| 10 | DD | A white, it was definitely a 4-door or? |
| 11 | MB | I believe it was a 4-door.  I'm not gonna be definite. |
| 12 | DD | OK or a Honda, a what? |
| 13 | MB | It was a Honda or a Hyundai sedan shows up. |
| 14 | DD | So it was a Hyundai… |
| 15 | MB | Like a Sonata or something. |
| 16 | DD | Or a Honda Civic…? |
| 17 | MB | An Accord I think. |
| 18 | DD | Accord? |
| 19 | MB | Yeah. |
| 20 | DD | How did you know it was involved? |
| 21 | MB | Because I saw the suspects get out of the vehicle. |
| 22 | DD | How many people did you see get out? |
| 23 | MB | Three. |
| 24 | DD | OK. |
| 25 | MB | There was a guy in a pink shirt. |
| 26 | DD | What, uh, race? |
| 27 | MB | Uh, it looked like it was, um, twenty-something Hispanic male, thin. |
| 28 | DD | This was all of them, or? |

12

Case 1609053 Interview of Michael Burbank

| | | |
|---|---|---|
| 1 | MB | Yeah, they're all about the same, yeah, they all looked the same to me. They kind |
| 2 | | of looked…inaud… |
| 3 | DD | They're all twenty-something or? |
| 4 | MB | That's what they looked like to me from a distance…inaud… |
| 5 | DD | …inaud…give me a range? |
| 6 | MB | Yeah twenty to, twenty to twenty-six. |
| 7 | DD | OK. |
| 8 | MB | Um, from where I was sitting. I was trying to get them through binoculars, um, to |
| 9 | | go a little bit tight but I wasn't close enough to get up on the faces. So I |
| 10 | | wouldn't…inaud… |
| 11 | DD | These are the first guys that showed up? |
| 12 | MB | First guys to show up. |
| 13 | DD | OK. |
| 14 | MB | So one… |
| 15 | DD | You said one had a pink shirt? |
| 16 | MB | A pink shirt, we had a gray shirt, and we had a, uh, a multi-colored shirt. It was |
| 17 | | like a, kind of a teal-blue, um, and gray. |
| 18 | DD | OK. So those guys walk over and meet up with…inaud… |
| 19 | MB | Yeah, they're meeting up. They're going back and forth to the van. They're |
| 20 | | checking the van out. |
| 21 | DD | OK. Hold, hold on real quick. So they meet up with Ronnie and Tony and they're |
| 22 | | all kind of talking or…? |
| 23 | MB | I didn't see Tony at this time. I saw Ronnie at this time. |
| 24 | DD | OK. Could you guys see them meeting up with him? |
| 25 | MB | Yeah. And they were way, way, they were over, there was a grove of trees, uh, as |
| 26 | | the parking lot comes, kind of comes around closest there's, there's a set of trees |
| 27 | | here. And then you have the main right, main road in front of the businesses. |
| 28 | DD | Mm-hmm. |

000456

| 1  | MB | They were kind of meandering around this tree in the shade. |
| 2  | DD | OK, is that near the Starbucks or? |
| 3  | MB | Uh, Starbucks would be somewhere over here. |
| 4  | DD | Mm-hmm. |
| 5  | MB | So they were and then this big rig was parked over here so… |
| 6  | DD | OK. |
| 7  | MB | Um… |
| 8  | DD | So I mean were they in that, like, mini courtyard there? |
| 9  | MB | Yeah, um, in the mini parking lot. |
| 10 | DD | …inaud… |
| 11 | MB | …inaud…I didn't, I didn't have any eyes on them at all in the courtyard. |
| 12 | DD | OK. |
| 13 | MB | I could not see at all. |
| 14 | DD | But when you saw them…inaud…with Ronnie in the parking lot? |
| 15 | MB | When I saw them, they were in the parking lot. |
| 16 | DD | And that was at, like, in front of Starbucks or? |
| 17 | MB | Yeah, it was, it was, um, um, it would be directly out from the Starbucks/Subway. |
| 18 | DD | OK. |
| 19 | MB | And then there was a, like I said, there was a big rig kind of parked kind of at an |
| 20 |    | angle so they were almost standing straight off the front of that big rig. |
| 21 | DD | OK. |
| 22 | MB | So… |
| 23 | DD | So you had eyes on Ronnie and the three guys but couldn't see Tony? |
| 24 | MB | Correct. |
| 25 | DD | OK.  So how long do they talk before they go over to the van? |
| 26 | MB | Uh, pretty quick.  I think it was maybe like five minutes of conversation. |
| 27 | DD | OK.  Now did you know at all what was going on?  Or you guys are just basically |
| 28 |    | know what you can see? |

14

Case 1609053 Interview of Michael Burbank

| | | |
|---|---|---|
| 1 | MB | I, I had no idea.  We didn't have any audio… |
| 2 | DD | OK. |
| 3 | MB | ...connection.  Um, we were getting some… |
| 4 | DD | But no radio at all? |
| 5 | MB | No, we were getting some minor updates, but we weren't actually hearing the |
| 6 | | conversation verbatim, so… |
| 7 | DD | So every once in a while just getting radio updates? |
| 8 | MB | Yeah, we were getting radio updates. |
| 9 | DD | So you knew a little bit about what was going on? |
| 10 | MB | Conversation's going good or they're talking about this.  They don't like the |
| 11 | | quality of the dope, um… |
| 12 | DD | OK, but that was so before they don't like the quality of the dope, they all walk |
| 13 | | over there.  Right? |
| 14 | MB | So, no.  So two of the guys go out…the pink shirt and striped shirt guy go over… |
| 15 | DD | Is that the gray or the teal-blue? |
| 16 | MB | Teal blue and gray striped shirt guy go over, pink shirt guy goes over to the van… |
| 17 | DD | Does Ronnie go with them? |
| 18 | MB | No. |
| 19 | DD | OK. |
| 20 | MB | Ronnie stays put underneath the tree. |
| 21 | DD | Got it. |
| 22 | MB | They go over, try to open the door to the van.  The van's locked. |
| 23 | DD | OK. |
| 24 | MB | Then as I remember it, they came back.  The van's locked.  Ronnie…inaud… |
| 25 | DD | You mean they went to Ronnie? |
| 26 | MB | Yeah, they went back to Ronnie…van's locked.  Um, Ronnie goes over, uh… |
| 27 | DD | Ronnie went to the van? |
| 28 | MB | Uh, I don't rem…I think he handed them the…I don't remember if he handed him |

| 1 | | keys or he actually went over to the van or not to open up the door. |
|---|---|---|
| 2 | DD | But somehow that door got open. |
| 3 | MB | Somehow the door...the, somebody was given the key or the key was, um, Ronnie |
| 4 | | unlocked the door for them. |
| 5 | DD | So then somebody gets in the van, or? |
| 6 | MB | They get in the van.  Um, they look in the...they kind of look in the van.  They're |
| 7 | | looking around... |
| 8 | DD | And who's they? |
| 9 | MB | Uh, the, um, teal shirt, pink, pink shirt. |
| 10 | DD | ...inaud...pink shirt, when they did this, is Ronnie still at Starbucks? |
| 11 | MB | He's, he's, he's gone.  He's not at Starbucks.  He's, he's under the tree still. |
| 12 | DD | In the parking lot? |
| 13 | MB | Yeah, in the parking lot.  Um, I saw the, um, pink shirt and, uh, striped shirt guy, |
| 14 | | um, both of them were on the phone, off the phone, looking at the van, kind of |
| 15 | | walking around, talking on the phone. |
| 16 | DD | Who get, does one of them get in? |
| 17 | MB | They, at one point I saw them both get in the van, driver's side, passenger side, |
| 18 | | they were in for just a short period of time, maybe three or four minutes. |
| 19 | DD | OK.  And then they're kind of just hanging out by the van on the phone? |
| 20 | MB | Yeah, then they get out of the van.  They're talking on.  They're walking back and |
| 21 | | forth.  They're kind of pacing between, um, where Ronnie is stand...still standing |
| 22 | | over here with gray shirt, he, he, and then he's with gray shirt guy. |
| 23 | | Um...inaud...walking... |
| 24 | DD | So they're pacing back and forth?  Who's on the phone? |
| 25 | MB | Um, at, at different times, both those guys were on the phone. |
| 26 | DD | OK. |
| 27 | MB | Striped shirt guy and pink shirt guy were both on the phone at different times. |
| 28 | DD | That's the teal gray, striped shirt? |

16

Case 1609053 Interview of Michael Burbank

| | | |
|---|---|---|
| 1 | MB | Yeah. |
| 2 | DD | And the pink? |
| 3 | MB | Yeah.  They're on the, they're, they're on the phone, off the phone. |
| 4 | DD | OK. |
| 5 | MB | We're getting minor updates at this time.  They don't like the quality of the dope. |
| 6 | | They've got to call their boss.  Um, there, I think there was a few more times that |
| 7 | | they went back and forth to the van.  They were kind of all over the place, so it's |
| 8 | | hard to, hard to remember exactly, um, their movements.  Because they were kind |
| 9 | | of suspiciously walking around the parking lot, um…inaud… |
| 10 | DD | And they're kind of pacing back and forth? |
| 11 | MB | Yeah, they're kind of pacing back and forth.  What I observed they were really |
| 12 | | kind of seemed like they were nonchalant.  I didn't see a lot of like clenched fists |
| 13 | | or nervous energy… |
| 14 | DD | So they appeared relaxed…inaud…? |
| 15 | MB | Yeah, they kind of appeared pretty relaxed about, about it, swinging their arms |
| 16 | | about, um… |
| 17 | DD | So unknown how many times they went back and forth between the van and |
| 18 | | Ronnie? |
| 19 | MB | Yeah, yeah, I have no idea.  It was, there was multiple, uh, in and outs in the van |
| 20 | | with, um, um…inaud… |
| 21 | DD | You mean as far as getting in? |
| 22 | MB | Yeah, getting in, getting out.  Looking at stuff.  Looking in the windows.  Um, at |
| 23 | | one point Ronnie went over there with them to the van. |
| 24 | DD | But they actually got into the van multiple times? |
| 25 | MB | Yeah. |
| 26 | DD | OK.  At some point Ronnie goes with them to the van? |
| 27 | MB | Yes. And this is I believe all before, um, the, the next thing happened, m-major |
| 28 | | thing happened was the apparent…we got over the radio that the guys the, the |

| 1 | | suspects in the white vehicle needed to go talk to their boss. |
| 2 | DD | OK. So Ronnie's away from the van at this point, right? |
| 3 | MB | He's away from the van. They need to go talk to their boss. |
| 4 | DD | OK. Could you see them leave? |
| 5 | MB | I saw the vehicle leave. |
| 6 | DD | Did you see who was in it? |
| 7 | MB | I didn't see who was in it. I don't know if three guys or two guys. I, I don't know. |
| 8 | DD | OK. |
| 9 | MB | I think it was two…if I remember radio chatter correctly, it was two guys, pink |
| 10 | | shirt guy and striped shirt guy. |
| 11 | DD | But you actually saw the white vehicle leave? |
| 12 | MB | I watched, I saw the white vehicle. Yes. |
| 13 | DD | Did you see which way it went? |
| 14 | MB | It, it went past the bank towards…Prospect? And then took a left towards East H. |
| 15 | DD | East H is that major…inaud…out there. |
| 16 | MB | Yeah, the main drag I believe is Prospect and I think it turns into East H? |
| 17 | DD | Oh, uh, Proctor Valley? |
| 18 | MB | Proctor Valley. |
| 19 | DD | East H turns into Proctor Valley…inaud… |
| 20 | MB | Yeah, I'm, yeah, I'm sorry, it's Proctor Valley Road. |
| 21 | DD | That's fine. OK. So you decide to pull out? |
| 22 | MB | Yeah, he pulled, but they went down, they took a left… |
| 23 | DD | And who do you think was in it? I'm sorry. |
| 24 | MB | Uh, pink shirt and striped shirt guy. |
| 25 | DD | And the other guy stayed? Gray shirt stayed? |
| 26 | MB | I, as far as I remember, yeah. |
| 27 | DD | OK. |
| 28 | MB | I believe there was only two in the vehicle when they left. So we were told |

| | | |
|---|---|---|
| 1 | | through, um, through the radio that these guys need to go talk to their boss. |
| 2 | DD | Right. |
| 3 | MB | So we actually had air support and we deployed air support to follow these guys. |
| 4 | DD | Do you get air, updates from air support? |
| 5 | MB | Yeah, we were on, we were talking to them via radio. |
| 6 | DD | OK. And what were those guys doing? |
| 7 | MB | So apparent...so they were only gone for about, for about seven or eight minutes. |
| 8 | | And they ended up just going down to East H Street, doing a couple loops, and |
| 9 | | coming right back. |
| 10 | DD | To where? Just down, westbound on East H? |
| 11 | MB | Yeah, they just went westbound on East H. And then turned around, came back |
| 12 | | into the parking lot. And we were updated that by air support. So they may be |
| 13 | | gone, maybe 10 minutes. |
| 14 | DD | OK. So seven to ten minutes? |
| 15 | MB | Yeah. |
| 16 | DD | OK. So then what happened? |
| 17 | MB | They come back. Um, we hear over the radio, now they're still meandering in the |
| 18 | | parking lot...inaud... |
| 19 | DD | So but did they park? |
| 20 | MB | They parked, they came in. Um, they parked, um, west of the van. They kind of |
| 21 | | backed in next to it. |
| 22 | DD | How far away were they? |
| 23 | MB | Um, three spots away from the van. |
| 24 | DD | Exactly or is that approximate? |
| 25 | MB | I believe it's approx....uh, accurate. |
| 26 | DD | Three spots west of where the van was parked? |
| 27 | MB | Yeah. |
| 28 | DD | Which way were they facing? |

19

Case 1609053 Interview of Michael Burbank

| 1 | MB | Facing, uh, north. |
|---|----|--------------------|
| 2 | DD | OK.  Now what happens? |
| 3 | MB | They were on, um, had the brake lights on for what I thought was longer than you |
| 4 |    | would normally keep them on.  They had their foot on the brake, um, for longer |
| 5 |    | than just parking.  So, uh, I didn't know what to make of that at the time.  Um… |
| 6 | DD | And how long do you think his brake lights were on? |
| 7 | MB | Probably just a, a couple minutes.  The, uh, the reverse lights and the brakes on, |
| 8 |    | brake lights on.  I, I thought it, it kind of caught my attention… |
| 9 | DD | …inaud…put on the brake? |
| 10 | MB | Yeah, it caught my attention because it's, it's more than you just going in to a spot |
| 11 |   | and throwing it in park and, and moving on. |
| 12 | DD | Instead of throwing it in park they were…inaud… |
| 13 | MB | Yeah, they were kind of just back and forth a little bit with it. |
| 14 | DD | Right. |
| 15 | MB | I don't know what, if they were adjusting it or what they were doing.  I, I didn't |
| 16 |   | see a move.  But maybe because of my angle they were probably, maybe kind of |
| 17 |   | setting up or something to make sure that they were, they were backed into a spot |
| 18 |   | so they could get out quickly.  I don't know. |
| 19 | DD | Yeah. |
| 20 | MB | You know, I'm kind of just second guessing what they were doing now. |
| 21 | DD | Right. |
| 22 | MB | But, um, that's probably what they were doing was probably setting up the |
| 23 |   | vehicle, uh, and, and lining it up in a spot for a quick getaway. |
| 24 | DD | Right. |
| 25 | MB | Um, so…inaud…right now they get out.  They finally get out of the vehicle. |
| 26 |   | There's a lot of meandering back and forth going on still.  Um, like I said, I, I lose |
| 27 |   | sight of them when they're kind of… |
| 28 | DD | Mm-hmm.  Just two guys get out of the vehicle? |

| 1 | MB | Yeah, um, so now they're… |
| 2 | DD | Could you, could you see that it was pink shirt and teal shirt?  Or could you tell? |
| 3 | MB | I couldn't tell. |
| 4 | DD | OK. |
| 5 | MB | Because, because now they're… |
| 6 | DD | But you saw two guys get out of the vehicle? |
| 7 | MB | Yeah.  Uh, they get out of the vehicle and then of course, you know, they're m- |
| 8 | | meandering back and forth.  Ronnie's, I believe he was interacting, I'm trying to |
| 9 | | just keep my eye on him.  I was ready…inaud… |
| 10 | DD | Where was Ronnie at this point? |
| 11 | MB | Ronnie was in the parking lot kind of off, uh, not where underneath the grove of |
| 12 | | trees but he was kind of moving around a little bit, um, between different shade |
| 13 | | spots within the parking lot. |
| 14 | DD | But he didn't go near the van? |
| 15 | MB | No, he wasn't near the van that I could see at this time.  So he was… |
| 16 | DD | Did those guys go over to Ronnie or? |
| 17 | MB | They went over to Ronnie.  Um, there was some interaction going on.  I'm trying |
| 18 | | to focus on Ronnie, looking whose, whose who.  Um, uh, we hear over the radio |
| 19 | | that um, the guy, the guy says that his boss wants to come here and look at the |
| 20 | | dope…inaud… |
| 21 | DD | OK.  Where, where is everybody at this point? |
| 22 | MB | They're, they're kind of in the parking lot here, just kind of just talking.  I heard |
| 23 | | him talking. |
| 24 | DD | Were they all together? |
| 25 | MB | Yeah, they were all together, just kind of mill… |
| 26 | DD | But they're away from the van? |
| 27 | MB | …milling around.  Yeah, they were a little bit aways from the van that I could see. |
| 28 | DD | Now is there the three guys and Ronnie and Tony? |

| | | |
|---|---|---|
| 1 | MB | Yeah.  And, and remember I lose sight of them when they're, when they're kind |
| 2 | | of… |
| 3 | DD | Right. |
| 4 | MB | …off that driveway. |
| 5 | DD | So do you, were you seeing Tony at this point too? |
| 6 | MB | I'm, I'm seeing, I'm seeing people move.  They're moving back and forth like this. |
| 7 | | So I'm… |
| 8 | DD | So you don't know whose who? |
| 9 | MB | I'm losing, I'm losing sight.  I know who, I know what Ronnie looks like. |
| 10 | DD | Yeah. |
| 11 | MB | So he, he's what, um, what I'm concerned with. |
| 12 | DD | Right. |
| 13 | MB | And then I know who the suspects are at this point based on the color of their shirt. |
| 14 | DD | Right. |
| 15 | MB | So what I'm seeing is I'm losing visibility from my set up spot because of this |
| 16 | | F150.  And I have a little bit of a blind spot here.  So I'm… |
| 17 | DD | The whole time you had eyes on Ronnie? |
| 18 | MB | Except when he moved through that one specific area. |
| 19 | DD | Yeah.  Except for the F150. |
| 20 | MB | Yeah, the F150 was only a couple spots back from me.  But it was impeding my |
| 21 | | direct line of sight to right off the driver's side of that van.  So they're moving |
| 22 | | back and forth in that area quite a bit. |
| 23 | DD | Yeah. |
| 24 | MB | Not quite to the van… |
| 25 | DD | Right. |
| 26 | MB | …but off, off the van a little bit. |
| 27 | DD | OK. |
| 28 | MB | So I'm seeing guys come out and I'm seeing guys go in.  So as far as… |

| 1 | DD | …Are they actually touching the van at all? |
|---|----|--------------------------------------------|
| 2 | MB | No, they're moving back and forth.  I, I don't know.  I don't know if, I don't |
| 3 |    | remember if they're touching the van or not touching the van.  They're really |
| 4 |    | hanging out at this point in my blind spot.  They're close, they're not under the |
| 5 |    | tree anymore. |
| 6 | DD | OK. |
| 7 | MB | So I'm, I'm seeing guys move in.  I'm seeing guys move out.  Um, the next, you |
| 8 |    | know, most of these, I feel like a lot of these are just kind of insignificant events so |
| 9 |    | I'm not like tracking everybody's movement. |
| 10 | DD | Mm-hmm. |
| 11 | MB | About who moved to the van when and who moved to the van, off the van, and |
| 12 |    | who went back to the van.  We're looking at it from a perspective of not |
| 13 |    | documenting what we're doing here… |
| 14 | DD | Mm-hmm. |
| 15 | MB | We're looking for a perspective of do I see a safety issue? |
| 16 | DD | Right. |
| 17 | MB | Here.  So that's why I'm maybe my accuracy is a little bit off as far as who's |
| 18 |    | doing what, when, where.  Um, I do know that they're looking at, they're, they're |
| 19 |    | m-meandering around this van.  And then the next, next significant event is we see |
| 20 |    | a red Chevy Trailblazer show up. |
| 21 | DD | Pull in?  Which side does it pull in? |
| 22 | MB | I don't see where he came from.  All I see is when he makes, I don't know if came |
| 23 |    | up by the bank and then took a right in front of the Starbucks and then kind of |
| 24 |    | looped around.  The time that I picked him up was he was coming down behind |
| 25 |    | where the, the row the van was parked in… |
| 26 | DD | Uh-huh. |
| 27 | MB | And he ended up somewhere around here. |
| 28 | DD | Mm-hmm. |

| 1 | MB | And I saw… |
| 2 | DD | Did he parked to the…? |
| 3 | MB | He never, I never saw him park. |
| 4 | DD | OK. How did you even know he was involved though? |
| 5 | MB | I had never, we assumed because he, they, a couple guys got out and started now |
| 6 | | interacting. |
| 7 | DD | OK. So the, the truck actually dropped two guys off? |
| 8 | MB | Yeah. |
| 9 | DD | So it pulled to the south of the van. Drops two guys off and then it continue…and |
| 10 | | leaves? |
| 11 | MB | And then it takes off. |
| 12 | DD | OK. |
| 13 | MB | So this is, and then this is, this is the beginning of the incident. So… |
| 14 | DD | Do we remember what those guys looked like? |
| 15 | MB | Hispanic males, I, no, I really don't. |
| 16 | DD | OK. |
| 17 | MB | Those guy…all this stuff after they get dropped off? |
| 18 | DD | Mm-hmm. |
| 19 | MB | All this next activity… |
| 20 | DD | So now there's the…Ronnie, Tony, the three guys, and then two additional guys? |
| 21 | MB | I don't know where Tony is at this point… |
| 22 | DD | OK. |
| 23 | MB | …because I never saw, I don't know where Tony was. |
| 24 | DD | OK. But there's, but at this point there's five HM's and Ronnie? |
| 25 | MB | As far as I could remember, yes. |
| 26 | DD | OK, hold on. |
| 27 | MB | Now if one of, one of those guys was Tony in the mix, um, because of the |
| 28 | | movement, I, I, I don't know. |

24

Case 1609053 Interview of Michael Burbank

000467

| | | |
|---|---|---|
| 1 | DD | Because there was already three guys there before? |
| 2 | MB | Three… |
| 3 | DD | And you're sure two guys came out of the Trailblazer? |
| 4 | MB | Yeah. |
| 5 | DD | And you didn't see anybody leave so it should be five… |
| 6 | MB | Yeah. |
| 7 | DD | Um, five HM's.  OK.  And Ronnie. |
| 8 | MB | So now at this, so now this is the beginning, so the Trailblazer takes off. |
| 9 | DD | OK. |
| 10 | MB | He goes down towards the main drag.  And I have no idea direction of travel for |
| 11 | | him. |
| 12 | DD | OK. |
| 13 | MB | When he was leaving, a lot of the, most of the action was happening in my blind |
| 14 | | spot. |
| 15 | DD | OK. |
| 16 | MB | So Special Agent Baroni was able to pick up kind of what was going on.  Um, he |
| 17 | | was actually in the process of calling out to the, uh, to air support, yes, go follow |
| 18 | | the, yes, go follow the, uh, the red Trailblazer, see where he lands. |
| 19 | DD | OK. |
| 20 | MB | Right during that call, he said something to the effects, holy shit, Ronnie's running |
| 21 | | and Ronnie… |
| 22 | DD | OK, so, hold on real quick.  Any he was on the radio when he was tell…talking to |
| 23 | | the helicopter? |
| 24 | MB | Yeah. |
| 25 | DD | So he kind of broke his sentence as he's talking to the helicopter? |
| 26 | MB | Yeah. |
| 27 | DD | He says holy shit, Ronnie's running? |
| 28 | MB | Yeah.  As much as I can remember…inaud… |

| | | |
|---|---|---|
| 1 | DD | Could you see anything at this point? |
| 2 | MB | Once, when he said that, I saw Ronnie making it past the van towards, um, the |
| 3 | | Albertson's. |
| 4 | DD | So he was running eastbound? |
| 5 | MB | Yep. |
| 6 | DD | OK.  Did you hear...inaud...? |
| 7 | MB | ...inaud...No, I didn't, we didn't hear any shots at all. |
| 8 | DD | Oh, OK. |
| 9 | MB | Um, I...inaud...out of the driver's side because as soon as he said holy shit, |
| 10 | | Ronnie's running, he throws the truck into reverse.  He throws the truck in |
| 11 | | reverse... |
| 12 | DD | Ronnie was driving? |
| 13 | MB | No, Chris Baroni was driving. |
| 14 | DD | Right. |
| 15 | MB | Um, threw the truck into reverse.  Backs up, um, they, he's now we're facing, um, |
| 16 | | east.  And I see Ronnie running from the scene towards the Albertson's. |
| 17 | DD | OK.  You saw him initially running and then towards Albertson's.  And then you |
| 18 | | guys turn around and you can see him continue to run towards Albertson's? |
| 19 | MB | Yeah. |
| 20 | DD | OK. |
| 21 | MB | So we come screaming down in front of, uh, Albertsons.  Um, lock up the brakes. |
| 22 | | Put our vehicle, position our vehicle in between him and the scene. |
| 23 | DD | OK you basically blocked Ronnie from the van? |
| 24 | MB | Yes. |
| 25 | DD | OK. |
| 26 | MB | I, I started, uh, we overshot a little bit, backed up, then stopped again.  I exited the |
| 27 | | vehicle and started to look over the, um, hood, the hood where I saw... |
| 28 | DD | Of the truck? |

Case 1609053 Interview of Michael Burbank

000469

| 1 | MB | Of the truck. |
| 2 | DD | Uh-huh. |
| 3 | MB | …towards the scene. |
| 4 | DD | Towards the van?...inaud…looked, uh, westbound? |
| 5 | MB | Towards the van.  Yeah, west, westbound towards the scene.  I saw Mark Meredith |
| 6 | | running towards the scene. |
| 7 | DD | And Mark was running eastbound, right? |
| 8 | MB | Uh, I believe he was running southbound towards the actual scene. |
| 9 | DD | Towards the van? |
| 10 | MB | Yeah.  Because I saw his face.  Unless he, unless that was just him turning to look |
| 11 | | at me?  I don't know if he's maybe not running in that direction but looking over |
| 12 | | to see if Ronnie was OK.  And then, because I def…distinctly saw his face. |
| 13 | DD | OK. |
| 14 | MB | So I know he was facing my direction at one point. |
| 15 | DD | Right. |
| 16 | MB | Uh, we made, at that time we made a decision we were gonna get Ronnie out of |
| 17 | | there.  So we called him to us, pulled him into the vehicle, shut the door, uh, exited |
| 18 | | and headed east. |
| 19 | DD | OK.  Then what happens? |
| 20 | MB | So we went down, uh, east a couple of, uh, about a half a mile.  And then did a U- |
| 21 | | turn. |
| 22 | DD | Do you remember what street you did that on? |
| 23 | MB | No. |
| 24 | DD | OK.  And you guys were heading westbound?  Or did you guys pull over?  Or |
| 25 | | what did you do? |
| 26 | MB | No, we, we kept going.  We went down to that, uh, um, what was the name of that |
| 27 | | street again?  Um, Prosper… |
| 28 | DD | San Miguel? |

| | | |
|---|---|---|
| 1 | MB | No…Proctor? |
| 2 | DD | Proctor Valley? |
| 3 | MB | Proctor Valley. |
| 4 | DD | Uh-huh. |
| 5 | MB | You know how it goes down and it takes, it hits a dead, a dirt road, a dirt section |
| 6 | | underneath the 125? |
| 7 | DD | Which…so you guys went east on, on Proctor Valley? |
| 8 | MB | Proctor Valley. |
| 9 | DD | At some point you make a U-turn and came back westbound, right? |
| 10 | MB | Yes. |
| 11 | DD | OK. |
| 12 | MB | And then went down, we went down, I don't know if we turned right at some, |
| 13 | | right and left at some point, but we went down a row that turns into a dirt road |
| 14 | | under the 125. |
| 15 | DD | OK. |
| 16 | MB | And right before we got to that dirt section of road and I can get it for you if you |
| 17 | | need what the roads were, um… |
| 18 | DD | Could it be like Old Proctor Valley, I don't… |
| 19 | MB | Possible… |
| 20 | DD | Yeah. |
| 21 | MB | Yeah possibly.  It goes under the bridge in the, on the, um… |
| 22 | DD | Do you remember if you took a right or a left? |
| 23 | MB | I think we take a right and then a quick left.  Or maybe just a right.  At this…I |
| 24 | | have Ronnie on my lap so it was kind of hard to see at that time. |
| 25 | DD | Right. |
| 26 | MB | Um, I was at that time…and I was checking him for, he thought at that time he |
| 27 | | said I've been shot.  I've been shot. |
| 28 | DD | OK. |

| | | |
|---|---|---|
| 1 | MB | So… |
| 2 | DD | When did he say that? |
| 3 | MB | He, it was as soon as we pulled him into the vehicle.  So we were… |
| 4 | DD | When you went to the dirt road, you parked? |
| 5 | MB | Yes, we parked.  But during the time of the trip, I was checking him to see if he |
| 6 | | had any injuries… |
| 7 | DD | Got it. |
| 8 | MB | …on him.  But he said, I've been shot in the back.  I've been shot in the back.  I |
| 9 | | had to shoot the guy.  I think I've killed him. |
| 10 | DD | OK. |
| 11 | MB | So he, he definitely at that point, um, when we pulled him in, thought he had been, |
| 12 | | he had taken a, a round from a firearm. |
| 13 | DD | OK.  I've been shot in the back.  I've been shot in the back.  Uh, I shot the guy? |
| 14 | MB | Yeah. |
| 15 | DD | What, what exactly did he say?  Do you remember? |
| 16 | MB | Um, it's recorded, so. |
| 17 | DD | OK. |
| 18 | MB | …inaud… |
| 19 | DD | But it's something like I shot the guy, I might have killed him? |
| 20 | MB | Yeah, it might have killed him. |
| 21 | DD | And did you find any…inaud…or anything in him? |
| 22 | MB | No, I looked, I looked for them.  I didn't find any initial, um, survey of his back.  I |
| 23 | | didn't see anything.  Um, and he had one of those thunderwear, uh, shirts on, I was |
| 24 | | kind of looking under, uh, on top of that to see if I saw any blood coming through. |
| 25 | | I didn't see anything.  Kind of checking for holes. |
| 26 | DD | Right. |
| 27 | MB | Didn't see anything.  Um, when we finally did stop and kind of looked underneath |
| 28 | | his shirt and saw, um…inaud… |

| 1  | DD | And this was down on the dirt road where you…inaud…? |
| 2  | MB | Yeah, we ended up parking down there. |
| 3  | DD | Yeah. |
| 4  | MB | And then we basically made him strip down, take his shirt off and make sure that |
| 5  |    | we could, and see if there was any, any wounds on his… |
| 6  | DD | Did you see any marks at all? |
| 7  | MB | I saw a mark on his, uh, dead center on his back, real red.  Um, there was one spot |
| 8  |    | that was very pronounced red.  Um, and then there…inaud… |
| 9  | DD | Did he have more than one spot or? |
| 10 | MB | I just saw one. |
| 11 | DD | And where was it on his back? |
| 12 | MB | Almost dead square in the middle of your shoulder blades. |
| 13 | DD | And how big of a mark was it? |
| 14 | MB | It was real, uh, the actual, almost like a blood red spot, real very, very, very pin, |
| 15 |    | pin-size? |
| 16 | DD | OK.  The tip of a pen? |
| 17 | MB | Yeah, |
| 18 | DD | OK. |
| 19 | MB | …The tip, tip of a pen.  And then there was a little bit of, um, discoloration around |
| 20 |    | that area.  But there was no, like, cuts or hooks or, or visible bleeding. |
| 21 | DD | You said discoloration around the red spot? |
| 22 | MB | Yeah, where that red spot was. |
| 23 | DD | Like, red discoloration or? |
| 24 | MB | Yeah, just very, very light. |
| 25 | DD | And you didn't see anything else? |
| 26 | MB | No. |
| 27 | DD | OK.  So then what happens? |
| 28 | MB | Oh, then we kind of took a few breaths, um, and we kind of meandered, um, just |

| | | |
|---|---|---|
| 1 | | kind of took the long way because we decided that we were gonna take him to the |
| 2 | | hospital, um… |
| 3 | DD | Where do you guys drive to? |
| 4 | MB | We ended up making our way, uh, we were gonna go west on the 54.  But we |
| 5 | | ended up taking a wrong turn and, and hitting up to Jamacha, and then back from |
| 6 | | Jamacha… |
| 7 | DD | Did you guys jump back on East H or? |
| 8 | MB | Yeah, cause we cut through that dirt road section and…inaud… |
| 9 | DD | So you guys took a dirt road all the way down? |
| 10 | MB | Yeah |
| 11 | DD | Oh. |
| 12 | MB | We took the dirt way all the way underneath the 125.  Um, when it, where it came |
| 13 | | out, took a left, then took another right. |
| 14 | DD | Where does it come out at?  Do you know? |
| 15 | MB | I don't remember. |
| 16 | DD | OK.  So where'd you guys…what hospital did you go to? |
| 17 | MB | Um, Sharps on, um, we ended up at Sharp on… |
| 18 | DD | Chula Vista? |
| 19 | MB | Yeah, Chula Vista. |
| 20 | DD | Whose idea was that? |
| 21 | MB | Um, kind of discussing it between Special Agt. Baroni and, uh, Ronnie, we should |
| 22 | | probably take you to the hospital, and I agreed.  I thought it was a pretty good idea |
| 23 | | to just go ahead and get him checked out. |
| 24 | DD | Yeah? |
| 25 | MB | Because we kind of figured at that point he had gotten tased… |
| 26 | DD | Right.  Why, why'd you think that? |
| 27 | MB | Just because he had been hit.  He had said, I, and then he said I think the guy had a |
| 28 | | taser or… |

| | | |
|---|---|---|
| 1 | DD | When did he say that? |
| 2 | MB | After the initial shock of him getting into the vehicle.  I'm shot, I'm shot.  And |
| 3 | | then I think further down the road, I think he said I had a taser…he had a taser or I |
| 4 | | got tased. |
| 5 | DD | Something like that? |
| 6 | MB | Yeah. |
| 7 | DD | OK.  So he had a taser or I got tased? |
| 8 | MB | Yeah. |
| 9 | DD | OK. |
| 10 | MB | And I think a lot of that is probably covered under the audio that… |
| 11 | DD | When did you guys actually turn off his wire? |
| 12 | MB | Probably about five minutes after the incident.  We were already in the car. |
| 13 | DD | So did you…? |
| 14 | MB | Prior to… |
| 15 | DD | …after you parked and when you got back in and shot to the, um, hospital, is that |
| 16 | | when you did it or…? |
| 17 | MB | Um, I think, uh, just prior or when we stopped before the dirt road. |
| 18 | DD | And how did he do that? |
| 19 | MB | Uh, he hands me the device and I…inaud… |
| 20 | DD | So you had to actually pull the device?  Uh, was it taped to him?  Or how does that |
| 21 | | work? |
| 22 | MB | No, it's in the, um, in those thunderwear, it's got a zipper pocket in there so he |
| 23 | | that's where he kind of likes to where it.  So he's able to remove it by |
| 24 | | zipping…inaud… |
| 25 | DD | Then you turn it off? |
| 26 | MB | Yeah…turn it off. |
| 27 | DD | OK.  Did you stay at the hospital with Ronnie? |
| 28 | MB | Um, I stayed outside with him for a period of time and Agt. Baroni went in to get |

| 1 | | him inducted in. And, um, we were out there for about ten minutes before they |
|---|---|---|
| 2 | | came out with a wheelchair and wheeled him in and I didn't go in, and that's the |
| 3 | | last contact that I had with him. |
| 4 | DD | Did Ronnie say anything else to you in the car? |
| 5 | MB | No. I think he made, he made a phone call to someone to pick up his wife or his |
| 6 | | kids. |
| 7 | DD | Pick up his wife and kids? |
| 8 | MB | Yeah, oh, I think his wife was flying in. So I think he made a phone call to a |
| 9 | | grandmother or I don't know, expecting them to… |
| 10 | DD | To pick up wife from the airport? |
| 11 | MB | Yeah. |
| 12 | DD | But it didn't have anything to do with this it was just cause…? |
| 13 | MB | No, the only thing I think he spoke to them about is I'm OK and they and just to |
| 14 | | assure them that, you know, he said I've been, there's been an incident but I'm |
| 15 | | OK. I'm fine. |
| 16 | DD | OK. And nothing else to you? |
| 17 | MB | No. No, at that point we decided it was probably in his best interest to not say |
| 18 | | anything anymore, you know, we basically stopped talking. |
| 19 | DD | OK. Any other details that you know about, or remember or? |
| 20 | MB | No, um. |
| 21 | DD | That's about it, huh? |
| 22 | MB | Not really. I mean, I wish I actually had been able to witness a little bit better so |
| 23 | | but, you know, it's Monday morning quarter… |
| 24 | DD | Yeah…inaud… |
| 25 | MB | Monday morning quarterback…inaud… |
| 26 | DD | Yeah. |
| 27 | MB | You know? |
| 28 | DD | Yeah, that's tough I'm sure…inaud… |

| | | |
|---|---|---|
| 1 | MB | You, you know, because the focus for us wasn't necessarily watching what these |
| 2 | | guys were specifically doing.  If it was…as far as the narcotics were concerned |
| 3 | | and the exchange, our, our focus was on making sure that they're not gonna do |
| 4 | | something to him. |
| 5 | DD | Right. |
| 6 | MB | And no weap…they don't have weapons, so… |
| 7 | DD | Right. |
| 8 | MB | When I'm looking at him, I looking at their ankle or to see and when I looked |
| 9 | | them over, they didn't seem like they had anything on them. |
| 10 | DD | Right. |
| 11 | MB | That I could see, so, you know, just kind of preliminary focusing on him.  And |
| 12 | | there was a lot of back and forths all day.  And I think this thing went on for at |
| 13 | | least a couple years. |
| 14 | DD | Yeah. |
| 15 | MB | You know, but you guys should be aware, um, I think they're gonna get you guys |
| 16 | | the audio from the radios. |
| 17 | DD | Good. |
| 18 | MB | Um, so… |
| 19 | DD | OK. |
| 20 | MB | All the updates that we were getting, you'll be able to listen to. |
| 21 | DD | OK. |
| 22 | MB | All the updates. |
| 23 | DD | Cool. |
| 24 | MB | Um, and in the audio, um, so you can actually hear the gunshots on that one which |
| 25 | | is…inaud… |
| 26 | DD | Oh good.  Very nice. |
| 27 | MB | So, so, that's the advantage of the UHF stuff that we have. |
| 28 | DD | Yeah. |

34

Case 1609053 Interview of Michael Burbank

| | | |
|---|---|---|
| 1 | MB | Because the VHS stuff, the old, you can't hear gunshots…inaud… |
| 2 | DD | Yeah.  Great. |
| 3 | MB | …inaud… |
| 4 | DD | …No, that should help us then. |
| 5 | MB | So. |
| 6 | DD | Good deal.  Well, cool, let's get you home to your family. |
| 7 | MB | …inaud… |
| 8 | DD | That's all right.  Just so I can kind of…inaud…write my report.  Appreciate your |
| 9 | | time. |
| 10 | END OF RECORDING. | |

35

Case 1609053 Interview of Michael Burbank

000478





# Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13931**

**1**
Page 1 of 3

## GENERAL CASE INFORMATION

| Special Studies: | Related Cases: |
|---|---|

| Location, City, State, ZIP: 2300 Proctor Valley Road, Chula Vista, CA 91913 | | | Occurred On: 6/14/2016 2:00:00 PM (Tuesday) |
|---|---|---|---|
| Jurisdiction: Chula Vista - CV | Beat: 31 | Call Source: | (and Between): |

## INDIVIDUAL/S

| Name: Baroni, Christopher | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | | Res. Country: | County Residence: | Undocumented: |
|---|---|---|---|---|

| Race | Sex | Date of Birth / Age: * | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status: E - Employed | Occupation/Grade: Special Agent | Employer/School: HSI | Employer Address, City, State, ZIP: 2255 Niels Bohr Court San Diego, CA 92154 |
|---|---|---|---|

### CONTACT INFORMATION

| Type: MP - Mobile Phone | Number/Address: |
|---|---|
| Type: EM - Email Address | Number/Address: christopher.baroni@dhs.gov |

### IDENTIFICATION:

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

| Name: Burbank, Michael | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | | Res. Country: | County Residence: | Undocumented: |
|---|---|---|---|---|

| Race | Sex | Date of Birth / Age: * | Height: | Weight: | Hair Color: | Eye Color: | Facial Hair: | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status: E - Employed | Occupation/Grade: Technical Enforcement Officer | Employer/School: HSI | Employer Address, City, State, ZIP: 2255 Niels Bohr Court San Diego, CA 92154 |
|---|---|---|---|

### CONTACT INFORMATION

| Type: MP - Mobile Phone | Number/Address: |
|---|---|
| Type: FX - Fax | Number/Address: 619 671-4520 |
| Type: EM - Email Address | Number/Address: michael.burbank@dhs.gov |

### IDENTIFICATION:

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

## REPORT NARRATIVE

My name is Agent Deaner #988. I am a Detective with the Chula Vista Police Department (CVPD) Family Protection Unit (FPU).

On 06/14/16 at about 1436 hrs. I was briefed that an Officer Involved Shooting involving an HSI Agent had occurred in the area of 2300 Proctor Valley Road. During the initial brief I received information that the Agent had been potentially injured and was en-route to Sharp Hospital in Chula Vista. At 1445 hrs. I responded to the hospital to contact the Agent and HSI Personnel. I arrived at 1459 hrs. and contacted HSI Agent Ronaldo Gonzalez (#A6301).

There were several other employees from the HSI present to support Gonzalez in the capacity of "Peer Support" and I didn't identify each one. I introduced myself to everyone on my arrival and was temporarily briefed on Gonzalez's medical condition by one of the Peer Supporters. They told me that Gonzalez was admitted to the ER due to a potential Taser deployment by a suspect and for confirmation that he hadn't been shot with a firearm. I confirmed that he hadn't been shot with a firearm with them and they said that he had not, but at the time of admission he and other employees thought that was possible.

I introduced myself to Gonzalez and told him that I was there to collect evidence and offer him the chance to give a voluntary statement. I informed him that I would need to eventually collect all of the clothing he was wearing at the time of the call and

| Reporting Officer CV0988 - Deaner, Jason | Division / Organization COV / INV - Investigations | Reviewed By CV0840 - Molina, Anthony |
|---|---|---|
| Report Date 6/15/2016 12:34:33 PM | Detective Assigned CV0499 - Thunberg, Eric | Reviewed Date 6/27/2016 11:50:44 AM |

PL Rule 56 Exhibit F

Page 1



# Chula Vista Police Department
## Officer Report

CAD Event No.                   Case No.   **1609053**

                                            Report No.  **13931**

**2**

Page 2 of 3

his firearm. He told me that HSI Special Agent Baroni and HSI Technical Enforcement Officer Burbank were not at the hospital but had his firearm. I attempted to have the HSI Personnel that were present contact Baroni and Burbank to surrender the firearm.

While standing near Gonzalez, I heard him repeatedly ask some of the Peer Supporters, "Is he here, is he here in this building?" His voice broke when he said it each time and I thought he was asking if the suspect who attacked him was also in the same hospital. He was sitting straight up in his bed and appeared very tense. I interjected and asked him if he was asking about the person that he fought with and that we currently had in custody. He said "Yes the guy who attacked me!" his face was visibly pale and his speech was altered in a way that clearly communicated a deep fear of that person. I ensured him that the guy he fought with was not in the hospital but was transported to another hospital that wasn't in Chula Vista. The moment he heard me say that, he visibly relaxed and leaned back in his bed.

At 1534 hrs. I was told that Baroni and Burbank were in the parking lot of the hospital to surrender the firearm to me. One of the HSI Personnel walked me outside and introduced me to both of them. The handgun was wrapped in a plastic bag that appeared to be some type of HSI Evidence bag and duct tape. Baroni unwrapped the gun to recorded the serial number and identifying information on the firearm for HSI receipt purposes. He then re-wrapped the gun and handed the gun to me. I left the gun in the packaging he provided to me. He also gave me a white t-shirt that he said that he had recovered from Gonzalez immediately after the shooting.

The t-shirt was in a similar packaging to the gun but wasn't duct taped. Baroni told me that the gun was loaded with a bullet in the chamber. Since I could see that the gun was in a holster inside the packaging I left the gun loaded since it appeared safe.

I returned into the hospital and met with Gonzalez. He and the other personnel were finishing gathering his clothing into Sharp Hospital bags. The bag included his pants, shirt, shoes, and sunglasses. I walked the clothing, gun, and white t-shirt out to my vehicle and secured them in the trunk of my car. Once I returned inside, Gonzalez told me that he had left his wallet and keys in his pants and requested to have them back. I didn't feel that they were evidentiary so I returned to my car and retrieved the bags. Without leaving him, I gave him the bag so he could locate the items in the pockets of his pants. He gave me back the bag and I re-secured the bag in my trunk. Sharp staff gave Gonzalez a set of scrubs to wear.

At 1542 hrs. I talked quickly with Gonzalez and obtained general information from him pertaining to his employment and identity. He told me his badge number was A6301 and he gave me his cell and work numbers. I didn't ask him for his personal information due to this being a work-related circumstance.

At 1612 hrs. I obtained consent to draw blood for drug/alcohol testing and DNA swabs from Gonzalez. I recorded his consent and later burned this consent onto a DVD. At 1632 hrs. I met with Forensic Specialist T. Venn (CVPD) who was there to photograph Gonzalez, take residue samples from his hands, and obtain mouth swabs for DNA. I briefed Venn on the information I had obtained.

I returned to Gonzalez and told him that we would be taking photos. I told him that I had learned that he had been Tasered at some point. He told me that he had and I asked him where. He told me that the area was in the small of his back just below his neck in his spinal area. I asked him to lift his scrub-shirt so I could examine the area, since he was lying in the hospital bed, it was tough for him to do so, and I assisted him.

I didn't see any injury on his back/neck area and had him specify the area he thought he was Tasered. He indicated with his hand in the area directly behind his neck over his spine. Again I couldn't see any injury indicative of a Taser deployment. I am a certified Taser International Instructor and have experience and training in the deployment of this device. I asked him if the Taser used was one like Law Enforcement would use or if it was a "stun type" device commonly used by citizens. He specified that it was the same type that Law Enforcement uses.

Venn took photos of Gonzalez including the area he reported being Tasered, mouth swabs, and gunshot residue samples of his hands.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0988 - Deaner, Jason | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 12:34:33 PM | CV0499 - Thunberg, Eric | 6/27/2016 11:50:44 AM |



# Chula Vista Police Department
# Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13931**

**3**

Page 3 of 3

At 1651 hrs, Certified Phlebotomy Tech (Sharp Hospital) Yuan G. Orezza arrived to conduct the blood draw. At 1653 hrs, he drew three vials of blood from Gonzalez's arm. I witnessed the draw in its entirety and Orezza handed me both vials wrapped in a bag following the draw.

At 1704 hrs, I transferred custody of the clothing to Venn for evidence processing and collection. With gloved hands, I unwrapped the gun which was in a black canvas ankle holster. The strap that was supposed to secure the weapon in the holster was removed from the holster. I removed the magazine from the handle of the gun. I could see that the magazine was loaded with an unknown number of bullets; the first in the stack had a silver casing and was the only one visible to me without unloading the magazine. I pulled back the slide on the weapon and a bullet ejected from the chamber. The bullet had a gold casing. I transferred the gun, bullet, magazine, holster, strap, and all packaging to Venn.

Since she was en-route to the original scene I retained custody of the vials of blood so they wouldn't be retained in a hot vehicle. At 1710 hrs, I responded back to CVPD. Once at CVPD I placed the vials of blood in a secure/locked refrigerator in CVPD Property for Venn to recover at a later date. She collected the blood directly from me after I removed it from the refrigerator on 06/21/16 at 1015 hrs..

At 1730 hrs, I received a call from Baroni who told me that he had a body wire that Gonzalez was wearing at the time of the shooting. I told him that it could have very critical evidence and that we needed custody of the device. At 1943 hrs, I met with Baroni and Burbank. Burbank specializes in technology for HSI and told me that the device was operating and recording audibly at the time of the shooting. He told me the device can be downloaded via USB drive. I immediately surrendered the device for evidence logging to Karina Regan, an Intern with the CVPD Crime Lab.

At about 2020 hrs, I interviewed Baroni at CVPD regarding his involvement in the incident. I recorded the interview on CCTV and a personal audio device for transcription purposes. I later burned both recordings onto a DVD for evidence purposes. On 06/15/16 I sent the audio file to the FPU Secretary for transcription. On that same date I reviewed the transcription and it is an accurate reflection of my interview with Baroni. Please see the transcription (attached to this report) for further details.

At 2107 hrs, I was told that we received information that one of the outstanding suspects was going to be surrendering himself to Immigration Officials after fleeing earlier in the day to Mexico. I was told that the suspect's information was Miguel Antonio Parra and that his date of birth was 09/06/93. I was shown a photo of him. I responded to the Port of Entry and met with officials. They walked me into a processing area and I immediately recognized Parra from the photo I was shown. Once his border crossing was formalized they surrendered him to me at 2200 hrs. I handcuffed him without incident. Since he was a large person, I used two sets of handcuffs for comfort. I double locked both sets after checking them for proper fit. I walked him to my marked patrol unit located outside of the building and secured him in the back seat. I transported him to CVPD and arrived at 2225 hrs. He was later booked into CVPD.

I later gave the DVD containing all recordings to CVPD Agent Monreal #905 for submission into CVPD Property and Evidence.

All times in this report are estimations. This concludes my involvement in this case.

END OF REPORT

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0988 - Deaner, Jason | COV / INV - Investigations | CV0840 - Molina, Anthony |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 12:34:33 PM | CV0499 - Thunberg, Eric | 6/27/2016 11:50:44 AM |

NetRMS_CASDCR.rtf v11-15-06

PL Rule 56 Exhibit F

Page 3









PL Rule 56 Exhibit I
Page 1





# Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13935**

**1**
Page 1 of 2

| GENERAL CASE INFORMATION | | | |
|---|---|---|---|
| Special Studies: | | | Related Cases: |
| Location, City, State, ZIP: **2314 Proctor Valley Road,Chula Vista, CA 91914** | | | Occurred On: **6/14/2016 1:58:00 PM (Tuesday)** |
| Jurisdiction: **Chula Vista - CV** | Beat: **32** | Call Source: | (and Between): |

**INDIVIDUAL/S**

**REPORT NARRATIVE**

On 06/14/2016 at approximately 3:15 PM I responded to the 2300 block of Proctor Valley Road in the city of Chula Vista. I responded to the shopping center with several other detectives from the Chula Vista Police Department in reference to an earlier shooting.

Once I arrived I was tasked along with Detective X. Rosario with taking statements of witnesses who were in the First Bank branch located at 2314 Proctor Valley Road Suite #101.

Detective Rosario and I took two witness statements at the bank. We took Geraldine Evans and Marlene Anzar's statements. For further details of those statements please refer to Detective Rosario's supplemental report.

I later took the names of the other occupants in the bank who did not witness the shooting incident. Khalil Elkhouri (DOB [redacted]/1979) arrived at the bank after the incident occurred. He is a customer of the bank and saw no part of the incident. Jaime Pena (DOB [redacted]/1942) is a bank employee. Pena was in the bank at the time of the shooting but did not see any part of the incident.

America Martinez (DOB [redacted]/1980) is also an employee of the bank. She too did not see anything but heard the gun shots. She immediately brought customers inside the bank and locked everyone inside. Soraya Martinez (DOB [redacted]/1972) is an employee of the bank. She too did not see any part of the incident. Luz Gomez-Ibarra (DOB [redacted]/1970) is an employee of the bank but did not witness any part of the incident.

Detective Rosario took Evan's daughters information and also bank employee Jesus Gonzalez' information., please refer to her supplemental report for further information.

We told the bank occupants their cars were part of the crime scene and could not be moved. We allowed them to retrieve personal items from their vehicles and then secure them. At 1705 hours Detective Rosario and I escorted all of the occupants of the bank down the driveway leading to Proctor Valley and out of the crime scene. We escorted them to the south sidewalk of Proctor Valley where they could be picked up.

After they were all out of the crime scene Detective Rosario and I walked back up to the command post. We were then tasked to take two witnesses back to the Chula Vista Police Department for more detailed interviews. We met Rachel and Molly Murphy. Rachel is Molly's mother. We introduced ourselves to them and then escorted them to my unmarked police car. The Murphy's and I exited the crime scene at 1721 hours. Detective Rosario exited the crime scene at 1723 hours. We drove them back to the Chula Vista Police Department and arrived at approximately 1745 hours.

Once at the police department we escorted Rachel Murphy to a video recorded interview room. At 1753 hours Detective Rosario and I began interviewing her. During the course of the interview she explained how just a few moments before the shooting she and her daughter drove into the shopping center, parked their car and had walked into the nail salon. R. Murphy said they were standing at the salon counter trying to get an appointment to have their nails done when she heard, "Pop, Pop!" She determined she had just heard gunshots so she stepped back and leaned out the front door of the business and looked in the direction of the old Albertson's grocery store building to see what had happened.

R. Murphy further described she saw a man standing with his legs slightly spread, his arms extended down holding a handgun. She said the male was still shooting. She demonstrated what she saw and while seated, she extended her arms out in front of her and pointed in a downward direction, clasped her hands together (as if making a gun with her hands) and

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| **CV0664 - Marshall, David** | **COV / INV - Investigations** | **CV0820 - Petray, James** |
| Report Date | Detective Assigned | Reviewed Date |
| **6/15/2016 2:53:00 PM** | **CV0499 - Thunberg, Eric** | **6/16/2016 1:58:07 PM** |

## Chula Vista Police Department
## Officer Report

CAD Event No.

Case No. **1609053**

Report No. **13935**

**2**

Page 2 of 2

simulated shooting towards someone laying on the ground. R. Murphy estimated she saw him fire approximately three bullets. She said once the reality set in that she was watching a shooting she turned back into the business and herded the rest of the occupants of the nail salon to the back of the store. She said the male working the counter stayed behind and kept watching what transpired. She said she continued to yell at him to lock the door. R. Murphy did not see anything else associated with the incident. After further questioning she stated she believes there were about 5 to 6 shots fired in total. She described the male who shot as possibly wearing a hat, because she could not remember a hair color. She stated he was a younger male who was thin. She believed he may have been Hispanic but was unsure. She also stated he was wearing a long black sleeve shirt and black pants.

R. Murphy said she never saw the individual who got shot. She said they were laying on the ground and her view was blocked by bushes.

During the interview Detective Rosario drew a schematic drawing of the area where the shooting occurred. Det. Rosario showed that drawing to her and R. Murphy pointed to the drawing and explained where the shooting occurred and the direction which she believed the shooter ran off. The interview with R. Murphy concluded at 1821 hours.

The interview with Molly Murphy began at 1828 hours. She stated that she and her mom had just parked outside the nail salon and had walked in to try to get an appointment. She said her mother was speaking with a male employee who was behind the counter when she heard gunshots. M. Murphy said once she heard the gunshots she turned and looked out the front windows of the business and saw an individual getting shot. She saw him start to fall towards the ground when she turned and ran towards the back of the salon. She stated as she ran she did not hear any further shots being fired. Once she was in the back of the salon she did not witness any other events associated with the shooting.

She said the male who got shot was wearing a black shirt. She had no other details pertaining to his description. She stated she never saw his face. She could not tell me what type of shirt it was; only that it was a black shirt.

I questioned her if the male was shot in the front of his torso or the back. She stated she saw him take bullet to his front torso and then he began to turn as she continued to hear shots being fired. She said the male started to fall forward. That was the last thing she saw before she started to run. I asked M. Murphy if she could describe the individual who was shooting the gun. She replied that she never saw him. M. Murphy could not add any further details of the incident. I asked her if she saw any other individuals or vehicles in the area and she replied she did not. I asked her if she heard anyone yelling prior to the shooting and she said she did not. We concluded the interview at 1845 hours.

I later downloaded and burned the interviews to a DVD. I gave that DVD to Agent J. Monreal as evidence. I also gave him the schematic drawing that Detective Rosario drew and referenced during the interview with R. Murphy.

On 06/15/2016 at approximately 1020 hours I went back to First Bank located at 2314 Proctor Valley Road. I met with branch manager Lourdes Valdez. I inquired about obtaining surveillance video of the shooting. Valdez was unsure how to access the surveillance footage from yesterday so she telephoned a security officer of the bank. That security officer stated a subpoena would need to be filed if they were to provide the footage. Valdez and America Martinez were able to access yesterday's footage at the time of the incident. I saw their coverage of the incident. Their video system did not cover any part of the shooting. The quality of their video is also very poor. They have two video angles covering the exterior of the business. One camera is located in the drive-thru ATM. That angle covers directly across the driveway that exits out onto Proctor Valley Road. The only portion of the footage that is in focus covers the driver's face when they are making transactions at the ATM. The second camera covers the approach to the drive-thru ATM. It is pointed in a downward direction and did not capture anything outside of the immediate area of the drive-thru ATM.

End of Report

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| CV0664 - Marshall, David | COV / INV - Investigations | CV0820 - Petray, James |
| Report Date | Detective Assigned | Reviewed Date |
| 6/15/2016 2:53:00 PM | CV0499 - Thunberg, Eric | 6/16/2016 1:58:07 PM |

NetRMS_CASDCR.rtf v11-15-06

Printed: June 27, 2016 - 1:14 PM



1               **TRANSCRIPT**

2

3  CASE NUMBER:   1609053

4

5

6

7

8

9               INTERVIEW OF:

10              CHRISTOPHER BARONI

11

12

13              INTERVIEWED BY:

14           DETECTIVE J. DEANER (ID 988)

15           CHULA POLICE DEPARTMENT

16

17

18

19

20

21

22

23

24

25

26  Transcribed By:  Kathy Koeppel

27

28

| 1 | LEGEND | |
|---|---|---|
| 2 | JD: | Detective J. Deaner (ID 988) |
| 3 | EF: | Christopher Baroni |
| 4 | (inaud) | Unintelligible |

| 5 | | |
|---|---|---|
| 6 | JD | …inaud… |
| 7 | EF | Yeah, of course…inaud… |
| 8 | JD | Yeah, so there's an audio recording, um, those are diff…more difficult for our, uh, |
| 9 | | dictation people to pull up and for them to be able to stop and use the tools that |
| 10 | | they use for it. |
| 11 | CB | No worries. |
| 12 | JD | So that's what that's for. |
| 13 | CB | Digital, yeah. |
| 14 | JD | Um, today is the 14th.  OK.  Um, do you have, everything's on here that I need |
| 15 | | except an address.  Do you have a work address…? |
| 16 | CB | Yeah, uh… |
| 17 | JD | …that you guys use for mail or anything like that? |
| 18 | CB | You know what?  I just went down to that office last week.  It's the Neils Bohr |
| 19 | | Court, probably what everybody else has been giving you. |
| 20 | JD | OK.  Yeah, yeah, let me look it up. |
| 21 | CB | The suite's…?  Yeah, if you could look that up.  Because I just came there from |
| 22 | | another group. |
| 23 | JD | OK.  I know you guys don't use it enough to…inaud… |
| 24 | CB | Yeah, I'm, I'm, this is the first time in my career I've been in that office. |
| 25 | JD | 2297 sound right? |
| 26 | CB | Neilsbor? |
| 27 | JD | Yeah. |
| 28 | CB | Yeah.  And then like there's a suite? |

| 1 | JD | I don't have that. |
|---|----|--------------------|
| 2 | CB | 111 or it's, it's a whole building, though, it does, I don't know why it would have |
| 3 |    | a suite. |
| 4 | JD | OK. All right. Um, let's start this today, and remember you saw me at the |
| 5 |    | hospital. I know very little about the scene itself because I was at the hospital. |
| 6 | CB | Yeah. |
| 7 | JD | So if I ask you questions that it seems like I should know the answer to frankly I |
| 8 |    | might not know the answer to them. Um, so I'm not setting you up or anything |
| 9 |    | like that, I just haven't seen it. |
| 10 | CB | I gotcha. |
| 11 | JD | I know it's the Albertson's parking lot. There's a bank close to there? |
| 12 | CB | Mm-hmm. |
| 13 | JD | Um, but that's about all I know. So...when was the, when was the first time you |
| 14 |    | knew something was wrong today, or had gone south today? |
| 15 | CB | I mean you always get that "spidey" sense kind of well as, as things are playing |
| 16 |    | out. Um, but it was the visual of uh, the, the undercover running, like, one second |
| 17 |    | he's hanging out with these guys, then all of a sudden... |
| 18 | JD | Yeah. |
| 19 | CB | ...He's running looking back, running, and I, at one point I think I see his gun |
| 20 |    | drawn but he's, he's, he's running from the scene. That's what I see. |
| 21 | JD | OK. |
| 22 | CB | And then I put that over the radio. I don't know what's going on but it's like UC's |
| 23 |    | running and that's when... |
| 24 | JD | You threw your car into drive obviously, that's why you're doing that? |
| 25 | CB | Yeah. So I was on the far south end of the parking lot so we had... |
| 26 | JD | OK. |
| 27 | CB | ...two UC cover groups, teams. |
| 28 | JD | OK. |

Case 1609053 Interview of Christopher Baroni

PL Rule 56 Exhibit M
Page 3

000419

| 1 | CB | I was with my partner, Mike Burbank, and I was the driver in the black Chevy |
| 2 | | Silverado. |
| 3 | JD | OK. That was the truck I met you guys in. |
| 4 | CB | Yeah. |
| 5 | JD | OK. |
| 6 | CB | So Chevy Silverado hanging out far southern end of the parking, uh, looking out |
| 7 | | the back window, the back tinted window, watching, calling things out on the |
| 8 | | radio as they develop the entire time. |
| 9 | JD | OK. |
| 10 | CB | Everything seemed pretty cool. Um, and then like I said UC's running. And I |
| 11 | | didn't even hear the audible shots to tell you the truth which is weird but, you |
| 12 | | know, the radio was going to and, uh, but... |
| 13 | JD | It's auditory exclusion. It happens. |
| 14 | CB | Yeah. Slammed the thing in drive and just as fast as that truck can go I got over to |
| 15 | | the, uh...um, I basically skirted in front of like what, you know, what used to be |
| 16 | | the closed down Albertsons... |
| 17 | JD | Mm-hmm. |
| 18 | CB | So it was a clear open path. I just fricking got there within, you know, five, six, |
| 19 | | seven seconds. And I was coming in so hot. I just like skidded with the truck. I |
| 20 | | put my truck in between like where he previously was with all the, uh, you know, |
| 21 | | all the, all the defendants. And then, um, and then whenever, and then I put, um, |
| 22 | | let me just take this thing off...inaud...is killing me. |
| 23 | JD | OK. So you placed the truck between the scene...? |
| 24 | CB | Yeah, be...yeah, as, as he ran away...so, so the UC was running for cover... |
| 25 | JD | Mm-hmm. |
| 26 | CB | And he was getting to the edge of the Albertson's and so we crossed all the way to |
| 27 | | the far eastern edge of the parking lot. At this point he's, we see him kind of |
| 28 | | running while I'm driving, and he kind of turns around and kind of regains like, |

| | | |
|---|---|---|
| 1 | | you know, he's running.  He turns around, and he's assessing the scene, and he's |
| 2 | | trying to, he's in, he's in some concealment.  Not cover but he has like some like |
| 3 | | foliage and stuff… |
| 4 | JD | Mm-hmm. |
| 5 | CB | He's looking around and we pull up, and he looks at us, you know.  And we're |
| 6 | | like, get in!  And we're like get in!  You know and he get…and like I, I overshot |
| 7 | | him a little bit.  I…he's kind of still getting a cover so I put the truck in reverse |
| 8 | | and I back up and again I'm just trying to like block him from, from all the, uh, |
| 9 | | hostile threats that just occurred, you know? |
| 10 | JD | Mm-hmm. |
| 11 | CB | And he basically, my partner, Mike Burbank, because I got just…inaud… |
| 12 | JD | Did you know at this time there were shots fired? |
| 13 | CB | Um… |
| 14 | JD | You said you didn't hear them? |
| 15 | CB | So I yelled that, I yelled, UC's running!  UC's running!  Something's wrong!  Or |
| 16 | | whatever… |
| 17 | JD | OK. |
| 18 | CB | Boom!  They're, while we were going I think it was put out.  Somebody put out |
| 19 | | shots fired.  I'm quite certain. |
| 20 | JD | Oh, so you heard it on the air?  So somebody heard it and maybe put it on the air? |
| 21 | CB | I'm trying to remember…Mike might've told me…I remember going in there with |
| 22 | | the mind frame of… |
| 23 | JD | OK.  All right. |
| 24 | CB | …like get ready to battle, you know?  And I even told Mike as we were going I |
| 25 | | told Burbank I'm like get ready to shoot.  So we're coming in and Mike's, you |
| 26 | | know, getting ready to shoot, like, we come in, Mike gets out.  And I realize we're |
| 27 | | kind of out in the middle of the parking lot. |
| 28 | JD | Mm-hmm. |

5

Case 1609053 Interview of Christopher Baroni

| | | |
|---|---|---|
| 1 | CB | Blocking, we don't have any cover. I'm like, stay with the truck in case there's |
| 2 | | shots coming at us... |
| 3 | JD | It gives you something. Sure. |
| 4 | CB | Yeah, to hide behind. I was like, you know, better yet get the UC in here. So the |
| 5 | | UC comes running over. He jumps, Mike grabs him. Now the three of us are |
| 6 | | basically laying across the bench of the seat. I already had it in drive and I just, I |
| 7 | | got out of there, so it was, uh... |
| 8 | JD | OK. So Mike pulled him in? |
| 9 | CB | Yeah, Mike pulled him in. Mike was like half out of the truck and then kind of got |
| 10 | | back in. He jumped on his lap literally. And then the three of us, uh, departed |
| 11 | | from the set. |
| 12 | JD | OK. |
| 13 | CB | And got out of there. |
| 14 | JD | Where did you go to get out of there? |
| 15 | CB | Uh, I went, uh, went down East H Street west. And then what's that first |
| 16 | | intersection? I would've turned right. I can look at the phone and tell you. |
| 17 | JD | Yeah. Do you have it? |
| 18 | CB | Yeah. |
| 19 | JD | Do you have AT&T or you have Verizon? |
| 20 | CB | I got, I got one bar, I'll just... |
| 21 | JD | OK. |
| 22 | CB | ...just use the map. Let's see I was like westbound on...let me |
| 23 | | see...hmm...where are we here? Uh, 125... |
| 24 | JD | You can put in twenty-three hundred Proctor Valley if you need to look it up. |
| 25 | CB | OK. |
| 26 | JD | That might be easier to...inaud... |
| 27 | CB | We ended up, yeah, we ended up on Proctor Valley Road...the, I'm, I'm familiar |
| 28 | | with that from, uh, like, motorcycle stuff from back in the day. |

| | | |
|---|---|---|
| 1 | JD | OK. |
| 2 | CB | And we just basically found a dirt turnout where we could see far down each end |
| 3 | | of the road. I got out, you know... |
| 4 | JD | OK. |
| 5 | CB | ...and then we, uh, had him strip down real quick to, we, we were patting him |
| 6 | | down for blood and stuff as we were, like, hauling ass out of there, feeling him. |
| 7 | JD | You said earlier, he said that, he said I got shot, right? |
| 8 | CB | Yeah, he's like I got shot. I think I got shot! I got shot! And he's just freaking |
| 9 | | out. Let's see Proctor Valley... |
| 10 | JD | So that's why you wound up with the shirt that you gave me... |
| 11 | CB | And he's freaking out... |
| 12 | JD | ....the white shirt that you gave me and that's how that wind up, wound up being |
| 13 | | there? |
| 14 | CB | Yeah so, now this is bothering me. Let, let me find this. That's kind of slow... |
| 15 | JD | OK. |
| 16 | CB | This is the right fricking place, come on. So I think...is it Miguel or San Miguel |
| 17 | | or something is the cross...? |
| 18 | JD | Mount Miguel? |
| 19 | CB | Mount Miguel? |
| 20 | JD | Yeah. |
| 21 | CB | So we would've been westbound Proctor Valley, like, northbound Mount |
| 22 | | Miguel... |
| 23 | JD | OK. |
| 24 | CB | Turned off... |
| 25 | JD | I know exactly where you are. |
| 26 | CB | Proctor Valley onto the dirt road. |
| 27 | JD | OK. |
| 28 | CB | Went about a mile or two down the road to where there's a long straightaway, |

| | | |
|---|---|---|
| 1 | | kind of shook up and, you know, we don't want to bring him through here, he's… |
| 2 | JD | Right. |
| 3 | CB | …undercover, too. |
| 4 | JD | OK.  All right.  Did they walk him back in after they…so they look at him, make |
| 5 | | sure he's OK, then they walk him back inside the hospital? |
| 6 | CB | They briefly looked at him and they, yeah, they put him in a, a wheelchair and |
| 7 | | they pushed him back in. |
| 8 | JD | OK.  All right.  Um, so when you were there that day earlier when it first |
| 9 | | happened, what time do you think that was about ballpark of when it happened? |
| 10 | CB | Um… |
| 11 | JD | Based on how long you guys were there, when you thought the operation was |
| 12 | | going to go? |
| 13 | CB | I think it was, uh, between, man because things were kind of getting delayed with |
| 14 | | the, with the subjects who were supposed to, uh, exchange, um… |
| 15 | JD | …inaud… |
| 16 | CB | It was probably just before two… |
| 17 | JD | OK…so around fourteen hundred…? |
| 18 | CB | I have some like I have like very, very, very brief notes up until that point.  Just |
| 19 | | like I was writing down the potential suspect vehicle cars.  And I remember I took |
| 20 | | a photo of my notes if you want me to…? |
| 21 | JD | Yeah, if you don't mind.  Let's look at them. |
| 22 | CB | …kind of a timeline.  It's not much because again my role was UC cover.  I'm not |
| 23 | | even supposed to look down so… |
| 24 | JD | Right. |
| 25 | CB | Just keep eyes on him. |
| 26 | JD | And ballpark of two o'clock though? |
| 27 | CB | Yeah, let me give you a better, uh… |
| 28 | JD | It doesn't need to be exact… |

10

Case 1609053 Interview of Christopher Baroni

| | | |
|---|---|---|
| 1 | CB | Yeah. |
| 2 | JD | …ballpark of two o'clock.  Um, did you see the shooter? |
| 3 | CB | No.  I did not. |
| 4 | JD | So you don't have any like real descriptive stuff for the shooter that would make |
| 5 | | him stand out from a crowd of other people or anything like that? |
| 6 | CB | Not at all.  I mean guys kept coming and going.  And, you know, I was calling like |
| 7 | | red shirt, multi-colored shirt.  You know, it was kind of a, it was a far look, uh… |
| 8 | JD | Yeah? |
| 9 | CB | Mike Burbank, my partner, was on, had, was, was on the binos… |
| 10 | JD | …inaud…question…inaud…glass. |
| 11 | CB | He had binos and I was looking through tinted glass.  And I could just, you know, |
| 12 | | I, sometimes I couldn't see them but I could just barely see the UC… |
| 13 | JD | OK. |
| 14 | CB | Which made me a little nervous, I should've been a little closer.  But there wasn't |
| 15 | | a whole lot of cars in that parking lot. |
| 16 | JD | It's an empty parking lot. |
| 17 | CB | It is an empty parking lot. |
| 18 | JD | Especially that close. |
| 19 | CB | It sucks. |
| 20 | JD | Yeah. |
| 21 | CB | I mean I wish I could've been closer.  But with a naked eye I could still see him… |
| 22 | JD | Mm-hmm. |
| 23 | CB | What's going on.  I was calling out movements on the radio…inaud… |
| 24 | JD | OK. |
| 25 | CB | So… |
| 26 | JD | Did you see any specific movements before he started running that keyed you up? |
| 27 | | I mean, outside of instinct, I get that, but did you see any specific movements or |
| 28 | | on their part?  Did you see any physical disturbance or…inaud…? |

11

Case 1609053 Interview of Christopher Baroni

| | | |
|---|---|---|
| 1 | CB | No, no I didn't see the actual disturbance take place. |
| 2 | JD | OK. |
| 3 | CB | I was probably…it happened so fast (snaps fingers) I was probably literally like |
| 4 | | looked away for a second.  I don't know what I was doing.  I mean, I remember |
| 5 | | my neck and my back were killing me because I was turned sideways in my |
| 6 | | driver's seat and looking out that side window. |
| 7 | JD | And you're looking out your back window.  So you're truck is… |
| 8 | CB | Yeah, well the truck's kind of… |
| 9 | JD | …facing like the Starbucks area? |
| 10 | CB | Now the truck is facing southbound. |
| 11 | JD | OK. |
| 12 | CB | So my truck is, like, facing…this is the front, facing southbound… |
| 13 | JD | Here's the Albertson's and the parking lot… |
| 14 | CB | I'm sorry, it's, it's like this… |
| 15 | JD | There's a, there's a loading dock over here.  There's a park like here.  And there's |
| 16 | | a bunch of businesses along here.  Big lot, right? |
| 17 | CB | Mm-hmm. |
| 18 | JD | A little road comes up through here.  And you can drive down along here for it. |
| 19 | | Um, this is East H or Proctor Valley out here.  Mount Miguel is right here. |
| 20 | CB | Yeah.  And this is the old Albertson's right? |
| 21 | JD | Yeah, this is the old Albertson's right here. |
| 22 | CB | So where everybody drives in, right, there's kind of like a where you drive in |
| 23 | | right? |
| 24 | JD | Mm-hmm. |
| 25 | CB | There's a, like, um, I guess herringbone-like parking spots right? |
| 26 | JD | Yeah. |
| 27 | CB | Pull in… |
| 28 | JD | Yeah. |

12

Case 1609053 Interview of Christopher Baroni

000428

| | | |
|---|---|---|
| 1 | CB | So we, we blended in with some like Cox Communications truck and that… |
| 2 | JD | OK. |
| 3 | CB | And we, we were parked like right here… |
| 4 | JD | So you guys were parked… |
| 5 | CB | Like, we're, we were like, I guess, if this is the park right here and this is the one |
| 6 | | that comes, we were parked it might have been the other way we were parked |
| 7 | | where I was like, the truck was kind of like this and I could see, I could put my |
| 8 | | head against the glass but I have like the back tinted windows so I was looking |
| 9 | | through that back half window like straight through where he was like in the |
| 10 | | middle of the parking lot right there. |
| 11 | JD | Oh, so he was in the middle…I, I pictured him over closer to the Albertson's… |
| 12 | CB | No, he was, they were more right there… |
| 13 | JD | So he's in the middle of the lot…? |
| 14 | CB | Yeah. |
| 15 | JD | And you guys are parked here.  So you're really cranked around toward the…? |
| 16 | CB | Yeah. |
| 17 | JD | …like the B pillar of the car looking back here? |
| 18 | CB | And like, and…exactly…and like to scale… |
| 19 | JD | But… |
| 20 | CB | I mean this is like, if this is kind of like the front of those and it kind of comes out |
| 21 | | or something like that for a little bit… |
| 22 | JD | Mm-hmm. |
| 23 | CB | But there's the businesses… |
| 24 | JD | Yeah, it does. |
| 25 | CB | And like, if say this is like Starbucks.  And, you know, Starbucks has the patio and |
| 26 | | there's some chairs out here… |
| 27 | JD | Mm-hmm. |
| 28 | CB | And this is all cement.  This is the curb and cement.  They probably would've |

| | | |
|---|---|---|
| 1 | JD | Those guys are the secretaries. |
| 2 | CB | E-exactly. |
| 3 | JD | OK. All right. All right. OK. |
| 4 | CB | Yeah. I think like my notes are like before, before the, the defendants even arrive |
| 5 | | on the scene. Because right at that point they're putting out on the radio potential |
| 6 | | suspect vehicles. I don't know how they got that information but I'm writing, |
| 7 | | jotting stuff down. Then after the, uh, the, the suspects arrive on the set, at that |
| 8 | | point it's just cranking my neck and back and just looking the entire time. I'm in |
| 9 | | full body armor, freaking just very uncomfortable but just… |
| 10 | JD | And you're there more for UC safety than anything else? |
| 11 | CB | It's, just, that's all it is… |
| 12 | JD | …inaud… |
| 13 | CB | I'm, I'm, I'm the UC extraction team… |
| 14 | JD | OK. |
| 15 | CB | And that's exactly what we did so… |
| 16 | JD | OK. All right. That clarifies a lot of it. And again realizing that you have some |
| 17 | | protection around the operation itself, because of, uh, I'm not sure what verbiage |
| 18 | | you guys even use but for clearances and stuff like that, um, there was a, there was |
| 19 | | a vehicle that was somewhat relevant important in terms of the transaction, right? |
| 20 | CB | The, the, the white van? |
| 21 | JD | Yeah. |
| 22 | CB | So yeah the white van was sitting pretty much in, kind of in the middle of the |
| 23 | | parking lot with, uh, loaded with, uh, marijuana. |
| 24 | JD | OK. |
| 25 | CB | Yeah. |
| 26 | JD | OK. So you had the white van and that was probably the vehicle I would assume |
| 27 | | that you pointed out in that drawing and said that they were to the, the east of, |
| 28 | | right? |

| 1 | CB | Because he was panicking obviously really bad. |
| 2 | JD | Yeah, sure, sure. |
| 3 | CB | Yeah. |
| 4 | JD | OK. Um, I think I got it partner. Can you think of anything else? Is that your |
| 5 | | water or was that in here? |
| 6 | CB | It's mine. |
| 7 | JD | OK. All right. Sometimes that happens and I'm like, oh… |
| 8 | CB | No, I'm not trying to get tuberculosis, man. I've been through those, uh, those |
| 9 | | bouts. |
| 10 | JD | We interview all kinds of people in here, so. |
| 11 | CB | Yeah. |
| 12 | JD | So I just want to be careful with that. Um, yeah, I think we're good brother. |
| 13 | CB | OK, yeah if you need… |
| 14 | JD | If you have anything else give me a call. |
| 15 | CB | Yeah…inaud… |
| 16 | JD | ….otherwise I think we're good on this… |
| 17 | CB | Yeah, and likewise if you need anything just, uh, hit us up. |
| 18 | JD | Thanks. |
| 19 | CB | I'll come down or whatever you want to do. |
| 20 | END OF RECORDING. | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

27

Case 1609053 Interview of Christopher Baroni

000443